```
                                                                    1

 1   UNITED STATES SECURITIES AND EXCHANGE COMMISSION

 2

 3   In the Matter of:            )

 4                                ) File No. FW-04461-A

 5   TORCHLIGHT ENERGY            )

 6   RESOURCES, INC.,             )

 7   n/k/a META MATERIALS, INC.   )

 8

 9   WITNESS:   Roger Wurtele

10   PAGES:     1 through 164

11   PLACE:     Securities and Exchange Commission

12              Burnett Plaza, 801 Cherry Street, Suite 1900

13              Fort Worth, Texas 76102

14   DATE:      Thursday, September 1, 2022

15

16        The above-entitled matter came on for hearing,

17   pursuant to notice, at 10:30 a.m.

18

19

20

21

22

23

24           Diversified Reporting Services, Inc.

25                      (202) 467-9200
```

[9/1/2022 10:30 AM] Wurtele, Roger - Vol. I.20220901.404780-...

MARTINEZ DEC EXHIBIT 5

5

## PROCEEDINGS

MR. ROGERS:  Okay.  So we are on the record at 10:30 a.m. on September 1st of 2022.  Mr. Wurtele, would you please state and spell your full name for the record?

MR. WURTELE:  My name is Roger, R-O-G-E-R, Wurtele, spelled W-U-R-T-E-L-E.

MR. ROGERS:  And Mr. Wurtele, is your middle name Neal?

MR. WURTELE:  It is, N-E-A-L.

MR. ROGERS:  Thank you.  Mr. Wurtele, do you swear or affirm to tell the truth, the whole truth and nothing but the truth here today?

MR. WURTELE:  I do.

MR. ROGERS:  Thank you.

Whereupon,

ROGER NEAL WURTELE

was called as a witness and, having been first duly sworn, was examined and testified as follows:

EXAMINATION

BY MR. ROGERS:

Q   Mr. Wurtele, we met shortly before we went on the record, but my name is Chris Rogers.  I'm a staff attorney in the Fort Worth Regional Office of the Securities and Exchange Commission's enforcement

18

1        A    No, no.
2        Q    I understand.  And are you still acting in
3   that capacity today?
4        A    I am.
5        Q    Are there any other employees of Torchlight,
6   particularly the employees you worked with as CFO,
7   that are continuing today?
8        A    There's actually two.
9        Q    And could you tell me who those people are,
10  please?
11       A    The person who assists me on the accounting
12  side, her name is Anita Barnet.  The other person is
13  Anna Bradshaw.  Anna was an employee premerger.  When
14  the merger closed, Anna picked up a -- a different set
15  of responsibilities with Meta, but she does remain on
16  the Torchlight Energy payroll.
17       Q    I appreciate the distinction.  What is Ms.
18  Barnett's role today?
19       A    We -- we use a piece of oil and gas
20  accounting software called Wolfpack, that is her
21  familiarity.  She is the person who would originate
22  entries into the accounting system and assist me, as
23  needed, when it's time for reporting or responding to
24  requests from upper management.
25       Q    And is her title the same or different than

                                                                19

 1    it was under Torchlight's management prior to the

 2    merger?

 3         A    She still -- we still refer to her as

 4    assistant controller.

 5         Q    Mr. Wurtele, I'd like to spend a moment on

 6    your background.  If we could show Exhibit No. 165

 7    please, Matilda.  Mr. Wurtele, I understand that you

 8    hold a couple of -- held a couple of CPA designations.

 9    Could you describe those for me as Matilda's pulling

10    up our exhibit?

11         A    My -- my early business experience started

12    in 1969.  After I graduated college, I went to work

13    for a CPA firm.  And in that same year, I passed the

14    CPA exam and obtained the CPA designation.  From that

15    time forward, until 1985, I was in public practice.  I

16    began my own practice in the mid-70s, and it continued

17    until '85.

18         Q    And Mr. Wurtele, are either of those CPA --

19    you had the CPA certificate in Louisiana and Colorado

20    at different points in time; is that right?

