# UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF TEXAS
### SHERMAN DIVISION

SECURITIES AND EXCHANGE
COMMISSION,

                              Plaintiff,

        v.

JOHN BRDA,
GEORGIOS PALIKARAS,

                              Defendants.

Case No. 4:24-cv-01048-SDJ

### DEFENDANT GEORGIOS PALIKARAS'S
### MOTION TO DISMISS AND BRIEF IN SUPPORT

Defendant Georgios Palikaras ("Palikaras"), by and through undersigned counsel, respectfully submits this memorandum in support of his motion, pursuant to Rule 12(b) of the Federal Rules of Civil Procedure, to dismiss the Complaint filed by the Securities and Exchange Commission ("SEC").

# <u>TABLE OF CONTENTS</u>

Page

I.    STATEMENT OF ISSUES ..................................................................................1

II.   RELEVANT FACTUAL BACKGROUND ........................................................3

    A.    Defendants and Related Entities. ...............................................................3

    B.    Ahead of the Deal, TRCH Publicly Disclosed the Proposed Merger between TRCH and Meta I, along with the Attendant Risks and Considerations. ..................4

    C.    TRCH's Proxy Statements Described the Merger; that the Public Knew a Short Squeeze Might Result; and Others Were Actively Manipulating TRCH's Share Price. ..................5

    D.    The Dividend's Effect on Short Investors was Understood and Discussed Online. ..................6

    E.    As Would Be Expected, Palikaras Attended an Industry Conference During the Merger Period, But the SEC Does Not Allege Palikaras Made Any Statement. ........7

    F.    Palikaras Engaged with a Few TRCH Shareholders on a Single Call in May 2021, which Was Secretly Recorded and Later Disseminated *in Part* by an Unidentified Internet User. ..................7

    G.    TRCH's Disclosures Described Terms and Risks of the June 2021 ATM Offering. ..................9

    H.    TRCH Shareholders Approved the Merger, and the Dividend Record Date is Disclosed. ..................11

    I.    The Merger Closes and Meta II Commences Operations, Terminates Palikaras, Settles with the SEC. ..................11

III.   ARGUMENT AND AUTHORITY ..................................................................12

    A.    THE SEC FAILS TO PLEAD THAT PALIKARAS MADE MATERIALLY FALSE AND MISLEADING STATEMENTS UNDER SECTION 10(B) OF THE EXCHANGE ACT, RULE 10B-5 THEREUNDER, OR SECTION 17(A) OF THE SECURITIES ACT ..................12

        1.    The SEC Fails to Allege that Palikaras Made *Any* Misstatement or Omission at the March 2021 Investor Conference. ..................12

        2.    Palikaras's Tweets Contained No Material Misrepresentations or Omissions. ..................13

            a.    The Shorts Tweets is Neither a Material Misrepresentation Nor Omission. ..................14

            b.    The T+2 Tweet is Neither a Material Misrepresentation Nor Omission. ..................16

            c.    Palikaras Did Not Otherwise Fail to Disclose Information He Had a Duty to Provide. ..................16

i

3.     Palikaras Made Neither Material Misrepresentations Nor Omissions During the Private Investor Call. ...................................................17

         a.     Palikaras's Beliefs About a Short Squeeze Occurring, Possible Purchasers for TRCH's Oil and Gas Assets, and Potential Value of the Dividend Were Opinions, Puffery, and Did Not Alter the Total Mix of Information. ................................................................................18

         b.     The SEC's Rule 10b-5(b) Claims Fail Because Palikaras is Not the Maker of the Screenshot or the Incomplete Secret Recording. .............21

         c.     The SEC Cannot Establish Omission Liability under Section 10(b), Rule 10b-5, or Section 17(a) for Palikaras's Alleged Failure to Correct or Address the Screenshot or Incomplete Secret Recording.......22

B.     THE SEC DOES NOT PLEAD SCHEME LIABILITY AGAINST PALIKARAS .....................23

     1.     The Complaint Does Not Allege Any Actionable Conduct by Palikaras Beyond Alleged Misrepresentations and Omissions. ......................................24

     2.     The SEC's Scheme Liability Claims Against Palikaras Also Fail Because the Details of the Alleged Scheme Were Known and Disclosed....................27

         a.     Details of the Dividend Were Disclosed and Consequence to Short Interests Was Understood. .......................................................................27

         b.     Details of TRCH's ATM Offering Were Also Disclosed......................31

     3.     The SEC's Scheme Liability Claims Against Palikaras also Fail to the Extent They are Based on Allegations Relating to Meta I's Actions. ............32

     4.     The SEC's 10b-5 Claims Fail to Allege Any Connection Between the Private Investor Call and the Purchase or Sale of TRCH Stock. .....................35

C.     THE SECTION 17(A)(2) CLAIMS FAIL TO ALLEGE THAT PALIKARAS OBTAINED MONEY OR PROPERTY "BY MEANS OF" ANY ALLEGED MISREPRESENTATION.........35

D.     THE SEC FAILS TO ADEQUATELY PLEAD A CLAIM UNDER SECTION 14(A)..............37

CONCLUSION....................................................................................................................40

## **TABLE OF AUTHORITIES**

**Page(s)**

**Cases**

*Aaron v. SEC*,
    446 U.S. 680 (1980)......................................................................................................28

*Abrams v. Baker Hughes, Inc.*,
    292 F.3d 424 (5th Cir. 2002) ......................................................................................17

*In re Adams Golf, Inc. Secs. Litig.*,
    381 F.3d 267 (3d Cir. 2004).........................................................................................16

*In re ATI Techs., Inc., Sec. Litig.*,
    216 F. Supp. 2d 418 (E.D. Pa. 2002) ...........................................................................9

*In re Bank of Am. AIG Disclosure Sec. Litig.*,
    980 F. Supp. 2d 564 (S.D.N.Y. 2013).........................................................................15

*Basic Inc. v Levinson*,
    485 U.S. 224 (1988).....................................................................................................17

*Boykin v. K12, Inc.*,
    54 F.4th 175 (4th Cir. 2022) .......................................................................................15

*Brooks v. United Dev. Funding III, L.P.*,
    No. 20-cv-00150-O, 2020 WL 6132230 (N.D. Tex. Apr. 15, 2020)......................3, 7

*Camelot Event Driven Fund v. Alta Mesa Res., Inc.*,
    No. 19-CV-957, 2021 WL 1416025 (S.D. Tex. Apr. 14, 2021) ..................................37

*Chadbourne & Park LLP v. Troice*,
    571 U.S. 377 (2014).....................................................................................................35

*City of Roseville Emps. Ret. Sys. v. EnergySolutions, Inc.*,
    814 F. Supp. 2d 395 (S.D.N.Y. 2011)..........................................................................17

*City of Taylor Police & Fire Ret. Sys. v. Zebra Techs. Corp.*,
    8 F.4th 592 (7th Cir. 2021) .........................................................................................30

*Dawes v. Imperial Sugar Co.*,
    975 F. Supp. 2d 666 (S.D. Tex. 2013) ........................................................................13

*Doyle v. Milton*,
    73 F. Supp. 281 (S.D.N.Y. 1947) ...............................................................................30

*Ernst & Ernst v. Hochfelder*,
    425 U.S. 185 (1976)................................................................................25

*In re Franklin Bank Corp. Sec. Litig.*,
    782 F. Supp. 2d 364 (S.D. Tex. 2011) .................................................20

*Funk v. Stryker Corp.*,
    631 F.3d 777 (5th Cir. 2011) ...............................................................3

*Halperin v. eBanker USA.com, Inc.*,
    295 F.3d 352 (2d Cir. 2002)..................................................................16

*Heinze v. Tesco Corp.*,
    971 F.3d 475 (5th Cir. 2020) ...............................................................38

*Ho v. Duoyuan Glob. Water, Inc.*,
    887 F. Supp. 2d 547 (S.D.N.Y. 2012)....................................................29

*Hulliung v. Bolen*,
    548 F. Supp. 2d 336 (N.D. Tex. 2008) .................................................37

*In re IBM Corp. Sec. Litig.*,
    163 F.3d 102 (2d Cir. 1998)..................................................................20

*Jacobowitz v. Range Res. Corp.*,
    596 F. Supp. 3d 659 (N.D. Tex. 2022) .................................................13

*Janus Capital Grp., Inc. v. First Derivative Traders*,
    564 U.S. 135 (2011)................................................................2, 21, 22, 29

*Kraft v. Third Coast Mistream*,
    No. 19 Civ. 9398, 2021 WL 860987 (S.D.N.Y. Mar. 8, 2021) ............30

*Krim v. BancTexas Grp., Inc.*,
    989 F.2d 1435 (5th Cir. 1993) ..............................................................35

*Kuwait Inv. Office v. Am. Int'l Grp., Inc.*,
    128 F. Supp. 3d 792 (S.D.N.Y. 2015)....................................................29

*Lain v. Evans*,
    123 F. Supp. 2d 344 (N.D. Tex. 2000) .................................................14

*Linenweber v. Sw. Airlines Co.*,
    693 F. Supp. 3d 661 (N.D. Tex. 2023) .................................................9

*Lorenzo v. SEC*,
    872 F.3d 578 (D.C. Cir. 2017), *aff'd*, 139 S.Ct. 1094 (2019)...............22

*Macquarie Infrastructure Corp. v. Moab Partners, L.P.*,
    601 U.S. 257 (2024) ................................................................................17

*Pedroli ex rel. Microtune, Inc. v. Bartek*,
    564 F. Supp. 2d 683 (E.D. Tex. 2008) ...........................................37, 38

*Morrison v. Nat'l Austrl. Bank Ltd.*,
    561 U.S. 247 (2010) ................................................................................31

*N. Port Firefighters' Pension--Loc. Option Plan v. Temple-Inland, Inc.*,
    936 F. Supp. 2d 722 (N.D. Tex. 2013) ..................................................29

*Nathenson v. Zonagen Inc.*,
    267 F.3d 400 (5th Cir. 2001) .................................................................18

*Neiman v. Bulmahn*,
    854 F.3d 741 (5th Cir. 2017) .................................................................16

*Norris v. Hearst Trust*,
    500 F.3d 454 (5th Cir. 2007) ...................................................................3

*Novak v. Kasaks*,
    216 F.3d 300 (2d Cir. 2000)...................................................................29

*Olkey v Hyperion 1999 Term Tr., Inc.*,
    98 F.3d 2 (2d Cir 1996).........................................................................39

*Omnicare, Inc. v. Laborers Dist. Couns. Constr. Indus. Pension Fund*,
    575 U.S. 175 (2015)...............................................................................15

*In re Overstock Sec. Litig.*,
    119 F.4th 787 (10th Cir. 2024) ....................................................*passim*

*In re Overstock Sec. Litig.*,
    2021 WL 4267920 (D. Utah Sept. 20, 2021)...............................*passim*

*In re Overstock Sec. Litig.*,
    No. 19 Civ. 709, 2020 WL 5775845 (D. Utah Sept. 28, 2020) ....*passim*

*Owens v. Jastrow*,
    789 F.3d 529 (5th Cir. 2015) ...........................................................13, 16

*Petrobras Am., Inc. v. Samsung Heavy Indus. Co., Ltd.*,
    9 F.4th 247 (5th Cir. 2021) ......................................................................3

*In re Petrobras Sec.*,
    862 F.3d 250 (2d Cir. 2017)...................................................................31

*Pharo v. Smith*,
　　621 F.2d 656 (5th Cir. 1980) ................................................................36

*Plotkin v. IP Axess Inc., Etc.*,
　　407 F.3d 690 (5th Cir. 2005) ..................................................................3

*Regents of the Univ. of Cal. v. Credit Suisse First Bos. (USA), Inc.*,
　　482 F.3d 372 (5th Cir. 2007) ...........................................................25, 33

*Emps.' Ret. Sys. v. Whole Foods Mkt., Inc.*,
　　905 F.3d 892 (5th Cir. 2018) ................................................................19

*Santa Fe Indus., Inc. v. Green*,
　　430 U.S. 462 (1977)...............................................................................32

*SEC v. Bowen*,
　　No. 22-CV-1415-S, 2023 WL 6166780 (N.D. Tex. Sept. 21, 2023)......................13

*SEC v. DiMaria*,
　　207 F. Supp 3d 343 (S.D.N.Y. 2016)......................................................36

*SEC v. Farmer*,
　　No. 14-CV-2345, 2015 WL 5838867 (S.D. Tex. Oct. 7, 2015) ................26, 36

*SEC v. Felton*,
　　No. 20-CV-822-G, 2020 WL 7056333 (N.D. Tex. Dec. 2, 2020)...................13, 29

*SEC v. Hopper*,
　　No. Civ.A. H-04-1054, 2006 WL 778640 (S.D. Tex. Mar. 24, 2006)...................36

*SEC v. Jankovic*,
　　15 Civ. 1248, 2017 WL 1067788 (S.D.N.Y. Mar. 21, 2017) ..................36

*SEC v. Killion*,
　　No. H-16-621, 2017 WL 7052310 (S.D. Tex. Mar. 24, 2017) ..................26

*SEC v. Mapp*,
　　16-CV-00246, 2017 WL 5230358 (E.D. Tex. Nov. 9, 2017) ..................24

*SEC v. Mapp*,
　　240 F. Supp. 3d 569 (E.D. Tex. 2017).........................................16, 17, 33

*SEC v. Mapp*,
　　No. 16-CV-00246, 2017 WL 5177960 (E.D. Tex. Nov. 8, 2017) ..................35, 36

*SEC v. Mercury Interactive, LLC*,
　　No. C 07-2822, 2009 WL 2984769 (N.D. Cal Sept. 15, 2009) ..................37

*SEC v. Mueller*,
No. SA-21-CV-00785, 2024 WL 400897 (W.D. Tex. Jan. 11, 2024) ...................................25

*SEC v. Narayan*,
No. 16-CV-1417-M, 2017 WL 4652063 (N.D. Tex. Aug. 28, 2017) ...........................2, 26, 28

*SEC v. Reynolds*,
No. CIV.A.3-08-CV-0384-B, 2008 WL 3850550 (N.D. Tex. Aug. 19, 2008) ................18, 19

*SEC v. Rio Tinto plc,*
41 F.4th 47, 52 (2d Cir. 2022) ........................................................................................23, 29

*SEC v. Seghers*,
298 F. App'x 319 (5th Cir. 2008) ......................................................................1, 14, 16, 24