21         A    That's correct.  The original one was in

22    Colorado.  When we moved to Louisiana, I -- I --

23    through reciprocity, I had a Louisiana certificate

24    issued to me.

25         Q    And are either of those licenses active

23

1  Oil and Gas and Torchlight; is that right?
2      A    Yes, that -- that's correct.  I was -- began
3  consulting in May of '13.  My actual employment was
4  documented with the employment agreement in September
5  of '13.
6      Q    How long had you served as the CFO of Xtreme
7  Oil and Gas when that combination happened?
8      A    From February '10 up to the -- the date.  So
9  it would be just slightly over three years.
10     Q    And when you came to join Torchlight, what
11 was your title at the beginning of your employment?
12     A    The title I was given was CFO.
13     Q    And so you were the CFO for Torchlight
14 throughout your tenure with the company, until the
15 merger?
16     A    Yes.  In terms -- in terms of -- of title,
17 I -- I -- I think it's important to understand that my
18 actual involvement and responsibilities to the company
19 would be much better described either as the
20 controller or chief accounting officer.
21     Q    Would you please elaborate on that, Mr.
22 Wurtele?  I do want to understand what
23 responsibilities that you had at Torchlight and
24 whether they changed during the course of your tenure.
25     A    Yeah.  At -- at Torchlight, the -- the

24

1  description of services and the responsibilities I was
2  given had to do with overseeing everything in the
3  office, located in Texas.  John Brda lived and -- and
4  still lives and works from an office in St. Louis,
5  Missouri.  And so the -- the accounting was located
6  and all of our auditor relationships were in Texas.
7  So my responsibility was to keep the records, to
8  maintain and interact with the auditors, tax
9  preparation, prepare the records so at any time that
10 there was a request for a report from Mr. Brda or from
11 the board, that I was always prepared to provide
12 those -- those records.
13      Q    Did your responsibilities include
14 preparation of financial statements?
15      A    I did initial drafts of 10-Qs and 10-Ks.
16 They subsequently were -- were circulated for others
17 to review in order to arrive at -- at actual filing
18 drafts.    Q    And who else would review the 10-Qs and
19 10-Ks before they were converted into final drafts?
20      A    They would go, of course, to John and to the
21 securities counsel.  And -- and then, also, not too
22 far into the relationship with Torchlight, we engaged
23 Whitley Penn, which is another CPA firm.  They were
24 the tax preparers, but specifically in the quarterly
25 Qs and the Ks, as they looked at it preliminarily,

25

1  before all of the records were transferred to the
2  auditor.  And they also assisted us.  They had
3  financial models for items that we needed.  For
4  example, the sealing test on -- on the oil and gas,
5  the full cost pool.  They -- they performed the tax
6  provision that was necessary for each of the filings.
7  And so it would be Whitley Penn, the securities
8  counsel and John, the CEO.
9      Q   Did you also have responsibilities with
10 respect to management of the company's securities,
11 meaning handling things like warrants, stock options,
12 grants of stock, et cetera?
13     A   Only from the -- only from the standpoint of
14 accounting for them.
15     Q   So, for example, when -- I know that there
16 were a number of warrants converted in the run up to
17 the closing of the merger between Torchlight and Meta
18 Material in June of 2021, what as your responsibility
19 with respect to those -- those warrants?
20     A   Well, the -- the warrants were issued from,
21 you know, over a period of years.  I maintained a
22 carry-forward schedule, line-by-line, of every issue,
23 which was updated every time there was a filing.  So
24 any time there was an exercise or an expiration, that
25 schedule was updated so that the disclosures in the Qs