*SEC v. Stack*,
21-CV-00051, 2021 WL 4777588 (W.D. Tex. Oct. 13, 2021) .............................................28

*SEC v. Texas Gulf Sulphur Co.*,
401 F.2d 833 (2d Cir. 1968) .................................................................................................35

*SEC v. Verges*,
716 F. Supp. 3d 456 (N.D. Tex. 2024) ...........................................................................24, 25

*SEC v. Wey*,
246 F. Supp. 3d 894 (S.D.N.Y. 2017) ...................................................................................36

*SEC v. Zandford*,
535 U.S. 813 (2002) ..............................................................................................................35

*Set Cap. LLC v. Credit Suisse Grp. AG*,
996 F.3d 64 (2d Cir. 2021) ....................................................................................................25

*Shandong Yinguang Chem. Indus. Jt. Stock Co., v. Potter*,
607 F.3d 1029 (5th Cir. 2010) ..............................................................................................19

*Southland Sec. Corp. v. INSpire Ins. Solutions Inc.*,
365 F.3d 353 .........................................................................................................12, 13, 19

*In re Synchrony Fin. Sec. Litig.*,
988 F.3d 157 (2d Cir. 2021) ..................................................................................................14

*In re Time Warner Inc. Sec. Litig.*,
9 F.3d 259 (2d Cir. 1993) .....................................................................................................19

*Trust Co. of La. v. N.N.P. Inc.*,
104 F.3d 1478 (5th Cir. 1997) ..............................................................................................39

*TSC Indus., Inc. v. Northway, Inc.*,
  426 U.S. 438 (1976) .................................................................................39

*In re Turquoise Hill Res. Ltd. Sec. Litig.*,
  625 F. Supp. 3d 164 (S.D.N.Y. 2022) .......................................................29

*Wilson v. Merrill Lynch & Co.*,
  671 F.3d 120 (2d Cir. 2011) .....................................................................32

*Yoshikawa v. Exxon Mobile Corp.*,
  No. 21-CV-00194-N, 2023 WL 5489054 (N.D. Tex. Aug. 24, 2023) ...................................12

**Statutes**

15 U.S.C. § 77q(a)(1) ..................................................................................24

15 U.S.C. § 77q(a)(2) ...............................................................................13, 35

15 U.S.C § 77q(a)(3) ...................................................................................24

15 U.S.C. § 78j(b) ........................................................................................24

15 U.S.C. § 78n(a)(1) ...................................................................................37

**Other Authorities**

17 C.F.R. § 240.10b-5 .............................................................................. *passim*

17 C.F.R. § 240.14a–9 ................................................................................39

# I.  <u>STATEMENT OF ISSUES</u>

Palikaras seeks to dismiss all three SEC claims against him:

- <u>First Claim for Relief</u>: for allegedly making fraudulent misrepresentations and omissions, and carrying out a fraudulent scheme, in violation of Section 17(a) of the Securities Act of 1933 ("Securities Act");

- <u>Second Claim for Relief</u>: for allegedly making fraudulent misrepresentations and omissions, and carrying out a fraudulent scheme, in violation of Section 10(b) of the Securities and Exchange Act of 1934 ("Exchange Act") and Rule 10b-5 thereunder; and

- <u>Third Claim for Relief</u>: for allegedly soliciting TRCH shareholder proxies by means of materially misleading statements or omissions in violation of Exchange Act Section 14(a) and Rule 14a-9 thereunder.

In deciding Palikaras's motion dismiss under Rules 9(b) and 12(b)(6), this Court must determine whether the SEC pled facts sufficient to establish that Palikaras made an actionable misrepresentation or omission—or that he can be liable for so-called scheme liability. Numerous bases exist on which the Court can, and should, dismiss the Complaint.

1. Pursuant to Rule 9(b)'s heightened standard for pleading fraud, the Fifth Circuit strictly requires the SEC to specify the fraudulent statements, identify the speaker, state when and where the statements were made, and explain why the statements were fraudulent." *Williams v. WMX, Inc.,* 112 F.3d 175, 177–78 (5th Cir. 1997). Should the claims by the SEC be dismissed when allegations against Palikaras are general, not particularized, and rely on impermissible group pleading, which the Fifth Circuit rejects?

2. Section 17(a)(2) and Section 10(b) and Rule 10b-5(b), mandate that Palikaras's alleged statements and omissions must be <u>both</u>: (i) misleading; and (ii) material. To be misleading, a statement, when understood as a whole, must mislead a reasonable investor. *SEC. v. Seghers*, 298 F. App'x 319, 327 (5th Cir. 2008). Materiality requires a "substantial likelihood that a reasonable investor would consider the information important in making a decision to invest." *Id*. Importantly, information already known to the market is not material as a matter of law. *See In re Compaq Sec. Litig.,* 848 F.Supp. 1307, 1317 (S.D.Tex., 1993). The SEC bases claims on two tweets by Palikaras. Should the Court dismiss claims premised on these tweets when the Complaint fails to allege they were more than personal opinions or repeated information already digested by, and disussed in, the public domain?

3. The SEC alleges Palikaras provided misleading information during a private call with purported TRCH investors in violation of Section 17(a)(2), Section 10(b) and Rule 10b-5(b), and Section 14(a) and Rule 14a-9. The Complaint contends that Palikaras said TRCH was communicating with potential buyers for its oil and gas assets and that a planned TRCH Dividend could be worth $1-$20. Palikaras was not an officer or employee of

TRCH, and the SEC does not allege purported investors on the call purchased or sold TRCH stock in connection with his statements. Did the SEC fail to plead any actionable misrepresentation or omission during that call where Palikaras's alleged statements were generic expressions of opinion, puffery, did not alter the total mix of information available to the public and, therefore, would not have been relied upon by a reasonable investor? Likewise, should such claims be dismissed because the SEC does not plead—as required under Rule 10b-5—that his alleged misrepresentations caused the purported TRCH investors to purchase or sell TRCH stock? Similarly, should the SEC's Section 14(a) claim be dismissed because the SEC failed to plead that Palikaras's alleged statements formed an "essential link" in the underlying merger transaction underpinning this action?

4.  To state a claim under Section 17(a)(2), the SEC must sufficiently allege that Palikaras obtained money or property in connection with his alleged misstatements or omissions. Here, the SEC alleges only that the post-merger company where Palikaras served as CEO benefitted financially, not Palikaras himself. Should the SEC's claim be dismissed because it failed to plead facts indicating that Palikaras actually obtained any money or property attributable to his scant few alleged misrepresentations and omissions?

5.  Without his knowledge, consent, or authority, third-parties created and disseminated over the internet a screenshot and a modified and incomplete audio recording of the above-referenced private call with purported TRCH investors. The SEC seeks to hold Palikaras liable for the screenshot and audio recording even though only the "maker" of a fraudulent statement can be liable under Rule 10b-5(b). *See Janus Capital Group, Inc. v. First Derivative Traders*, 564 U.S. 135 (2011). "[T]he maker of a statement is the person or entity with ultimate authority over the statement, including its content and whether and how to communicate it." *Id.* at 143. Should the Court dismiss the SEC's claims to the extent they are based on a screenshot and audio recording the creation of which Palikaras did not know about or consent to, had no authority regarding whether or how to communicate, and thus was not their "maker"? Similarly, should such claims be dismissed where the SEC failed to identify any duty Palikaras had to correct others' statements?

6.  Section 17(a)(1) and (3) and Rule 10b-5(a) and (c) create so-called "scheme liability," which "hinges on the performance of an inherently deceptive act that is distinct from an alleged misstatement" and "a proper pleading of scheme liability requires that the complaint allege conduct beyond misrepresentations or omissions." *SEC v. Narayan*, No. 3:16-CV-1417-M, 2017 WL 4652063, at *6-7 (N.D. Tex. Aug. 28, 2017). Should the Court dismiss the SEC's Complaint because it fails to allege that Palikaras performed some inherently deceptive act beyond statements or omissions?

7.  Rule 10b-5 and Section 17(a)(1) require the SEC to plead specific facts giving rise to a credible inference that Palikaras acted with scienter. Though the SEC contends Palikaras illicitly intended for a TRCH dividend to cause a short squeeze and thereby drive up TRCH's share price in advance of its forthcoming securities offering, it also contends that one of Palikaras's tweets expressed that very same intent to the market. In addition, judicially noticeable public records establish that the market had already digested other

information about the dividend and was actively discussing a possible short squeeze before the earliest date on which Palikaras is alleged to have engaged in wrongdoing. Moreover, TRCH's repeated disclosure of the nature and terms of its forthcoming dividend adequately informed the market, which immediately recognized the likelihood of an impending short squeeze. *See In re Overstock Sec. Litig.*, 119 F.4th 787 (10th Cir. 2024). Should the SEC's claims be dismissed because the SEC has failed to credibly allege that Palikaras acted with scienter and failed to disclose an allegedly deceptive intent?

## II.    RELEVANT FACTUAL BACKGROUND[1]

### A. Defendants and Related Entities.

Torchlight Energy Resources ("TRCH") was a Texas-based oil and gas exploration company listed on the Nasdaq under the ticker symbol "TRCH."  ECF No. 1 ("Compl."), ¶ 17. Brda was TRCH's CEO from 2014 through June 28, 2021. *Id.* ¶ 15. TRCH was known to have a significant number of short interest holders.[2]

Metamaterial, Inc. ("Meta I") was a Canadian nanotechnology company listed on the Canadian Securities Exchange. *Id.* ¶ 18. Palikaras was Meta I's President and CEO from 2011 through June 28, 2021. *Id.* ¶ 16. Meta Materials, Inc. ("Meta II") was created on June 28, 2021, through the merger of TRCH and Meta I. *Id.* ¶ 19. Meta II is a Nevada corporation headquartered in Dartmouth, Nova Scotia. *Id.* Palikaras served as Meta II's CEO until he was terminated in October 2023. *Id.* ¶ 16. The same day the SEC sued Palikaras, it settled with Meta II for just $1,000,000.[3] The relevant timeline of events is as follows:

---

[1] Background is drawn from the non-conclusory allegations of the Complaint. A court need not "accept as true conclusory allegations, unwarranted factual inferences, or legal conclusions." *Plotkin v. IP Axess Inc., Etc.*, 407 F.3d 690, 696 (5th Cir. 2005). Documents incorporated by reference into the Complaint may be considered by this Court. *See Funk v. Stryker Corp.*, 631 F.3d 777, 783 (5th Cir. 2011). The Court may judicially notice publicly-filed documents, including press releases and SEC filings.  *See, e.g.*, *Norris v. Hearst Trust*, 500 F.3d 454, 461 n.9 (5th Cir. 2007) (judicial notice of matters of public record); *see also Petrobras Am., Inc. v. Samsung Heavy Indus. Co., Ltd.*, 9 F.4th 247, 255 (5th Cir. 2021) (judicial notice of SEC filings).

[2] Peter Krauth, *Oil & Gas Explorer Proves Up Exciting Measured Oil and Gas Production from Orogrande Basin Project*, Streetwise Reports (Feb. 25, 2020), https://www.streetwisereports.com/article/2020/02/25/oil-gas-explorer-proves-up-exciting-measured-oil-and-gas-production-from-orogrande-basin-project.html. Courts may judicially notice materials in the public record for noting what the documents state, rather than to prove the truth of their contents.  *See, e.g.*, *Brooks v. United Dev. Funding III, L.P.*, No. 20-cv-00150-O, 2020 WL 6132230, at *33 (N.D. Tex. Apr. 15, 2020) (taking judicial notice of website: "it is generally proper to take judicial notice of articles and [w]eb sites published on the internet") (internal quotation marks and citation omitted).

[3] *In re Meta Materials, Inc.*, Securities Act Release No. 11292, Exchange Act Release No. 100415 (June 25, 2024), *available at* https://www.sec.gov/files/litigation/admin/2024/33-11292.pdf (hereinafter "Meta II Settlement Action").

| DATE | EVENT |
|---|---|
| February 25, 2020 | TRCH publicly understood to have significant short interests |
| September 21, 2020 | Merger LOI announced |
| December 14, 2020 | Definitive merger agreement announced |
| February 4, 2021 | TRCH files preliminary proxy describing the merger |
| March 16-18, 2021 | Brda and Palikaras attend virtual investor conference |
| May 7, 2021 | TRCH files definitive proxy statement for the merger |
| May 13, 2021 | TRCH investors speak with Palikaras, call secretly recorded |
| May 28, 2021 | TRCH files registration statement for $250 million offering |
| June 11, 2021 | TRCH shareholders vote to approve merger with Meta I |
| June 13, 2021 | Palikaras posts Shorts Tweet |
| June 14, 2021 | SEC declares TRCH shelf registration statement effective; TRCH announces June 24, 2021 Dividend record date; Palikaras posts T+2 Tweet |
| June 16, 2021 | TRCH files first prospectus supplement for ATM Offering |
| June 18, 2021 | TRCH at the market offering begins |
| June 21, 2021 | TRCH files second prospectus supplement for ATM Offering |
| June 22, 2021 | TRCH shareholders' T+2 deadline |
| June 24, 2021 | TRCH Dividend record date; TRCH at the market offering concludes |
| June 28, 2021 | Meta II is formed |
| December 13, 2022 | SEC sues social media influencers for engaging in a campaign to artificially inflate TRCH stock price |
| June 25, 2024 | SEC sues and settles with Meta II for $1 million; SEC files this action in the Southern District of New York |

## B. Ahead of the Deal, TRCH Publicly Disclosed the Proposed Merger between TRCH and Meta I, along with the Attendant Risks and Considerations.

On September 21, 2020, TRCH and Meta I announced a letter of intent to merge, with TRCH shareholders expected to own twenty-five percent of the resulting company.[4] The merger

---

[4] TRCH, Press Release, dated Sept. 21, 2020 (Form 8-K, Ex. 99.1) (Sept. 23, 2020), *available at* https://www.sec.gov/ix?doc=/Archives/edgar/data/1431959/000119983520000245/form-8k.htm.

represented a "strategic shift" for TRCH from oil and gas to cleantech and technology. *Id.* TRCH disclosed a plan to issue a preferred dividend ("Dividend") for legacy shareholders to "retain full value in [TRCH's] oil and gas assets[.]" *Id.* As the Complaint alleges, Palikaras was never an employee, officer, director, or control person of TRCH.  Compl. ¶¶ 15-16. He had no authority to cause TRCH to make any disclosure nor could he make disclosures on TRCH's behalf.