26

1    and the Ks were current.
2         Q    And did you then have the responsibility to
3    communicate with external parties to ensure that those
4    securities were issued or distributed appropriately?
5    Or did that responsibility fall to someone else?
6         A    That was typically an interaction from John,
7    and the securities counsel was always attending the
8    board meetings.  So as transactions, such as you're
9    describing, were approved, the actual mechanics of
10   either if -- if their warrants or options, the
11   securities firm drafted those.  They were then
12   forwarded to us to, of course, keep as in -- in our --
13   in what I call the shared file.  If it had to do with
14   issuing stock, that was one of the principal duties of
15   Anna Bradshaw was the interactions of any -- anything
16   that was occurring for issuing of -- for relationship
17   with the transfer agent is where the actual mechanics
18   of getting issues were done.
19        Q    And Mr. Wurtele, I appreciate the roles of
20   the different people involved.  And having reviewed a
21   substantial number of those documents, I appreciate
22   the amount of effort that was necessary to maintain
23   the schedule of equities that was outstanding.  You're
24   aware that Torchlight did issue some restricted stock;
25   are you not?

[9/1/2022 10:30 AM] Wurtele, Roger - Vol. I.20220901.404780-...

1      A    I'm aware.

2      Q    Could you describe the circumstances under

3   which Torchlight issued restricted stock that you were

4   aware of?

5      A    There was a -- an amount, about 262,000

6   shares, that were issued to a director that he -- he

7   requested and there was an agreement from the board to

8   place a restriction on those shares.  Then, you know,

9   securities counsel, if -- if other issues were subject

10  to Rule 144, then that would've originated with, you

11  know, the -- the counsel and followed through by Anna.

12     Q    If someone asked for a 144 restriction to be

13  lifted on their securities, were you involved in that

14  process often?

15     A    No, sir.  That would typically be, again,

16  those requests and communications would go to Anna

17  Bradshaw.  She would notify securities counsel for the

18  documentation that would be necessary to send to the

19  transfer agent to get that accomplished.  She -- she

20  was in charge of those mechanics.

21     Q    And Ms. Bradshaw was in charge of those

22  mechanics.  Did Ms. Bradshaw report to you, in her

23  capacity as the accountant for these transactions?

24     A    Yes.  She did report to me.  At my request,

25  she kept a log of anything that was issued, that I

                                                                    28

1    used to update my carryforward schedules at the point
2    that we were preparing to file either a 10-K or a
3    10-Q.
4        Q   And so my only point is that you oversaw the
5    process and were aware that the company issued
6    restricted stock from time-to-time, including the
7    instance you pointed to of the $262,000 shares issued
8    to a director.  But this was a -- this was a process
9    that you were aware of and -- and supervised, although
10   it was Ms. Bradshaw's responsibility to take care of?
11       A   Yeah.  I was aware of it from -- from the
12   accounting and -- and being always prepared for
13   disclosures, not involved in communicating with the --
14   the party who -- who was being impacted, either by a
15   stock issue, warrant issue, option.  That was not my
16   circle.  It came to me for purposes of -- of
17   accounting.
18       Q   And you wouldn't have been the person
19   directly communicating with the stock transfer agent,
20   for example, to have the shares issued or have legends
21   changed?
22       A   That's correct.  I did not do that.
23       Q   But that person would have been Ms.
24   Bradshaw?
25       A   Yes.

[9/1/2022 10:30 AM] Wurtele, Roger - Vol. I.20220901.404780-...

33

1   what other strategic transactions are you aware of

2   that happened or that arose between June of 2020 and

3   the consummation of the Meta Material merger?

4        A    I'm familiar with -- with those.  But again,

5   I was not involved.  I was aware of what was being

6   considered, but I was not involved in -- in the

7   negotiations.

8        Q    Were you aware of the specific mechanic of a

9   preferred share being featured in those transactions?

10       A    No, I wasn't that close to the process.

11       Q    Were you aware whether those transactions

12  included reverse mergers akin to the one that the Meta

13  Material and Torchlight companies consummated?

14       A    I don't recall that any of those got to the

15  point where there was really a -- a hard and fast

16  discussion or a -- a delineation of what the structure

17  would look like if, in fact, the parties agreed to go

18  forward.

19       Q    Understand.  With respect -- I've asked you

20  the question with respect to the prior transactions.