On December 14, 2020, TRCH and Meta I announced the signing of a definitive merger agreement.[5] On that date, TRCH further announced its "shareholders on the record date will be entitled to receive a [Dividend]" based on net proceeds of the sale of TRCH's oil and gas assets. *Id.* TRCH explained that the Dividend "will be exempt from registration under all applicable [s]ecurities [l]aws."[6] Hence it was clear as early as December 2020 that the Dividend could not be traded upon issuance, making it difficult for short interests to acquire the Dividend in the market. Public information about the Dividend meant such parties knew they would need to cover their TRCH positions or face difficulty complying with the terms of their short contracts.

## C.  TRCH's Proxy Statements Described the Merger; that the Public Knew a Short Squeeze Might Result; and Others Were Actively Manipulating TRCH's Share Price.

On February 4, 2021, TRCH filed its a preliminary proxy statement relating to the merger.[7] The proxy informed shareholders that TRCH would hold a special meeting to vote on the merger. *Id.* at 26. It also reminded shareholders that the Dividend would not be registered, could not be listed or traded on any exchange, and would not be freely transferable. *Id.* at 48. Subsequent preliminary proxy statements reiterated the same message.[8]

---

[5] TRCH, Press Release (Form 8-K, Ex. 99.1) (Dec. 14, 2020), *available at* https://www.sec.gov/ix?doc=/Archives/edgar/data/1431959/000119983520000329/form-8k.htm.
[6] TRCH, Agreement with Meta I (Form 8-K, Ex. 2.1) (Dec. 14, 2020) at 49 & D-5, *available at* https://www.sec.gov/ix?doc=/Archives/edgar/data/1431959/000119983520000329/form-8k.htm.
[7] TRCH, Preliminary Proxy Statement (PREM14A) (Feb. 4, 2021), *available at* https://www.sec.gov/Archives/edgar/data/1431959/000119312521027524/d117540dprem14a.htm.
[8] *See* TRCH, Preliminary Proxy Statement (PRER14A), at 50 (Mar. 23, 2021), *available at* https://www.sec.gov/Archives/edgar/data/1431959/000119312521090024/d117540dprer14a.htm; TRCH, Preliminary Proxy Statement (PRER14A), at 50 (Apr. 21, 2021), *available at* https://www.sec.gov/Archives/edgar/data/1431959/000119312521124753/d117540dprer14a.htm.

At the same time in February 2021—and well before the earliest date on which the SEC alleges any wrongdoing by Palikaras—a group of social media influencers "engaged in a campaign to raise the price" of TRCH's stock," "encouraged buying and holding the stock until the…upcoming merger with another company, Meta [I]," and "promoted the purported benefits of the merger," including the Dividend, as detailed in the SEC's separate enforcement action filed in December 2022.[9] According to the SEC, these "seasoned stock manipulators" claimed to be "robbing f*cking idiots of their money" as they used Twitter and other channels in a long-running scheme that involved, among other things,  "a campaign to raise the [share] price of" TRCH . *Id.* at ¶¶ 1, 29, 90

On May 7, 2021, TRCH filed its Definitive Proxy Statement for the merger.[10] It again informed investors that the Dividend would not be registered, could not be listed or traded on any exchange, and would not be freely transferable. *Id.* at 48. TRCH further explained that "[n]o market is expected to develop for the [Dividend] in the foreseeable future and holders of the [Dividend] may not be able to find a buyer and sell their shares if they desired to do so." *Id.* TRCH warned that "[f]urther dilution may occur . . . in connection with the [merger]." *Id.* at 168.

**D.  The Dividend's Effect on Short Investors was Understood and Discussed Online.**

TRCH's heavily shorted interest became a popular topic on social media platforms, setting off a "meme stock" frenzy and driving up retail interest in TRCH's stock.  In fact, in early March 2021—weeks before the alleged Investor Conference and months before the alleged Private Investor Call, Shorts Tweet, and T+2 Tweet—internet users on Twitter, Reddit, and YouTube were

---

[9] On December 13, 2022, the SEC filed its *Constantin* enforcement action against the eight social media influencers. *See* Complaint, *SEC v. Constantin et al*, 4:22-cv-04306 (S.D. Tex. Dec. 13, 2022), ECF No. 1, at ¶¶ 90-91. It was stayed pending a parallel criminal action styled *USA v. Constantinescu, et al.*, 4:22-cr-00612 (S.D. Tex.). The SEC's action appears stayed. The docket has been inactive since November 2023, though, in March 2024, the court overseeing the criminal action dismissed all charges, holding the government failed to sufficiently allege market manipulation-based securities fraud charges. Order, *Constantinescu*, 4:22-cr-00612 (S.D. Tex. Mar. 20, 2024), ECF No. 628. On April 4, 2024, the government appealed the court's order. *See* Notice of Appeal, *Constantinescu* (S.D. Tex. Apr. 4, 2024), ECF No. 643. The parties' briefing on appeal has been fully submitted, but the matter is held in abeyance by agreement of the parties as of October 22, 2024. *See* Order, *USA v. Constantinescu*, 24-20143 (5th Cir. Oct. 22, 2024).
[10] TRCH, Definitive Proxy Statement (DEFM14A) (May 7, 2021), *available at* https://www.sec.gov/Archives/edgar/data/1431959/000119312521154788/d117540ddefm14a.htm (hereinafter "Definitive Proxy Statement").

already discussing the potential for a short squeeze given the Dividend, with one user tweeting: "Selling will drive price down and make it easier for anybody to get access to the special dividend when transaction is complete. If we keep holding, shorts will get burned and SP will rise making it more expensive to get the dividend HOLD!!"[11] Similar messages continued to circulate publicly in March and April 2021.[12]

### E. As Would Be Expected, Palikaras Attended an Industry Conference During the Merger Period, But the SEC Does Not Allege Palikaras Made Any Statement.

Brda, Palikaras, and others attended a virtual investor conference hosted by an investment bank in March 16 -18, 2021 (the "Investor Conference"). Compl. ¶ 60. This is the earliest date on which the SEC contends Palikaras engaged in wrongdoing. And though the SEC takes issue with Palikaras's mere online attendance, the Complaint fails to allege that he made any specific statement or omission at the Investor Conference.

### F. Palikaras Engaged with a Few TRCH Shareholders on a Single Call in May 2021, which Was Secretly Recorded and Later Disseminated *in Part* by an Unidentified Internet User.

According to the SEC, on May 13, 2021, Palikaras spoke with a few individuals believed to be TRCH shareholders (the "Private Investor Call"). *Id.* ¶ 61. The SEC contends that the purpose of the Private Investor Call was to solicit their proxy votes for the merger and encourage them to

---

[11] I Need Money (@I_need_money11), X (F/K/A TWITTER) (Mar. 15, 2021), https://x.com/i_need_money11/status/1371459055194144774?s=46&t=6snUrWh2ie7u1BYXnIRxZA.

[12] Palikaras respectfully requests that the Court judicially notice articles and social media posts published on the Internet for the limited purpose of establishing the existence of statements made rather than to prove the truth of their contents. *See Brooks*, 2020 WL 6132230 at *33-34 (taking judicial notice of articles on the Internet). *See, e.g.*, theWalrus Street (@theWalrusStreet), *The ONLY DD You Need on the Odd Merger between Torchlight Resources $TRCH & Metamaterial $MMATF*, YOUTUBE, (Mar. 1, 2021) https://www.youtube.com/watch?v=FHgduIlmTaQ (discussing TRCH short interest at 7:31 and noting that shorts will have to "close out" before the merger, that this would "drive up the price up" because "you can't short a company that no longer exists"); I Need Money (@I_need_money11), X (F/K/A TWITTER) (Mar. 15, 2021), https://x.com/I_need_money11/status/1371414410321915907 ("When the merger is complete trch won't exist anymore, only Meta will stay. Short positions on trch will have to close and open new short positions in Meta if they really want to short."); Penny Queen (u/Saint_O_Well), REDDIT r/TRCH (Apr. 4, 2021), https://www.reddit.com/r/TRCH/comments/mk6oio/is_there_even_a_short_coverage_mechanism/ ("How are the TRCH shorts going to cover? When someone shorts a stock and there is a dividend, it is paid for by the shorter. The special dividend will not be publicly traded, so they can't just buy it. It also isn't a cash dividend (yet) so they can't just put up the cash AND once the stock switches over they will then be short META, which is a position I wouldn't want to be in.").

hold the common stock of Meta II post-merger. *Id.* ¶ 82. On the call, Palikaras fielded questions about the potential for a short squeeze and the value of the Dividend.  *Id.* ¶¶ 61, 83, 84.

Almost a month later, on June 7, 2021, "an anonymous Stocktwits user ('KingOneFolle')" posted a "screenshot" and publicized *his own summary* of the Private Investor Call *and* supposed other meetings involving Brda (*i.e.*, not a summary of Palikaras's statements alone, despite the SEC's allegations to the contrary) as shown in the Screenshot, copied below but excluded from the Complaint (*id.* ¶ 50):



Soon after, on June 11, 2021, an unidentified internet user publicized a partial, manipulated audio recording of the Private Investor Call on social media (the "Incomplete Secret Recording").[13] *Id.* ¶ 86. At that point, the SEC alleges, partial statements from the Incomplete Secret Recording Call became a topic of discussion on social media. *Id.* ¶ 86. Tellingly, while the SEC references the Incomplete Secret Recording throughout the Complaint – and though it is central to the claims against Palikaras – the SEC selectively isolates a few phrases from the wider context of Palikaras's alleged statements on the Incomplete Secret Recording, specifically: (i) that TRCH was speaking to "the right potential buyers" for TRCH's oil and gas assets; and (ii) that based on "the analysis" the potential value of the Dividend "could be" between $1- 20 per share. *Id.* ¶¶ 83-84. But the phrases challenged by the SEC cannot be divorced from the context of the entire call – let alone the context of the entire Incomplete Secret Recording – which shows that Palikaras heavily caveated his statements and noted that any predictions about the Dividend's value and the oil and gas assets were speculative. *See* Brda's Motion to Dismiss at 8-9 and note 22.[14]

**G. TRCH's Disclosures Described Terms and Risks of the June 2021 ATM Offering.**

On May 28, 2021, TRCH filed a shelf registration statement covering one or more offerings not to exceed $250 million in the aggregate.[15] It informed investors that net sale proceeds might be used for "general corporate purposes," including capital expenditures, additions to working capital, or reduction of accounts payable or other corporate obligations. *Id.* at 11.TRCH also

---

[13] Among other things, the audio recording is incomplete, disclaimers and forward-looking statements have been omitted, the audio is at times difficult to discern, speakers are not identified by name or role, and there is no indicia of participants' consent to record.

[14] Because the Incomplete Secret Recording is both referred to in the Complaint and central to the claims, the Court may consider the transcript of the Incomplete Secret Recording, attached as Exhibit A-1 to Brda's Motion to Dismiss. *See* Brda Motion to Dismiss at note 22; *see also Linenweber v. Sw. Airlines Co*., 693 F. Supp. 3d 661, 674 (N.D. Tex. 2023) (taking judicial notice of press release and transcript of earning calls where press release and transcript contained statements for which plaintiffs claimed defendants were liable); *In re ATI Techs., Inc., Sec. Litig.*, 216 F. Supp. 2d 418, 430 (E.D. Pa. 2002) ("Reference to [conference call transcripts] is necessary to assess defendants' statements in context, and to consider whether statements that are misleading in isolation are accurate or immaterial in their entirety.") That said, Palikaras has grave concern regarding the provenance, chain of custody, authentication, and completeness of the Incomplete Secret Recording. The splicing and editing are apparent from the audio file of the Incomplete Secret Recording, which the SEC has in its possession and can present to the Court. Palikaras reserves the right to challenge the admissibility of the Incomplete Secret Recording at the appropriate time.

[15] TRCH, Registration Statement (S-3) (May 28, 2021), *available at* https://www.sec.gov/Archives/edgar/data/1431959/000119983521000350/vision_form-s3.htm.

disclosed that the securities might be sold through underwriters, dealers, or agents "at market prices prevailing at the time of sale." *Id.* at 11-12. Further, TRCH advised investors to review prospectus supplements for offering terms, purchase pricing, and estimated net proceeds to TRCH from sales. *Id.* at 12. The SEC declared this registration statement effective on June 14, 2021.[16]

On June 16, 2021, TRCH filed the first prospectus supplement,[17] and announced entry into a sales agreement with Roth Capital Partners, LLC ("Roth") to sell shares under the registration statement for up to an aggregate offering price of $100 million. *Id.* at 1. TRCH made clear that sales would be at market prices in an "at the market offering" (the "ATM Offering"). *Id.* at S-11; *see also id.* at 1. TRCH explained share price and dilution risks associated with the ATM Offering:

- "Investors who purchase shares in this offering at different times will likely pay different prices, and so may experience different levels of dilution and different outcomes in their investment results."  *Id.* at S-9.

- "If you invest in our common stock issued pursuant to this offering, your ownership interest will be immediately diluted to the extent of the difference between the public offering price per share and the as adjusted net tangible book value per share after giving effect to this offering.  *Id.* at S-10.

TRCH further disclosed that net sale proceeds would be used for "general corporate purposes" and that, if the merger closed, a portion "may be allocated to [its] oil and gas business." *Id.* at S-9. TRCH also disclosed that it might raise additional capital. *Id.* at S-10.

On June 21, 2021, TRCH filed a second prospectus supplement,[18] disclosing that, as of June 21, 2021, 11,738,345 shares of common stock were sold for approximately $100 million and that TRCH amended the sales agreement with Roth to sell up to an additional $150 million more. *Id.* at 1. Again, TRCH made clear that shares would be sold in the ATM Offering (*id.* at 1, S-8, S-9), and TRCH issued share price and dilution warnings (*id.* at S-9, S-10). TRCH *again* disclosed that net sale proceeds would be used for "general corporate purposes" and that, if the merger

---

[16] TRCH, Notice of Effectiveness (June 14, 2021), *available at* https://www.sec.gov/Archives/edgar/data/1431959/999999999521002335/xslEFFECTX01/primary_doc.xml.
[17] TRCH, Prospectus (424B5) (June 16, 2021), *available at* https://www.sec.gov/Archives/edgar/data/1431959/000119983521000383/form-424b5.htm.
[18] TRCH, Prospectus (424B5) (June 21, 2021), *available at* https://www.sec.gov/Archives/edgar/data/1431959/000119983521000410/form-424b5.htm.

closed, a portion "may be allocated to [its] oil and gas business." *Id.* at S-9. TRCH raised $137.5 million in the ATM Offering, which took place between Friday, June 18, 2021, and Thursday, June 24, 2021. Compl. ¶ 106.