21  Let me ask the same question with respect to the Meta

22  Material transaction so that I'm also understanding

23  that correctly.  What role or responsibility did you

24  have with respect to negotiating the -- the structure

25  of the transaction between Torchlight and Meta

1   Material?
2       A    Again, that -- that was just not my
3   involvement.  I was not involved in those
4   conversations at all.  I was aware of them, but I was
5   not involved in the -- in the negotiation.
6       Q    Thank you.  And I wasn't questioning your
7   response.  I think I asked the question before about
8   prior transactions.  I was trying to make sure I also
9   asked the question about the Meta Material transaction
10  and I understand that you were aware of the
11  discussions but didn't necessarily have responsibility
12  for the structure or the manner in which they
13  proceeded.  At what point did you become aware of the
14  potential for Torchlight and Meta Material to enter
15  into a strategic transaction?
16      A    At some point, John would have sent me a
17  PowerPoint on Meta Materials, essentially letting me
18  know that he was looking in the direction to move
19  forward with the combination that the board had kind
20  of mandated that -- that would be pursued.  That would
21  have to have been -- you -- you asked when, August of
22  '20.
23      Q    And in August of '20, when the transaction
24  first came to your attention, was it always your
25  understanding that the Torchlight Oil and Gas assets

```
                                                                    40
```

1   was -- was very rare.  Conversations, you know, that
2   we were talking about the actions that were being
3   considered at the board level, my understanding of
4   that typically came from John or, of course, the --
5   the minutes, eventually, after the counsel prepared
6   them, found their way to my accounting system.
7        Q    Did Mr. Brda ever articulate a view about
8   how an outstanding short interest holder would behave
9   when the preferred share dividend was issued?
10       A    No.
11       Q    Did you and Mr. Brda ever discuss short
12  interests with respect to Torchlight?
13       A    No.
14       Q    Mr. Brda and you didn't talk about the
15  amount of outstanding short interest in the company?
16       A    No, just had -- it wasn't my role.  If -- if
17  it had to do with accounting, if it was something that
18  was happening that -- that I needed to either have
19  gathered information for purposes of disclosure or for
20  accounting classification, that -- that those -- we
21  just didn't have those conversations.
22       Q    Did you participate in any conversations
23  between Mr. Brda and other investors in Torchlight
24  around the time of the merger about this preferred
25  share?

1    A    No, I have had no conversations with the
2    shareholders.
3    Q    Did you participate with Mr. Brda in
4    preparations for any of the conversations with
5    Shareholders or potential investors about the merger
6    or the preferred share dividend?
7    A    Only to the extent that John may have asked
8    me for a detail of the outstanding shares, the
9    stock -- what I call the stock issuance detail.
10   That's all I recall.
11   Q    Okay.  I know -- I'm aware that Mr. Brda and
12   some of the members of Meta Materials' management went
13   to a number of conferences in connection with the
14   marketing of the merger and the future prospects of
15   Meta Materials, Inc.  Did you participate in the
16   preparations for those presentations?
17   A    No, sir.
18   Q    And other than providing financial
19   information or financial statements that might've
20   supported those presentation materials, did you
21   participate in the preparation of any of those
22   presentation materials?
23   A    Perhaps, on a -- on a specific slide about,
24   for example, if there was a slide that had to do with
25   the gross and net acres, I would have been requested

67

1      Q    Were you a part of the conversation between
2  Mr. Brda and members of Meta Material management in
3  June of 2021 about securing financing from the June
4  2021 ATM offering in order to meet its drilling
5  obligations for 2021?
6      A    No, I was not part of such conversations.
7      Q    Are you aware whether Mr. Brda told members
8  of Meta Material management that he would only do the
9  ATM offering if Meta agreed to loan Torchlight the
10 money to drill those wells?
11     A    I -- I'm not aware.
12     Q    Are you aware whether the Meta Material
13 board made a decision or had a discussion prior to the
14 June 2021 ATM offering and the June 2021 merger close
15 about whether to operate those four wells and meet the
16 drilling obligation in 2021?
17     A    Not specifically, but there, of course, was
18 a loan made.  I do not recall the date that loan was
19 made, whether it's in the time period you're
20 referencing or if it was at a later date.  I -- I
21 apologize, I don't remember.
22     Q    We can talk about the timing, and that's
23 important, but there were two loans made, two
24 substantial more than six -- more than seven-figure
25 loans made from Meta Material to Torchlight, correct?