## H.  TRCH Shareholders Approved the Merger, and the Dividend Record Date is Disclosed.

TRCH's May 7, 2021 Definitive Proxy Statement notified shareholders of a June 11, 2021 special meeting to vote on the merger.[19] On June 11, 2021, TRCH's shareholders overwhelmingly approved the merger. [20] On June 13, 2021, Palikaras posted his "Shorts Tweet," a picture of shorts branded with the Meta I and TRCH logos and stating that "[t]o commemorate the $TRCH and $MMAT merger we are thinking of launching a one time, limited edition shorts-in-flames this summer. If we get 500 likes on this post we may actually do it :-) #getyourshorty #BBQseason #SundayRoast." On June 14, 2021, TRCH announced June 24, 2021 as the Dividend record date ("Record Date").[21] To receive the Dividend, an investor had to either hold or place an order to buy TRCH stock by June 22, 2021 to ensure they were shareholders of record as of June 24, 2021 (the "T+2 Rule"). Compl. ¶ 32 n.4. The same day, Palikaras posted his "T+2 Tweet" (and with the Shorts Tweet, the "Tweets") linking to TRCH's own release and saying "[n]ice release by $TRCH, the dividend [record] date is 06/24 (ten day notice required), there is a T plus 2 rule so last chance to be in @TRCHEnergy is Tuesday 06/22 end of day." Though the SEC rests much of its case on them, it does not allege that either the Shorts Tweet or T+2 Tweet was materially misleading.

## I.  The Merger Closes and Meta II Commences Operations, Terminates Palikaras, Settles with the SEC.

On June 28, 2021, TRCH announced the completion of its merger with Meta I, and Meta II commenced operations and began trading on Nasdaq. *Id.* ¶¶ 19, 107. Meta II terminated Palikaras as President and CEO in October 2023. *Id.* at ¶ 16.

---

[19] Definitive Proxy Statement *supra* note 10.
[20] TRCH, Press Release, dated June 11, 2021 (Form 8-K, Ex 99.1.) (June 16, 2021), *available at* https://www.sec.gov/Archives/edgar/data/1431959/000119983521000381/ex99-1.htm.
[21] TRCH, Press Release, dated June 13, 2021 (Form 8-K, Ex. 99.2) (June 16, 2021), *available at* https://www.sec.gov/ix?doc=/Archives/edgar/data/1431959/000119983521000381/form-8k.htm.

On June 25, 2024, the SEC settled with Meta II without requiring the company to admit any wrongdoing or pay any disgorgement and imposing a civil penalty of just $1 million.[22]

## III.   ARGUMENT AND AUTHORITY

### A. The SEC Fails to Plead that Palikaras Made Materially False and Misleading Statements under Section 10(b) of the Exchange Act, Rule 10b-5 Thereunder, or Section 17(A) of the Securities Act

#### 1. The SEC Fails to Allege that Palikaras Made *Any* Misstatement or Omission at the March 2021 Investor Conference.

The Complaint insists Defendants (collectively) "met with a series of investors" at the March 2021 virtual Investor Conference hosted annually by an investment bank to bring together a number of companies, investors, and other market participants. Compl. ¶ 60. Defendants (collectively) allegedly "pitched the justification for the merger" and "described . . . the potential for the Preferred Dividend to cause a short squeeze" in "private communications" with investors. *Id.* Relying solely on an unidentified "note-taker" who "recorded Brda telling an investment firm" about the potential for the Dividend to cause a short squeeze (which was already being discussed on social media),[23] the SEC concludes that "*Defendants*" (collectively) "intended to drive interest with these investors in the merger and in buying or retaining [TRCH] stock, without publicly disclosing their plan or belief that a short squeeze would occur." *Id.* This allegation is misleading and also constitutes impermissible group pleading.

The Fifth Circuit has "never adopted the 'group pleading' doctrine," and "[S]ection 10(b) and Rule 10b–5 required plaintiffs to identify the roles of the individual defendants, and describe their involvement." *Southland Sec. Corp. v. INSpire Ins. Solutions Inc.*, 365 F.3d 353, 364-65 (5th Cir. 2004;[24] *see also Yoshikawa v. Exxon Mobile Corp.,* No. 21-CV-00194-N, 2023 WL 5489054,

---

[22] Meta II Settlement Action*, supra* note 3.

[23] *See supra* at II.D.

[24] In *Southland*, the Fifth Circuit explained: "Consistent with our rejection of the 'group pleading' doctrine, we do not construe allegations contained in the Complaint against the 'defendants' as a group as properly imputable to any particular individual defendant unless the connection between the individual defendant and the allegedly fraudulent statement is specifically pleaded. While the plaintiffs aver … that the individual defendants 'each controlled the contents of and participated in writing [the defendant's] SEC filings, reports and releases,' this conclusory allegation fails to specify which of these documents is attributable to each individual defendant, let alone which portions or statements within these documents are assignable to each individual defendant." 365 F.3d at 365.

at * 2 (N.D. Tex. Aug. 24, 2023) ("Plaintiffs also must 'distinguish among those they sue and enlighten each defendant as to his or her particular part in the alleged fraud.'") (quoting *Southland*, 365 F.3d at 365 and citing *Owens v. Jastrow*, 789 F.3d 529, 534–35 (5th Cir. 2015)).

The Complaint improperly implies that "Defendants" jointly promoted the short squeeze narrative during the Investor Conference. But the SEC does not allege that Palikaras, himself, actually said (or omitted) *anything* at the Investor Conference. This fails to state a claim against Palikaras under any provision of Section 10(b), Rule 10b-5, or Section 17(a), because it wholly lacks the particularity demanded by Rule 9(b) about what material statement Palikaras made or failed to make at the Investor Conference. *See SEC v. Bowen,* No. 22-CV-1415-S, 2023 WL 6166780, at *7 (N.D. Tex. Sept. 21, 2023) (dismissing fraud claims where allegations "fail[] to provide the who, what, when ,where, and how of the fraud that is required by Rule 9(b)"); *SEC v. Felton*, No. 20-CV-822-G, 2020 WL 7056333, at *5 (N.D. Tex. Dec. 2, 2020) (dismissing fraud claims based on similar allegations where SEC generally claimed the defendant "actively participated" in a scheme but only pointed to "uncontextualized communications").

And this fatal pleading maneuver is no errant mistake. Throught its Complaint, the SEC generically impugns Palikaras by lumping him into allegations collectively about Brda, TRCH, or Meta I's alleged acts and statements, perhaps in an attempt to create an appearance of so-called scheme liability which, as discussed below, is not available in this case where the only specific facts pleaded are about statements Palikaras made or failed to make (including at the Investor Conference). *See, e.g.*, Compl. ¶¶ 29, 47, 51, 52, 55, 60, 67, 88, 89, 91, 92, 96, 97, 103, 104, 107.

### 2. Palikaras's Tweets Contained No Material Misrepresentations or Omissions.

The SEC must show that a statement or omission is both misleading *and* material. *See* 15 U.S.C. § 77q(a)(2); 17 C.F.R. § 240.10b-5(b); *see also Jacobowitz v. Range Res. Corp.*, 596 F. Supp. 3d 659, 672 (N.D. Tex. 2022) ("Even if misrepresentations or omissions are pleaded with sufficient specificity and individualization, they must be *material* to properly state a claim.") (emphasis in original). "To be actionable, a misrepresentation or omission of a fact must be *objectively* material." *Dawes v. Imperial Sugar Co.*, 975 F. Supp. 2d 666, 687 (S.D. Tex. 2013)

13

(emphasis added). Courts assess "whether the information disclosed, understood as a whole, would mislead a reasonable potential investor." *SEC v. Seghers*, 298 F. App'x 319, 328 (5th Cir. 2008) (internal quotation and citation omitted). The SEC cannot allege that either the Shorts Tweet or T+2 Tweet injected materially inaccurate information into the market or deceived investors. In fact, there are no specific allegations that the Tweets resulted in a material increase (or decrease) in the securities' price.

        **a.**  **The Shorts Tweets is Neither a Material Misrepresentation Nor Omission.**

The SEC does not allege that Palikaras's Shorts Tweet contained a materially false statement or omission, hence it cannot support a claim under Rule 10b-5(b) or Section 17(a)(2). The SEC does not dispute any statement in the Shorts Tweet itself. Instead, it makes the conclusory assertion that the tweet "impl[ies] that he intended to tout" the short squeeze. Compl. ¶ 65. The SEC alleges Palikaras's Shorts Tweet revealed his belief, or intent, that the Dividend would result in a short squeeze and was meant to promote the "short squeeze theory and encourage investors" to buy TRCH stock (*id.* ¶ 64)—notwithstanding a contradictory argument elsewhere in the Complaint that he *failed* to disclose his intent. *Id*. ¶ 48 (alleging Palikaras "never disclosed" that he "believed" the Dividend would cause a short squeeze). The SEC springboards off the Shorts Tweet to fault Palikaras for "do[ing] nothing to disabuse the connection his followers on social media were drawing between his tweet and the short squeeze." *Id.* ¶ 66. But the Complaint pleads no facts showing the Shorts Tweet was misleading based on any specific content (or omission) within it, and the supposed understanding circulating online based on what the SEC argues the Shorts Tweet *implied* cannot support a material misstatement by Palikaras. His statement is "of the vague and optimistic type that cannot support a securities fraud action ... and contain[s] no concrete factual or material misrepresentation." *Lain v. Evans*, 123 F. Supp. 2d 344, 348 (N.D. Tex. 2000) (citation omitted); *see also In re Synchrony Fin. Sec. Litig.*, 988 F.3d 157, 168 (2d Cir. 2021) (a material misstatement requires a "concrete description" and a "factual representation," rather than a "vague expression"). Further, the SEC's allegations about how some Twitter

commenters interpreted Palikaras's statements fails to plead that a reasonable investor would have interpreted it the same way. *See Omnicare, Inc. v. Laborers Dist. Couns. Constr. Indus. Pension Fund*, 575 U.S. 175, 186–87 (2015) ("whether a statement is 'misleading' depends on the perspective of a reasonable investor" because "[t]he inquiry (like the one into materiality) is objective"); *see also Boykin v. K12, Inc.,* 54 F.4th 175, 185 (4th Cir. 2022) (declining to adopt plaintiff's proposed reading of challenged disclosure, despite argument that "[t]wo financial analysts covering the company" read it that way, because "[t]he falsity element of a Rule 10b-5 claim boils down to the reasonable investor's view of [the] statements, [] not any individual investor's reaction").

The Complaint suggests that a statement the SEC does not allege is false was nevertheless a "deceptive marketing and promoting" statement that led the market "to believe a short squeeze would occur and drive the surge." *Id.* ¶ 97. But the SEC overlooks the fact that, by the time Palikaras tweeted on June 14, 2021, the market had already digested and was discussing the likelihood of a short squeeze (and, as noted above, others were actively campaigning to artificially increase the share price of TRCH).[25] The SEC fails to allege that the Shorts Tweet *itself* was materially misleading but rather seeks to impose on Palikaras (i) a duty *not to speak* so as to avoid being misconstrued; or (ii) a duty to *say more* based on how his truthful statements were interpreted by third parties (which would also impose on him a duty to determine how his tweet was interpreted and presumably address *numerous* interpretations). Such duties do not exist and were not pleaded. Indeed, to impose such duties would create an impossible game of interpretational Whack-a-mole on executives like Palikaras that are not contemplated by the securities laws.

In sum and substance, allegations about the Shorts Tweet fail because the statement did not include—and is not alleged to have included—material misrepresentations or omissions; it simply repeated commentaries of a looming short squeeze already in the public domain. *See, e.g.*, *In re Bank of Am. AIG Disclosure Sec. Litig.*, 980 F. Supp. 2d 564, 577 (S.D.N.Y. 2013) (dismissing

---

[25] *See supra* at II.C and note 9.

securities fraud claims and holding, "[b]ecause the substance of the alleged omissions was already in the public domain, the alleged omissions could not have altered 'the total mix of information available' to the public and were also immaterial as a matter of law") (citation omitted); *In re Adams Golf, Inc. Secs. Litig.*, 381 F.3d 267, 279 (3d Cir. 2004) (affirming dismissal of certain claims because defendant had no duty to disclose "information already available in the public domain"); *Halperin v. eBanker USA.com, Inc.*, 295 F.3d 352, 361 (2d Cir. 2002) (affirming dismissal where "[t]he allegedly omitted facts were either disclosed or implied in the offering memoranda").

### b.   The T+2 Tweet is Neither a Material Misrepresentation Nor Omission.

The SEC points to Palikaras's T+2 Tweet as further evidence he desired a short squeeze and promoted such a narrative but again does not allege the statement *itself* to be false or misleading. Indeed, the T+2 Tweet is a plainly factual statement and an accurate observation of information already in the public domain. Compl. ¶ 90 n.4. There can be no scienter, or even negligence,[26] in repeating truthful information already in the public domain because truthful disclosures inform, rather than deceive, investors. *See Neiman v. Bulmahn*, 854 F.3d 741, 750 (5th Cir. 2017) (disclosure of truthful information weighed against inference of scienter); *Owens*, 789 F.3d at 541 ("[a]dditional transparency ... further negates the inference of scienter.").