[9/1/2022 10:30 AM] Wurtele, Roger - Vol. I.20220901.404780-...

82

```
 1        A    No.
 2        Q    Mr. Wurtele, did you have an understanding
 3   of the effect the preferred share would have on an
 4   individual that owned a short position in Torchlight
 5   when the merger closed?
 6        A    No.
 7        Q    Mr. Wurtele, did you ever have a
 8   conversation with Mr. Brda where he described that a
 9   short interest holder would have no way to get their
10   hands on the preferred shares that came out in the
11   dividend and would, therefore, be under pressure to
12   close out their short positions?
13        A    No.
14        Q    Did you have any conversation with any
15   individual about that subject?
16        A    No.
17        Q    Did you ever review any information publicly
18   available on the internet about that subject?
19        A    I did not.
20        Q    Did you ever see the transaction between
21   Torchlight and Meta referred to as a "short squeeze?"
22        A    No.
23        Q    Do you have any understanding of what the
24   word short squeeze means?
25        A    No.
```

[9/1/2022 10:30 AM] Wurtele, Roger - Vol. I.20220901.404780-...

                                                                83

1    Q    In marketplace news stories or other
2    financial press, have you ever been exposed to the
3    concept of a short squeeze?
4    A    No.  I understand what a short sale is, I --
5    I -- I don't understand the dynamics of what you're
6    referring to as a squeeze.
7    Q    And so you didn't see any instance of Mr.
8    Brda or other members of Torchlight or Meta Materials
9    management explaining to shareholders that there would
10   be pressure -- positive pressure on the stock price as
11   a result of the preferred share dividend?
12   A    No.
13   Q    And you didn't see any information about
14   Torchlight or Meta Management explaining to
15   shareholders that because the preferred stock dividend
16   would be issued as non-tradeable or non-transferrable
17   shares, a short interest holder would have no way to
18   gain access to those securities?
19   A    No.
20   Q    And you didn't see Mr. Brda or Mr. Palikaras
21   explain to investors or the marketplace that as a
22   result of that, the short interest holders would have
23   to -- have to close out their short positions by
24   purchasing Torchlight stock and that those purchases
25   would have to be made prior to the issuance of the

[9/1/2022 10:30 AM] Wurtele, Roger - Vol. I.20220901.404780-...

```
 1                PROOFREADER'S CERTIFICATE

 2

 3  In The Matter of:    TORCHLIGHT ENERGY RESOURCES, INC.,

 4                       n/k/a META MATERIALS, INC

 5  Witness:             Roger Wurtele

 6  File No.             FW-04461-A

 7  Date:                Thursday, September 1, 2022

 8  Location:            Fort Worth, TX

 9

10          This is to certify that I, Maria E. Paulsen,

11  (the undersigned), do hereby certify that the foregoing

12  transcript is a complete, true and accurate

13  transcription of all matters contained on the recorded

14  proceedings of the investigative testimony.

15

16  [signature]                    9/6/2022

17  (Proofreader's Name)           (Date)

18

19

20

21

22

23

24

25
```

```
 1                REPORTER'S CERTIFICATE
 2
 3  I, Kevin Carr, reporter, hereby certify that the
 4  foregoing transcript of 162 pages is a complete, true
 5  and accurate transcript of the testimony indicated, held
 6  on September 1, 2022 at Fort Worth, TX in the matter of:
 7  TORCHLIGHT ENERGY RESOURCES, INC., n/k/a META MATERIALS,
 8  INC.
 9
10  I further certify that this proceeding was recorded by
11  me, and that the foregoing transcript has been prepared
12  under my direction.
13
14
15       Date: 9/6/2022              [signature]
16       Official Reporter:
17
18
19
20
21
22
23
24
25
```