### c.   Palikaras Did Not Otherwise Fail to Disclose Information He Had a Duty to Provide.

"In a securities fraud omissions case, the defendant must have a duty to speak to be found liable." *SEC v. Mapp*, 240 F. Supp. 3d 569, 580 (E.D. Tex. 2017) (citing *Cent. Bank of Denver, N.A. v. First Interstate Bank of Denver, N.A.*, 511 U.S. 164, 174 (1994)). Absent an affirmative duty, there is no obligation to disclose even material information under the antifraud provisions of

---

[26] Negligence is sufficient for liability under Section 17(a)(2) (misrepresentation or omission) and Section 17(a)(3) (scheme). *Seghers*, 298 F. App'x. at 327. But the SEC fails to plead facts suggesting Palikaras acted negligently; in fact, the Complaint suggest the opposite – Palikaras knew at the time not to share posts on the short squeeze because of a "risk for potentially speculative content." Compl. ¶ 63. For these reasons, and as set out in Brda's Motion to Dismiss, these negligence-based claims should also be dismissed. *See* Brda's Motion to Dismiss at 33-34 (discussing SEC's inability to allege a negligence-based theory).

the federal securities law. *See Macquarie Infrastructure Corp. v. Moab Partners, L.P.,* 601 U.S. 257, 264 (2024) ("Rule 10b–5(b) does not proscribe pure omissions."); *Basic Inc. v Levinson*, 485 U.S. 224, 239 n.17 (1988) ("[s]ilence, absent a duty to disclose, is not misleading"). Importantly, "a duty to speak the full truth o*n a particular subject* arises when a defendant undertakes to say anything *on that particular subject*." *Mapp*, 240 F. Supp. 3d at 584 (emphasis in original).  Put another way, "[a]n omission is actionable under federal securities laws only when the [defendant] is subject to a duty to disclose the omitted facts." *City of Roseville Emps. Ret. Sys. v. EnergySolutions, Inc*., 814 F. Supp. 2d 395, 410 (S.D.N.Y. 2011) (internal quotations omitted).

Beyond generically complaining that he did not correct *others'* alleged misstatements or omissions, the SEC does not identify any obligation Palikaras had to make a statement correcting TRCH's public disclosures relating to the Dividend or ATM Offering (nor does it plead he knew or had a basis for believing such disclosure to be wrong). The SEC points to no facts showing why Palikaras would be required to do so —he was not a corporate officer of TRCH (let alone involved in the day-to-day operations of the company), not involved in the negotiations between TRCH and Roth or its other advisors, not a signatory to TRCH's SEC filings, and held no other position that made him uniquely situated to have access to or control over TRCH's internal processes, advice from its legal and financial advisors, or public filings. *See Abrams v. Baker Hughes, Inc.*, 292 F.3d 424, 432 (5th Cir. 2002) (affirming dismissal where pleading "rest[ed] on the inference that defendants must have been aware of the misstatement based on their positions within the company").

### 3. Palikaras Made Neither Material Misrepresentations Nor Omissions During the Private Investor Call.

Using a novel theory contrary to existing precedent, the SEC attempts to hold Palikaras liable for statements created and disseminated by others to an online audience with whom Palikaras never communicated (and never intended to communicate). The Complaint makes no effort to distinguish between what Palikaras stated in the Private Investor Call and how others acting

beyond his knowledge or control and with their own motivations repackaged and independently communicated information selectively clipped and edited from the Private Investor Call.

During the Private Investor Call, Palikaras allegedly mentioned the potential for a short squeeze (which was already public knowledge at the time as it had been digested by the market and stockholders were regularly commenting on it online), Compl. ¶ 50; opined that the value of the Dividend could be between $1 and $20, *id.* at ¶ 84; and further opined that TRCH was having discussions to find the right buyers for its oil and gas assets. *Id.* at ¶ 83.  None of these allegations supports a claim.

> **a.  Palikaras's Beliefs About a Short Squeeze Occurring, Possible Purchasers for TRCH's Oil and Gas Assets, and Potential Value of the Dividend Were Opinions, Puffery, and Did Not Alter the Total Mix of Information.**

According to the SEC, Palikaras made two "false and misleading statements" during the Private Investor Call, pointing to his opinion (as a non-representative of TRCH) that the value of TRCH's Dividend "*could* be" between $1 to $20 based on "the analysis" and his understanding that TRCH was speaking to "the right *potential* buyers" for possible sale of its oil and gas assets. Compl. ¶¶ 82-84; 87-88. The SEC cannot maintain misrepresentation or omission claims based on cherry-picked, qualified statements made during the Private Investor Call, especially where those statements were merely expressions of Palikaras's opinions and belief while the market had access to the specific, concrete facts from TRCH's public filings. Palikaras's optimistic generalizations were not worded as guarantees or supported by specific statements of fact. "No reasonable investor would find such generic predictions actually significant and therefore material in their decision making." *SEC v. Reynolds*, No. CIV.A.3-08-CV-0384-B, 2008 WL 3850550, at *5 (N.D. Tex. Aug. 19, 2008) (citing *Rosenzweig v. Azurix Corp.*, 332 F.3d 854, 870 (5th Cir. 2003)); *see also Nathenson v. Zonagen Inc.*, 267 F.3d 400, 419 (5th Cir. 2001) (statements worded in the form of "optimistic generalizations" cannot support liability under the securities laws); *SEC v. Reynolds*, No. CIV.A.3-08-CV-0384-B, 2008 WL 3850550, at *5 (N.D. Tex. Aug. 19, 2008) (dismissing certain claims where statement did not reference "any actual facts upon which an investor might

evaluate a business" and noting "[a] reasonable investor relies on common sense and objective facts, not on speculation as to stock price or potential—particularly when that speculation is not accompanied by any substantive information about the business.").

The Complaint states that Palikaras vaguely referred to "the analysis" to support his estimation for what the Dividend range *could* be, not that he determined it would be in that range or even whether he himself had reviewed TRCH's analysis. Similarly, he generally referenced his understanding that TRCH identified quality "potential buyers" for its oil and gas assets, not that particular parties were negotiating anything approaching a transaction. These are high-level opinion statements based on beliefs held at the time as a non-member of TRCH. Such statements are puffery and statements of opinion not actionable under the securities law. *See Emps.' Ret. Sys. v. Whole Foods Mkt., Inc.,* 905 F.3d 892, 901 (5th Cir. 2018) (puffery is "immaterial because [it] do[es] not alter a reasonable investor's assessment of the company's prospects); *Shandong Yinguang Chem. Indus. Jt. Stock Co., v. Potter,* 607 F.3d 1029, 1033 (5th Cir. 2010) (affirming dismissal and finding "sound financial condition" statement immaterial where the plaintiff failed to plead that the defendant "presented any detailed, corroborating information, facts or figures to support the statement that might entice a reasonable person to attach importance to the statement"); *Reynolds,* 2008 WL 3850550, at *5 ( "Statements 'are non-actionable puffery [if] they are of the vague and optimistic type that cannot support a securities fraud action ... and contain no concrete factual or material misrepresentation.'") (quoting *Southland,* 365 F.3d at 372).

Moreover, the SEC focuses on Palikaras's statements in a vacuum, ignoring the fact that he was fielding questions from others who may have provided that range to Palikaras as a hypothetical. Regardless, these statements "lack[ed] the sort of definitive positive projections that might later require correction." *In re Time Warner Inc. Sec. Litig.,* 9 F.3d 259, 267 (2d Cir. 1993). Importantly, TRCH reported on the value of its oil and gas assets and the number of outstanding

shares *after* Palikaras's statements on the Private Investor Call.[27] The SEC unfairly casts Palikaras in a bad light by alleging that, at the time of this statement, he had "reviewed the investment bank's third-party asset valuation, which implied an estimate asset value of less than $1.00 per share" Compl. ¶ 85. Tellingly, and perhaps because it undermines the claim that Palikaras's reference to "the analysis" gave investors a "misleading impression that his value range was supportable," the Mets II Settlement Action reveals that this was the same investment bank analysis included in TRCH's Definitive Proxy Statement.[28] Contrast with (i) TRCH's publicly filed financial statements which included accounting and valuation methodologies and (ii) the investment bank analysis included in TRCH's proxy filings, no reasonable investor would have credited Palikaras's off-base projections in the Private Investor Call to a handful of individuals believed to be TRCH shareholders. *See In re Franklin Bank Corp. Sec. Litig.*, 782 F. Supp. 2d 364, 381 (S.D. Tex. 2011) ("Allegations that amount to little more than corporate 'cheerleading' are puffery[.] [P]rojections of future performance not worded as guarantees [ ] are not actionable under federal securities law."); *In re IBM Corp. Sec. Litig.*, 163 F.3d 102, 110 (2d Cir. 1998) ("[T]here is no duty to update vague statements of optimism or expressions of opinion. There is also no need to update when the original statement was not forward looking and does not contain some factual representation that remains 'alive' in the minds of investors as a continuing representation, or if the original statements are not material.") (citations omitted).

---

[27] *See, e.g.*, TRCH Form 10-Q (May 14, 2021) at 13, *available at* https://www.sec.gov/ix?doc=/Archives/edgar/data/0001431959/000119983521000292/form-10q.htm; Definitive Proxy Statement, *supra* note 10, at 93.

[28] The Meta II Settlement Action, *see supra* note 3, shows that "a valuation study performed by TRCH's investment bankers that Palikaras reviewed, which estimated the asset value from $0.034 to $0.83 per share." *See* Meta II Settlement Action*, at ¶ 30. The Definitive Proxy Statement includes financial analyses from TRCH's investment bankers, including a value range for the equity value of the oil and gas assets. *See* Definitive Proxy Statement, *supra* note 10, at 111- 116; *id.* at 116 ("Roth assessed the implied equity value of [TRCH's] existing O&G Assets combined with the implied equity value attributable to [TRCH] from Meta to determine a range of implied equity values of $83.5 million to $161.4 million.").

### b. The SEC's Rule 10b-5(b) Claims Fail Because Palikaras is Not the Maker of the Screenshot or the Incomplete Secret Recording.

The Complaint contends that, after the Incomplete Secret Recording was published by others acting beyond Palikaras's knowledge or control, a "common refrain on social media" was that Palikaras "estimated the Preferred Dividend would be worth $20 per share." Compl. ¶ 86. As noted above, the SEC does not allege that Palikaras himself made any direct statement to that effect—indeed, he did not. *See* Compl. ¶ 84 (cherry-picking one word-quotation from the call where "Palikaras claimed that, based on 'the analysis,' the value of the Preferred Dividend ***could be*** between $1-$20 per share") (emphasis added).

Under Rule 10b–5, only the "maker of a statement" can be primarily liable for securities fraud. *Janus Capital Grp., Inc. v. First Derivative Traders*, 564 U.S. 135, 141 (2011). "[T]he maker of a statement is the person or entity with <u>ultimate authority</u> over the statement, including its content and <u>whether and how to communicate it</u>." *Id*. (emphasis added). Palikaras is not the "maker" of the Screenshot or the Incomplete Secret Recording. Rather, the SEC's allegations hinge on statements made and disseminated by KingOneFolle and an unidentified[29] social media user. Compl. ¶¶ 50, 86. Indeed, the SEC does not allege Palikaras had anything to do with KingOneFolle's decision to create and publish *his own* "synopsis of four takeaways" from alleged meetings with both Palikaras and Brda, including KingOneFolle's opinion that "this news will create a short squeeze as there are many short stocks to cover before the merger!!" Compl. ¶ 50. Similarly, by choosing to record and then circulate an unauthorized, incomplete, and modified recording of the Private Investor Call, the unidentified internet user created a new statement—over which Palikaras exercised no authority and certainly no say in whether or how to communicate it. Hence, that internet user (not Palikaras) is the maker of that statement.[30]

---

[29] The passive voice in the Complaint obscures who posted the Incomplete Secrete Recording. Compl. ¶ 86 (alleging a "partial audio recording…had been posted to social media." But the Meta II Settlement Action reveals the poster was a "Reddit user." Meta II Settlement Action, *supra* note 3, at ¶ 18.

[30] Indeed, the Incomplete Partial Recording does not include, among other things, any of the disclaimers made at the beginning of the call.

In *Janus*, the government argued that a person who "provides the false or misleading information that another person then puts into the statement" should be liable for the statement. *Janus*, 564 U.S. at 144-145 (quoting the Brief for United States as Amicus Curiae). But the Supreme Court rejected that interpretation, explaining that "participating in the drafting of a false statement" is insufficient to allege a primary violation, even when the defendant provided the information that "was later incorporated into false public statements." *Id.* at 145; *see also id.* at 145 n.8 (noting "[t]his also is not the first time this Court has disagreed with the SEC's broad view of § 10(b) or Rule 10b–5") (citing cases). Maker liability under *Janus* requires "ultimate authority" and "control," including about whether and how to communicate a statement – all of which are lacking here. Cases applying *Janus* look at whether the person preparing or publishing the statement is acting independently or whether a defendant "lacked 'ultimate control' over the statements' content and dissemination." *Lorenzo v. SEC*, 872 F.3d 578, 586 (D.C. Cir. 2017), *aff'd*, 139 S.Ct. 1094 (2019); *id.* at 587 (holding investment banker, who "cut and pasted" and "sent the email messages at the behest of his boss[,]" was not the "maker" of false statements where his boss "retained ultimate authority"). Here, the SEC does not allege that Palikaras "retained" any authority over the creation, content, or dissemination of the Screenshot or the Incomplete Secret Recording. Indeed, he did not. Palikaras was, at best, a participant or provider of information that was incorporated into false public statements by KingOneFolle and the unknown internet user. Thus, under *Janus*, Palikaras is not the maker of those statements as a matter of law.

### c. The SEC Cannot Establish Omission Liability under Section 10(b), Rule 10b-5, or Section 17(a) for Palikaras's Alleged Failure to Correct or Address the Screenshot or Incomplete Secret Recording.

In a further effort to make Palikaras liable for the Screenshot and Incomplete Secret Recording, the SEC contends that Palikaras should be faulted for failing to prevent them from being disseminated by and then reacted to by others on social media. However, the SEC's contention finds no support in the law. The SEC also makes no suggestion how Palikaras, who had no ultimate control, could have corrected the actions of KingOneFolle or the unknown internet

user without creating confusion or further market turbulence.[31] The Second Circuit rejected an attempt by the SEC to expand liability premised on such a theory. *See SEC v. Rio Tinto plc*, 41 F.4th 47, 52 (2d Cir. 2022) (rejecting SEC's argument that the defendants failed to prevent misleading statements from being disseminated by others where there was no allegation that the defendants themselves disseminated the statements). Here, the SEC does not plead any facts suggesting that Palikaras consented to (or even knew) he was being recorded, much less that utterances would be recharacterized by others and excerpted, edited, and remade into an altogether new statement by a third party posting it to the internet without his authority or consent.

## B.  THE SEC DOES NOT PLEAD SCHEME LIABILITY AGAINST PALIKARAS

The SEC alleges that Brda "conceived, designed, and structured" a fraudulent scheme to artificially inflate TRCH's stock price via the Dividend to create a short squeeze and taking advantage of the inflated price (even though the SEC does not actually allege a short squeeze occurred) by raising capital through the ATM Offering. Compl. ¶ 30.  According to the Complaint, Palikaras "failed to disclose" his "private coordination" with Brda, which "concealed Defendants' scheme, plans and intentions." *Id.* ¶¶ 48-48. But the SEC does not plead a market manipulating act by Palikaras and, instead, merely repackages already-deficient claims about what he allegedly said or failed to say (addressed above) as "scheme liability," to argue Palikaras "actively worked with Brda to carry out" a fraudulent scheme from which he did not personally gain. *Id.* ¶¶ 37, 47-49. But because there can be no scheme liability based purely on alleged statements and omissions, such claims should be dismissed.

Exchange Act Section 10(b) makes it unlawful "for any person, directly or indirectly…[t]o use or employ, in connection with the purchase or sale of any security…any manipulative or deceptive device or contrivance in contravention of such rules and regulations as the [SEC] may prescribe."  15 U.S.C. § 78j(b).  In relevant part, Rule 10b-5, makes it unlawful to: (a) "employ any device, scheme, or artifice to defraud"; or (c) "engage in any act, practice, or course of business

---

[31] The SEC also fails to account for the possibility that legal and other advisors may have advised Palikaras not to intervene.

which operates or would operate as a fraud or deceit upon any person" in connection with the purchase or sale of any security. 17 C.F.R. § 240.10b-5. Similarly, Securities Act Section 17(a)(1) makes it unlawful to "employ any device, scheme, or artifice to defraud" in the offer or sale of securities, and Section 17(a)(3) prohibits engaging "in any transaction, practice, or course of business which operates or would operate as a fraud or deceit upon the purchaser." 15 U.S.C. §§ 77q(a)(1), 77q(a)(3). Essentially, the same elements are required under Section 17(a)(1) and (3) as under Section 10(b) and Rule 10b-5, though no showing of scienter is required for Section 17(a)(3). *Seghers*, 298 F. App'x at 327.  Rather, negligence is sufficient to plead a violation of Section 17(a)(3).  *Id.*

### 1.    The Complaint Does Not Allege Any Actionable Conduct by Palikaras Beyond Alleged Misrepresentations and Omissions.

The foregoing provisions of Rule 10b-5 and Section 17(a) create what courts call scheme liability. *SEC v. Mapp*, 16-CV-00246, 2017 WL 5230358, at *4 (E.D. Tex. Nov. 9, 2017) (analyzing first and third prongs of both Section 17(a) and Rule 10b-5 together as "scheme liability" claims). To state a claim for scheme liability, "the SEC must allege sufficient facts for the court to draw the reasonable inference that [Palikaras] (1) committed a deceptive or manipulative act; (2) in furtherance of the alleged scheme to defraud; (3) with scienter." *SEC v. Verges*, 716 F. Supp. 3d 456, 466 (N.D. Tex. 2024) (citing *SEC v. Wilson*, 2022 WL 18275941, at *6 (N.D. Tex. Dec. 28, 2022)).  The SEC must also meet Rule 9(b)'s heightened pleading standard when attempting to state a scheme liability claim. *Id.* at 474 ("Scheme liability claims are subject to Rule 9(b)'s heightened pleading requirements because they sound in fraud…To satisfy Rule 9(b), the SEC must articulate the precise contours of the alleged scheme to defraud, or the specific acts conducted in furtherance of it.") (citing *Tuchman v. DSC Commc'ns Corp.*, 14 F.3d 1061, 1067 (5th Cir. 1994)).

Scheme liability requires more than misrepresentations or omissions; it requires "proof of participation in an illegitimate, sham, or inherently deceptive transaction where the defendant's conduct or role has the purpose and effect of creating a false appearance." *Verges*, 716 F. Supp.

3d at 466 (citations omitted); *id.* (noting scheme liability "is appropriate if the defendant has *substantially participated* in scheme to mislead investors even if a material misstatement by another person creates the nexus between the scheme and the securities market") (internal quotation marks and citation omitted) (emphasis added). To plead scheme liability, "[i]t is not enough that a *transaction* in which a defendant was involved had a deceptive purpose and effect; the defendant's *own conduct* contributing to the transaction or overall scheme must have had a deceptive purpose and effect." *Verges*, 716 F. Supp. at 466 (internal quotation marks and citation omitted) (emphasis in original). A manipulative or deceptive act is a "term of art . . . refer[ring] generally to practices, such as wash sales, matched orders, or rigged prices, that are intended to mislead investors by artificially affecting market activity, and connotes intentional or willful *conduct* designed to deceive or defraud investors by controlling or artificially affecting the price of securities." *Set Cap. LLC v. Credit Suisse Grp. AG*, 996 F.3d 64, 76 (2d Cir. 2021) (internal quotation and citation omitted) (emphasis added); *Verges*, 716 F. Supp. 3d at 467 (type of conduct prohibited under the scheme liability provisions includes "[m]arket manipulation, employment of a manipulative device, and engaging in manipulative schemes such as a scheme to artificially inflate or deflate stock prices, falsifying records to reflect non-existent profits, and creating and distributing false research reports favorably reviewing a company") (citation omitted).

As the Fifth Circuit has explained, the critical question is whether alleged deceptive conduct has "the effect of either creating the false impression that certain market activity is occurring when in fact such activity is unrelated to actual supply and demand or tampering with the price itself." *Regents of the Univ. of Cal. v. Credit Suisse First Bos. (USA), Inc.*, 482 F.3d 372, 391 (5th Cir. 2007); *see also Ernst & Ernst v. Hochfelder*, 425 U.S. 185, 199 (1976) (defining market manipulation as conduct "designed to deceive or defraud investors by controlling or artificially affecting the price of securities"); *SEC v. Mueller*, No. SA-21-CV-00785, 2024 WL 400897, at *19 (W.D. Tex. Jan. 11, 2024) ("To succeed on such a scheme liability theory, a plaintiff must prove that the defendant ... engaged in conduct that had the principal purpose and effect of creating a false appearance of fact in furtherance of the scheme.") (internal quotation

marks and citation omitted). "Scheme liability thus 'hinges on the performance of an inherently deceptive act that is distinct from an alleged misstatement.'" *SEC v. Farmer*, No. 14-CV-2345, 2015 WL 5838867, at *14 (S.D. Tex. Oct. 7, 2015) (quoting *SEC v. Kelly*, 817 F. Supp. 2d 340, 344 (S.D.N.Y. 2011)). Critically, the SEC only describes Palikaras's supposed participation in the alleged scheme in terms of *statements* he allegedly made (vague allegations that he said *something* (albeit not pleaded) at the Investor Conference; high-level opinions in the Private Investor Call later repackaged and repurposed in the Screenshot and Incomplete Secret Recording; and the Tweets) or failed to make despite no duty to do so. The SEC does not identify—much less with the specificity required under Rule 9(b)—any inherently deceptive *conduct* Palikaras undertook *in addition to* his alleged misstatements and omissions.

And despite the SEC's efforts to recharacterize disclosure-based facts as scheme liability, it is well-settled that misstatements and omissions alone are insufficient to state such a claim. *Narayan* illustrates this principle. There, Judge Lynn carefully considered similar issues in dismissing the SEC's scheme liability claims against two corporate officers where the "core misconduct" involved a co-defendant's (Narayan) misrepresentations to investors. *SEC v. Narayan*, No. 16-CV-1417-M, 2017 WL 4652063, at *10 (N.D. Tex. Aug. 28, 2017). Judge Lynn examined "whether the Complaint adequately pleads that" each defendant "did some deceptive act beyond facilitating or covering up" another's acts and found the allegations of an undisclosed finder's fee arrangement were "not an independent deceptive act, apart from Narayan's failure to disclose." *Id.* at *10-11. As Judge Lynn highlighted, "a proper pleading of scheme liability requires that the complaint allege conduct beyond misrepresentations or omissions." *Id.* at *7; *see also id.* at *4-7 (reviewing authorities from Texas federal district courts, as well as the Second, Eighth, and Ninth Circuits, and highlighting that all have held that "a scheme liability claim must be based on conduct beyond misrepresentations or omissions"); *SEC v. Killion*, No. H-16-621, 2017 WL 7052310, at *9 (S.D. Tex. Mar. 24, 2017) (dismissing scheme liability claims where "no 'scheme' can be discerned" beyond alleged misrepresentations and omissions).

2.   **The SEC's Scheme Liability Claims Against Palikaras Also Fail Because the Details of the Alleged Scheme Were Known and Disclosed.**

According to the SEC's own Complaint and relevant precedent, the features and potential impact of the Dividend, ATM Offering, and even Palikaras's alleged awareness or belief that a squeeze would result were publicly known and disclosed.

a.   **Details of the Dividend Were Disclosed and Consequence to Short Interests Was Understood.**

As noted above, TRCH was known to have a significant short interest and was susceptible to stock price manipulation by "seasoned stock manipulators."[32] Commentators on social media and other platforms frequently addressed the impact a merger would have on short interests and, possibly, the price of TRCH stock. TRCH repeatedly disclosed the fact, terms, nature, and risks of the Dividend in SEC filings.[33] Consistently, and in every proxy solicitation filed between the preliminary proxy statements and the Definitive Proxy Statement, TRCH unambiguously informed shareholders that the Dividend would not be registered, could not be listed or traded on any exchange, and would not be freely transferable. *See id*. Further, in its Definitive Proxy Statement, TRCH explained that "[n]o market is expected to develop for the [Dividend] in the foreseeable future and holders of the [Dividend] may not be able to find a buyer and sell their shares if they desired to do so." *Id*.

At least one other court considering similar facts previously held that a complaint failed to allege any deception in connection with a company's announcement of a dividend where its nature and terms were disclosed and the market immediately recognized the effect the Dividend might have on short sellers. In *Overstock*, the court was confronted with allegations that said company and its CEO issued a dividend with the knowledge and intent to "cause" a short squeeze, "artificially spike" Overstock's stock price, and "force short sellers of Overstock to cover their positions at inflated prices." *In re Overstock Sec. Litig.*, No. 19 Civ. 709, 2020 WL 5775845, at *4

---

[32] *See supra* at II.C.
[33] *See, e.g.*, Feb. 4, 2021 Preliminary Proxy Statement, *supra* note 7; Mar. 23, 2021 Preliminary Proxy Statement, *supra* note 8, at 50; Apr. 21, 2021 Preliminary Proxy Statement, *supra* note 9, at 50; Definitive Proxy Statement, *supra* note 10.

(D. Utah Sept. 28, 2020) ("*Overstock I*"). Like TRCH, Overstock had significant short seller interest, and it also publicly disclosed the terms of the dividend and its attendant risks, including that (like TRCH's) it would not be registered or resold. *Id.* at *8. In the face of a precipitous drop in Overstock's share price and a short seller's putative class action, the court held that Overstock had no duty "to disclose the impact on short sellers" because it was already "readily apparent" from Overstock's disclosures about the "nature" of the dividend, so there was no "act" giving a "false impression to the marketplace" and thus no deception. *Id.* (citing *United States v. Finnerty*, 533 F.3d 143, 148 (2d Cir. 2008)).

Similarly, because the market was well aware of (and discussing) the short interest in TRCH (a company already vulnerable to market manipulation according to another pending SEC lawsuit),[34] and repeated public statements about the merger, Dividend, and ATM Offering informed the market a squeeze could occur, Palikaras had no obligation to disclose a possible impact on short interests or increase in TRCH's stock price, even if he hoped for, expected, or intended it.[35] And on this point, the SEC noticeably seeks to have it both ways—alleging both that Palikaras failed to disclose TRCH's and Brda's intent to create a short squeeze and drive up TRCH's stock price *while at the same time* alleging that his Shorts Tweet did just that: conveyed a message laying bare his intent for the Dividend to result in a short squeeze.[36]  Compl. ¶¶ 64-66.

---

[34] *See supra* at II.C and note 9.

[35] Overstock's CEO, who resigned not long after the dividend was announced, published a blog post in which he allegedly confirmed that he designed the dividend "carefully" and with knowledge that it "put legitimate short sellers in a bind." *In re Overstock Sec. Litig.*, 119 F.4th 787,796-97 (10th Cir. 2024). Despite this fact, the Tenth Circuit affirmed the lower court's finding that there was no deception.

[36] Scheme liability claims under Rule 10b-5 and Section 17(a)(1) require proof of scienter. *Aaron v. SEC*, 446 U.S. 680, 691 (1980). The scienter element requires the SEC to plead that Palikaras acted with "'an intent to deceive, manipulate, or defraud or that severe recklessness in which the danger of misleading buyers or sellers is either known to the defendant or is so obvious that the defendant must have been aware of it.'" *SEC v. Stack*, 21-CV-00051, 2021 WL 4777588, at *4 (W.D. Tex. Oct. 13, 2021), *R. & R. adopted*, No. 21-CV-051, 2022 WL 1546718 (W.D. Tex. Jan. 24, 2022) (quoting *Flaherty & Crumrine Preferred Income Fund, Inc. v. TXU Corp.*, 565 F.3d 200, 207 (5th Cir. 2009)). "To plead scienter adequately in the securities law context, Rule 9(b) requires the SEC to set forth specific facts in the complaint that support an inference of fraud." *Narayan*, 2017 WL 4652063 at *11 (internal quotation marks and citations omitted). An "inference of fraud" requires the SEC plead facts that constitute "strong circumstantial evidence of conscious misbehavior or recklessness." *Id.* at *12. In SEC enforcement actions, the scienter inquiry boils down to whether the complaint "sufficiently alleges (1) facts supporting an inference of fraud, and (2) [defendant's] motive to commit fraud." *Id.* at *13. "Motives that are universal to corporations and their officers do not suffice to establish an inference of fraud under Rule 9(b)." *Id.* at *12 (citation omitted). Here, even construing the allegations in the light most favorable to the SEC, the alleged facts are insufficient to support an

Taking the SEC's latter allegation as true, as the Court must, the SEC's position that Palikaras failed to disclose a relationship between the Dividend and Brda's supposed intent should be denied.

To the extent the SEC posits a deception occurred because Palikaras (or non-party Meta I[37] with whom he is sometimes unfairly lumped) failed to disclose Brda or TRCH's own alleged intent to create a short squeeze, that argument fails short for the same reasons. *See Felton*, 2020 WL 7056333, at *6-7 ("Mere knowledge of another's violation of § 10(b), or even aiding and abetting a violation, is not enough to establish [primary] liability under the Exchange Act…The SEC provides no details on [defendant's] specific activities, when they may have occurred, or how any activities are tied to fraud.") First, Palikaras was not responsible for making or correcting TRCH's alleged misstatements (or omissions) (assuming *arguendo* he knew or believed them to be such*)*, or somehow requiring Meta I to do so as a counterparty to the merger.[38] *See, e.g.*, *Novak v. Kasaks*, 216 F.3d 300 (2d Cir. 2000) ("Corporate officials . . . are only responsible for revealing

---

[37] "inference of fraud" or a plausible claim that Palikaras had a "motive to commit fraud." *Id.* at *13. All that is pleaded is that an informed board process at Meta I resulted in the decision to merger with TRCH, effectuated through a legitimate business transaction via the Dividend and ATM Offering that was fully disclosed. *See infra* note 37. And the *Overstock* cases, discussed in detail, *infra* at 30-31, confirm that "a fully disclosed corporate transaction" is not condemned manipulative. *In re Overstock Sec. Litig.*, 119 F.4th 787, 793 (10th Cir. 2024). Accordingly, the SEC's claims under Section 10(b) and Section 17(a)(1) should be dismissed for failure to allege scienter.

[37] TRCH and Meta I were legally separate entities, each with its own board of directors. The merger was the result of arm's length negotiations—in fact, "the letter of intent was heavily negotiated" between representatives of TRCH and Meta I, and "their respective financial and legal advisors." Definitive Proxy Statement, *supra* note 10, at 106. It is "undisputed that the corporate formalities were observed[.]" *Janus*, 564 U.S. at 146. As the speaking entity with ultimate authority over its public disclosures, TRCH alone "takes credit – or blame – for what is ultimately said." *Id.* at 143; *see also N. Port Firefighters' Pension--Loc. Option Plan v. Temple-Inland, Inc.*, 936 F. Supp. 2d 722, 741 (N.D. Tex. 2013) ("In the context of a public SEC filing, the entity that 'bears the statutory obligation to file' and that the SEC has recorded as filing the document ordinarily 'makes' the statements.") (quoting *Janus*, 564 U.S. at 146-47). Even a "well-recognized and uniquely close relationship between Company A and Company B or evidence that Company A exerts significant influence over Company B" does not make one entity responsible for the other's disclosures where the companies remain "legally separate entities." *In re Turquoise Hill Res. Ltd. Sec. Litig.*, 625 F. Supp. 3d 164, 203-04, 206 (S.D.N.Y. 2022) (finding that defendant Rio Tinto, who owned majority stake in defendant Turquoise Hill, did not have ultimate authority over Turquoise Hill's statement where companies enjoyed "own corporate form" and there was "no allegations that corporate formalities were not observed"); *see also Kuwait Inv. Office v. Am. Int'l Grp., Inc.*, 128 F. Supp. 3d 792, 809-11 (S.D.N.Y. 2015) (recognizing that under *Janus* the non-maker of a statement, an "officer[] of a separate entity" who held "no role in the business structure of the speaking entity," could not be "primarily liable for alleged misstatements and omissions in the disclosures issued by [the speaking entity]"); *Ho v. Duoyuan Glob. Water, Inc.*, 887 F. Supp. 2d 547, 572 n.13 (S.D.N.Y. 2012) ("Since each party is liable only for their own misstatements, *Janus* implies that each party is only liable for their own omissions as well.").

[38] Neither in this action nor the prior settled action against Meta II has the SEC ever alleged that Meta I misrepresented or failed to disclose any fact whatsoever. *See Meta II Settlement Action*, *supra* note 3.

those material facts reasonably available to them" and "there are limits to the scope of liability for failure adequately to monitor the allegedly fraudulent behavior of others"); *see also City of Taylor Police & Fire Ret. Sys. v. Zebra Techs. Corp.*, 8 F.4th 592, 596 (7th Cir. 2021) (declining to find scienter with respect to statement made about another company because "[e]xecutives possess only limited information about the internal operations of other corporations"). Second, the intent to cause a short squeeze, where public disclosures make it obvious that a short squeeze would occur, need not be disclosed. *See Doyle v. Milton*, 73 F. Supp. 281, 286 (S.D.N.Y. 1947) (failure of proxy materials to disclose "confession of selfish motive" not a violation of the securities laws where data from which an inference of selfish motive may be drawn is supplied in statement.).

Indeed, Palikaras "could not manipulate the market via truthful statements or via [TRCH's issuance of a] dividend that everyone immediately knew would impact short sellers." *In re Overstock Sec. Litig.*, 2021 WL 4267920, at *11 (D. Utah Sept. 20, 2021) ("*Overstock II*"), *aff'd*, 119 F.4th 787 (10th Cir. 2024)*; see also Overstock I*, 2020 WL 5775845, at *8 ("There is no duty to disclose something so obvious that the entire market immediately understands it."); *Kraft v. Third Coast Mistream*, No. 19 Civ. 9398, 2021 WL 860987, at *23 (S.D.N.Y. Mar. 8, 2021) (no market manipulation where "the market accurately understood the message that [the defendant's] decisions were sending"). The Tenth Circuit affirmed *Overstock* in November 2024, and held, *inter alia,* that "acting in a manner that results in an artificial price, on its own, is not enough to constitute manipulative conduct" and that "truthful disclosure of the terms of the upcoming dividend transaction did not deceive investors as to how the market valued Overstock." *In re Overstock Sec. Litig.*, 119 F.4th 787, 802-803 (10th Cir. 2024). In affirming the district court decision in *Overstock II*, the Tenth Circuit addressed this very point, agreeing in principle that conduct not inherently manipulative should be considered manipulative when accompanied by manipulative intent so long as there is an element of secrecy, which is lacking here as it was there. *Overstock*, 119 F.4th at 804. Here, the effect of the Dividend was clear: short interests would be forced to cover by the record date. *See Overstock I*, at *10 (noting the market "immediately" recognized a short squeeze could be a "collateral consequence[]" of the Overstock dividend based

on disclosures relating to its nature and terms, which "place[d] short sellers in a pickle by forcing them to cover their short positions"). Indeed, just like in *Overstock,* the market was aware of and discussing the practical effect of the TRCH Dividend on short sellers, and before and apart from Palikaras's alleged statements and omissions. *Id*. (noting that the market's discussion of the impact of dividend on short sellers belies contention that defendants deceived the market).[39] What is more, the SEC's own Complaint argues that at the March 16-18, 2021 Investor Conference, the May 13, 2021 Private Investor Call, and in his June 13, 2021 Shorts Tweet, Palikaras openly discussed the expectation that a short squeeze would result, thus eliminating any element of secrecy.

Thus, in the face of public disclosures about the Dividend, the market's knowledge that a short squeeze could follow, and even the very statements on which the SEC bases its claims against Palikaras are based, there can be no scheme liability.

### b. Details of TRCH's ATM Offering Were Also Disclosed.

TRCH filed at least three statements with the SEC disclosing the terms and various risks in connection with the ATM Offering.[40] In announcing the ATM Offering and later providing additional information about it, TRCH also made clear it was working with a variety of its own legal and financial advisors.

TRCH's shelf registration for the ATM Offering (conducted between June 16 and June 24, 2021) disclosed key terms of the merger, including that TRCH would raise up to $250 million in proceeds.[41] TRCH reiterated the risks involved and cautioned investors about "activities" that

---

[39] In its own guidance, the SEC observes that short squeezes can be and are a natural occurrence. *See* Key Points about Regulation SHO (Mar. 31, 2022), *available at* https://www.sec.gov/investor/pubs/regsho.htm.

[40] *See* May 28, 2021 Registration Statement, *supra* note 16; June 14, 2021 Prospectus, *supra* note 18; June 21, 2021 Prospectus, *supra* note 19. The SEC also alleges that Palikaras failed to disclose TRCH's intent to conduct an ATM Offering. The SEC fails to plead with particularity facts demonstrating Palikaras had a duty to speak on a transaction he was not a party to. Indeed, neither Palikaras nor Meta I were part of the negotiations with Roth, and Palikaras was not a corporate insider at TRCH. In any event, the SEC, had no extraterritorial reach to dictate what and how Meta I, a Canadian company with no registered shares trading on any domestic exchange, should make its disclosures. *Morrison v. Nat'l Austrl. Bank Ltd.*, 561 U.S. 247, 267 (2010) (holding the Exchange Act does not apply to securities not registered on domestic exchanges); *see also In re Petrobras Sec.*, 862 F.3d 250, 259 (2d Cir. 2017) (extending *Morrison*'s to the Securities Act). Indeed, the SEC has never alleged wrongdoing by Meta I (or any of its other board members or management involved in the merger).

[41] *See* May 28, 2021 Registration Statement, *supra* note 16, at 1 & 10-12 (May 28, 2021); June 16, 2021 Prospectus, *supra* note 18, at 1 & 9-10; June 21, 2021 Prospectus, *supra* note 19, at 1 &  8-10.

would affect "the price of the securities" during the ATM Offering, including "purchases to cover syndicate short positions created in connection with the offering." *Id.* at 14. Specifically, TRCH disclosed that the ATM Offering could "affect the market price of the securities, which may be higher than the price that might otherwise prevail in the open market." *Id.* at 14.

Only two days after the SEC declared its registration statement effective, TRCH filed its first prospectus supplement, publicly disclosing it engaged Roth to sell shares in the ATM Offering up to $100 million.[42] TRCH again disclosed the risks, including that investors who bought shares "at different times will likely pay different prices" and "may experience different levels of dilution and different outcomes in their investment results," while TRCH had "discretion, subject to market demand, to vary the timing, prices, and numbers of shares sold." *Id.* at S-9. Thereafter, TRCH filed a second supplemental prospectus, during the ATM Offering, disclosing the sale of 11,738,345 shares of common stock and a plan to sell more for an additional $150 million aggregate offering price.[43] Hence, the only entity with the information and authority to make public disclosures about its own ATM Offering—TRCH (not non-party Meta I nor Palikaras individually)—disclosed the terms in numerous SEC filings. As noted above, truthful disclosures cannot form the basis for scheme liability. *See Wilson v. Merrill Lynch & Co.*, 671 F.3d 120, 130 (2d Cir. 2011) ("[t]he market is not misled when a transaction's terms are fully disclosed"); *Santa Fe Indus., Inc. v. Green*, 430 U.S. 462, 477 (1977) ("[N]ondisclosure is usually essential to the success of a manipulative scheme.").

Thus, the SEC fails to state a claim for scheme liability under Rule 10b-5(a), Rule 10b-5(c), Section 17(a)(1), and Section 17(a)(3), and such claims against Palikaras must be dismissed.

### 3. The SEC's Scheme Liability Claims Against Palikaras also Fail to the Extent They are Based on Allegations Relating to Meta I's Actions.

In addition to being based solely on statements and omissions and despite fulsome and repeated disclosure about the merger, Dividend, and ATM Offering, the SEC's scheme liability

---

[42] *See* June 16, 2021 Prospectus, *supra* note 18, at 11.
[43] *See* June 21, 2021 Prospectus, *supra* note 19, at 1, 11.

claims against Palikaras are also flawed insofar as they impute to him the unpleaded (and false) assumption that non-party Meta I was a willing supporter of Brda's alleged plan for TRCH to merge with a strawman company which would, as Brda willed, go along with the alleged scheme, including rejecting his plans for TRCH's oil and gas assets and blindly approving the Dividend. Compl. ¶¶ 26-37.

The SEC skips past the fact that Meta I was an operating corporation, led by a board of directors and publicly traded in Canada. The SEC does not allege that Palikaras asserted singular control over Meta I's board or the company's role in heavily negotiating the merger, just as it does not allege that Palikaras somehow forced Meta I's board of directors *and* shareholders to approve the merger.[44] In short, the SEC cannot establish that Palikaras failed to satisfy a duty to disclose where one did not exist. *See Regents of Univ. of Cal.*, 482 F.3d at 389 (stating that Supreme Court precedent "has established that a device, such as a scheme, is not 'deceptive' unless it involves breach of some duty of candid disclosure"); *Mapp*, 240 F. Supp. 3d at 585 (refusing to recognize scheme liability in the absence of a duty to disclose because "[i]t is clear that the Fifth Circuit requires a breach of a duty to disclose to be liable under Rule 10b–5").

The Complaint implies that Meta I's entry into the merger came about as a result of a simple one-off presentation in September 2020 by Palikaras and Brda to Meta I's Board of Directors. Compl. ¶ 35. The reality is different, even based on the Complaint's plain language and public records at the time. The companies' letter of intent was "heavily negotiated" between the parties, and they considered Meta I's desire for TRCH to divest its oil and gas assets and, at Meta I's suggestion, how to "structure the transaction so that all of the value of the O&G Assets would be allocated to the legacy [TRCH] stockholders[.]"[45] On October 28, 2020, Meta I's legal advisors

---

[44] The SEC's own allegations undermine any theory that Palikaras controlled Meta I's Board and, in fact, demonstrate that the Meta I Board acted independently. According to the Complaint, Brda emailed Palikaras on June 16, 2021, seeking a formal agreement from Meta I to use funds from the ATM Offering to pay TRCH's drilling expense. Compl. ¶ 99. Using ambiguous language, the SEC asserts that Palikaras and Meta I's CFO presented Brda's proposal to the Meta I Board, "writing on or around June 18, 2021" that "Meta I's advisors" "strongly recommended" the arrangement. *Id.* ¶ 101. Howeverl, "Meta I did not formally agree to Brda's demands." *Id.* at ¶ 102.

[45] Definitive Proxy Statement, *supra* note 10, at 106.

circulated initial draft merger documents, with "fairly stringent requirements with respect to the process for selling the O&G Assets[.]"  *Id.* at 107. Between November 13, 2020 and December 13, 2020, the companies and their separate legal advisors negotiated key points, including the "optimal structure to allocate and distribute the value obtained from the sale of the O&G Assets" before ultimately deciding upon the Dividend.  *Id.*  Between December 3, 2020 and December 13, 2020, the companies continued to negotiate.  *Id.* at 108. On December 14, 2020, the parties executed the merger agreement. *Id.*  Faced with these facts, the SEC does not allege that the merger was a sham transaction in which Palikaras forced Meta I to enlist.

The SEC does not allege Palikaras somehow fleeced Meta I (and its advisors) to agree to the merger.  Nor does the SEC allege Meta I lacked corporate formalities, that Palikaras controlled Meta I, that Palikaras misled Meta I's board of directors, or that Meta I's board of directors breached fiduciary duties to shareholders. The merger was approved by Meta I's entire board of directors after consideration of financial and legal advice and the exercise of business judgment. Meta I's financial advisor, not Palikaras, advised its board on the merger arrangement, upon which Meta I's board determined that the merger was "fair from a financial point of view, to the Meta Shareholders," and "in the best interests of Meta and the Meta Shareholders" to unanimously recommend to shareholders that they vote in favor of the merger.[46]  On March 12, 2021, Meta I shareholders voted to merge.[47] Then, as required under Ontario's Business Corporations Act, the Ontario Superior Court of Justice (Commercial List) issued and entered an order on March 17, 2021 approving the "substantive and procedural fairness" of the merger.[48]

Though it incorporates TRCH's SEC filings in its Complaint, making them fair for the Court's consideration, the SEC omits these important facts from its Complaint. Instead, the SEC suggests that Palikaras was, essentially, an empty vessel who willingly allowed Brda to carry out a complex scheme through him and that he somehow single-handedly caused Meta I and its

---

[46] Agreement with Meta I, *supra* note 6, at 3 & 25.
[47] Definitive Proxy Statement, *supra* note 10, at 103.
[48] *Id.* at 103.

shareholders to go along. Complaint ¶ 28. But a fair reading of the Complaint and the public records it incorporates show that Meta I, after arms'-length negotiations and with the benefit of outside advice, independently determined proper business reasons supported the merger, with a Dividend for TRCH's legacy shareholders. Thus, the SEC's scheme liability claims against Palikaras cannot be supported by allegations relating to Meta I's actions.

### 4. The SEC's 10b-5 Claims Fail to Allege Any Connection Between the Private Investor Call and the Purchase or Sale of TRCH Stock.

To violate Rule 10b–5, Palikaras's statements about the Dividend and possible buyers for TRCH's oil and gas assets must have been made "in connection with the purchase or sale of any security." *SEC v. Zandford*, 535 U.S. 813, 819 (2002) (internal quotation marks and citation omitted); *see also Chadbourne & Park LLP v. Troice*, 571 U.S. 377, 387 (2014) ("A fraudulent misrepresentation or  omission is not made 'in connection with' such a 'purchase or sale of a covered security' unless it is material to a decision by one or more individuals (other than the fraudster) to buy or to sell a 'covered security.'"); *SEC v. Texas Gulf Sulphur Co*., 401 F.2d 833, 860 (2d Cir. 1968). But the SEC does not allege any such connection and does not plead that attendees at the Private Investor Call who were "believed to be" TRCH shareholders actually were or, if so, that they ever purchased or sold any TRCH shares based on Palikaras's statements. "It is well established that mere retention of securities in reliance on material misrepresentations or omissions does not form the basis for a § 10(b) or Rule 10b–5 claim." *Krim v. BancTexas Grp., Inc.*, 989 F.2d 1435, 1443 n. 7 (5th Cir. 1993) (citing *Blue Chip Stamps v. Manor Drug Stores*, 421 U.S. 723 (1975)).

### C. THE SECTION 17(A)(2) CLAIMS FAIL TO ALLEGE THAT PALIKARAS OBTAINED MONEY OR PROPERTY  "BY MEANS OF"  ANY ALLEGED MISREPRESENTATION

Section 17(a)(2) of the Securities Act makes it unlawful "to obtain money or property" by means of any material misrepresentation or omission. 15 U.S.C. § 77q(a)(2). "'It is not sufficient that a materially untrue statement was made and the person also made money, such as the incidental payment of a scheduled salary and bonus. It must be plausibly alleged that the money

was obtained 'by means of' the false statement.'" *SEC v. Mapp*, No. 16-CV-00246, 2017 WL 5177960, at *6 (E.D. Tex. Nov. 8, 2017) (quoting *SEC v. Wey*, 246 F. Supp. 3d 894, 915 (S.D.N.Y. 2017)).

Some courts have found liability under section 17(a)(2) where a defendant obtains money indirectly, such as through increased compensation. *See, e.g., Farmer*, 2015 WL 5838867, at *8 (S.D. Tex. Oct. 7, 2015). But the SEC must nevertheless show how money or property obtained is "attributable to" the defendant's own misstatement or omission. *SEC v. Hopper*, No. Civ.A. H-04-1054, 2006 WL 778640, at *12 n.20 (S.D. Tex. Mar. 24, 2006) ("[I]f any portion of this bonus was attributable to the round-trip trading scheme, the SEC may be able to prevail on its § 17(a)(2) claim against him."); *see also SEC v. Jankovic*, 15 Civ. 1248, 2017 WL 1067788, at *15 (S.D.N.Y. Mar. 21, 2017) (requirement can be met "in a highly roundabout or indirect manner" but "it is essential that the SEC prove that a defendant has obtained . . . money or property himself in order to establish his liability under Section 17(a)(2)") (internal quotation marks and citations omitted).

The SEC argues TRCH's ATM Offering raised $137.5 million, which "primarily benefitted" Meta II (which the SEC agreed to settle with for $1 million)[49] where Palikaras served as CEO.  Complaint ¶ 8. However, there is no allegation that Palikaras's Meta II compensation was in any way "attributable to" his handful of alleged statements and omissions, such as in the form of a bonus, the sales of any shares, or otherwise.  *Hopper*, 2006 WL 778640, at *12 n.20; *see also Pharo v. Smith*, 621 F.2d 656, 674 (5th Cir. 1980) (affirming dismissal of section 17(a)(2) claim on the ground that the defendant did not "obtain[] any money by means of an untrue statement it uttered…[a]ny fraudulent statements made to induce the stock purchasers were uttered by [the co-defendants]"); *Wey*, 246 F Supp 3d 894, 915 (S.D.N.Y. 2017) ("[I]f the person would have earned the same fees or compensation regardless of whether the statement was false, a Section 17(a)(2) claim does not lie"); *SEC v. DiMaria*, 207 F. Supp 3d 343, 358 (S.D.N.Y. 2016) (dismissing 17(a)(2) claim where there was no allegation defendant's "compensation was

---

[49] *See* Meta Settlement Action, *supra* note 3.

increased in any way, or that he owned (or sold) [the company's] stock that increased in value as a result of the alleged misconduct."). The Complaint is devoid of allegations that Palikaras obtained any money or property, directly or indirectly, "by means of" his alleged misrepresentations or omissions. = Based on this failure to plead, the Section 17(a)(2) claim against Palikaras must be dismissed.

### D.  THE SEC FAILS TO ADEQUATELY PLEAD A CLAIM UNDER SECTION 14(A)

Exchange Act Section 14(a) makes it unlawful to solicit proxies from public shareholders without complying with the rules enacted by the SEC. 15 U.S.C. § 78n(a)(1). Rule 14a-9 prohibits the use of proxy statements and other proxy-related communications "containing any statement which, at the time and in light of the circumstances under which it is made, is false or misleading with respect to any material fact, or which omits to state any material fact necessary to make the statements therein not false or misleading." 17 C.F.R. § 240.14a–9. "Rule 9(b) pleading requirements apply to section 14(a) claims that sound in fraud." *Pedroli ex rel. Microtune, Inc. v. Bartek*, 564 F. Supp. 2d 683, 687 (E.D. Tex. 2008). To state a cause of action under Section 14(a) and Rule 14a-9, the SEC must show that the defendant was at least negligent and the following elements: "(1) defendants misrepresented or omitted a material fact in a proxy statement; (2) defendants acted at least negligently in distributing the proxy statement; and (3) the false or misleading proxy statement was an essential link in causing the corporate actions." *Camelot Event Driven Fund v. Alta Mesa Res., Inc.*, No. 19-CV-957, 2021 WL 1416025, at *10 (S.D. Tex. Apr. 14, 2021). The "essential link" required for proxy fraud liability can only be established when the proxy statement at issue *directly authorizes* the loss-generating corporate action." *Hulliung v. Bolen*, 548 F. Supp. 2d 336, 341 (N.D. Tex. 2008) (emphasis added). This requirement is intended "to prevent corporate management 'from obtaining authorization for corporate action by means of deceptive or inadequate disclosure of proxy solicitation.'" *SEC v. Mercury Interactive, LLC*, No. C 07-2822, 2009 WL 2984769, at *4 (N.D. Cal Sept. 15, 2009) (quoting *J.I. Case Co. v. Borak*, 277 U.S. 426, 431 (1964)).

Of course, Palikaras did not draft, file, or have any control over TRCH's proxy statements. Thus, the SEC bases its claim that Palikaras unlawfully solicited TRCH investor proxies on his alleged one-time discussion during the Private Investor Call in which he provided a high-level opinion based on his understanding that TRCH was communicating with *potential* buyers of its oil and gas interests and what the value of its Dividend *could* be. Compl. ¶ 61; *see also id.* ¶ 126 ("Palikaras solicited shareholder approval by means of the oral and/or written communications during the Italian Investor Call"). But the SEC does not plead that Palikaras's two generic statements at issue during that discussion were an "essential link"—much less even relevant to effectuating the merger because the SEC does not, and cannot, allege that the so-called Italian Investors actually were shareholders or were present or represented at the special proxy meeting on June 11, 2021 or that they voted in favor of the merger. *See* SEC's Proposed Substantive Jury Instructions, *SEC v. Wyly et al*, Case No. 10-cv-05760, ECF No. 311, at 37-38 (S.D.N.Y. Apr. 29, 2014) ("a proxy solicitation is an essential link in the accomplishment of a corporate action or transaction *if the votes of the shareholders solicited were required to effect a corporate action or transaction*") (emphasis added). The SEC's inability to plead an "essential link" is fatal to its claim that Palikaras violated Rule 14a-9, especially where the claim depends on an atypical *private* proxy solicitation that does not rely on the publicly filed proxy statement.

As discussed above, Palikaras's alleged misrepresentation during that Private Investor Call that the value of the preferred dividend *could be* worth $1 to $20 was immaterial as a matter of a law. A misstatement is material "only if there is a substantial likelihood that a reasonable shareholder would consider it important in deciding how to vote." *Heinze v. Tesco Corp.*, 971 F.3d 475, 480 (5th Cir. 2020); *see also Pedroli*, 564 F. Supp. 2d at 687 ("An omitted fact is material if there is a substantial likelihood that a reasonable shareholder would consider it important in deciding how to vote.") (internal quotation and citation omitted). "[A]n omission is material if there is a *substantial* likelihood that the disclosure of the omitted fact would have been viewed by the reasonable investor as having *significantly* altered the total mix of information made available."

*Trust Co. of La. v. N.N.P. Inc.*, 104 F.3d 1478, 1490 (5th Cir. 1997) (internal quotation marks and citation omitted) (emphasis added).

The law is clear that context matters for purposes of determining materiality. *TSC Indus., Inc. v. Northway, Inc.*, 426 U.S. 438, 449 (1976). No reasonable investor would have relied on an oral, off-the-cuff representation by a non-officer of TRCH speculating about what the value of the Dividend *could be*, especially when that anecdotal opinion contradicted any sensible reading of TRCH's own publicly filed disclosures in the market at that time. On multiple occasions post-dating the Private Investor Call, TRCH reported on the value of its oil and gas assets and the number of outstanding shares.[50] In contrast to these publicly filed financial statements, which included accounting and valuation methodologies, no reasonable investor would have credited Palikaras's in-the-moment, off-base opinions or estimates. Indeed, as the SEC alleges, at that time, it may have been difficult to believe that the Dividend would be worth more than $1.00. *See* Compl. ¶¶ 86, 87. The Section 14(a) claims against Palikaras fail as pleaded on materiality grounds because TRCH's actual proxy statement and financial statements included explicit disclosures that contradict Palikaras's imprecise representations on the Italian Investor Call. *See Olkey v Hyperion 1999 Term Tr., Inc.*, 98 F.3d 2, 4 (2d Cir 1996) (affirming dismissal where "reasonable investors would not have relied on oral assurances when they were contradicted by specific disclosures in the prospectuses"). In addition, Palikaras could not have solicited proxies of TRCH investors not present on the Private Investor Call—that is, because as discussed above, he is not the maker of the Screenshot or the Incomplete Partial Recording, he similarly did not solicit any TRCH shareholders when others made and disseminated those statements outside of his knowledge, consent, or ability to control.[51]

---

[50] *See supra* at 19-20 and accompanying note 27.

[51] While the SEC's factual allegations are accepted as true at this stage, and it is unnecessary for the Court to resolve any factual disputes to grant Palikaras's Motion, it is telling that the SEC's allegations omit the disclaimers and forward-looking statements that were provided at the beginning of the Private Investor Call. It is also telling that the SEC never quotes from the actual PowerPoint presented at the Private Investor Call, as seen in Screenshot.

## **CONCLUSION**

For the foregoing reasons, the SEC fails to state any viable cause of action against Palikaras—nor any basis on which he should be (i) permanently enjoined; (ii) penalized; (iii) broadly prohibited from ever again participating in the issue, offer, purchase or sale of any security but for his own account; and (iv) permanently barred from service as a public company officer or director. Palikaras respectfully requests that this Court grant this Motion to Dismiss, and with prejudice given the inability of the SEC to cure its pleading deficiencies.

Dated: Dallas, Texas
        January 17, 2025

Respectfully submitted,

*/s/ Jessica B. Magee*

Jessica B. Magee
Texas Bar No. 24037757
Michael W. Stockham
Texas Bar No. 24038074
HOLLAND & KNIGHT LLP
One Arts Plaza
1722 Routh Street, Suite 1500 Dallas,
Texas 75201
Tel: (214) 964-9500
Jessica.Magee@hklaw.com
Michael.Stockham@hklaw.com

Kayla Joyce (*PHV motion forthcoming*)
New York Bar No. 6093314
HOLLAND & KNIGHT LLP
787 Seventh Avenue, 31st Floor
New York, New York 10019
Tel:  212-513-3200
Kayla.Joyce@hklaw.com

*Counsel for Georgios Palikaras*

## **CERTIFICATE OF SERVICE**

I hereby certify that on January 17, 2025, I electronically submitted the foregoing document with the clerk of the court of the U.S. District Court, Eastern District of Texas, using the electronic case filing system of the Court, which will send notification of such submission to the counsel who have registered with the Court.

*/s/ Jessica B. Magee*
Jessica B. Magee

41