**IN THE UNITED STATES DISTRICT COURT**
**FOR THE EASTERN DISTRICT OF TEXAS**
**SHERMAN DIVISION**

| | |
|---|---|
| SECURITIES AND EXCHANGE COMMISSION,<br><br>  Plaintiff,<br><br> - v -<br><br>JOHN BRDA,<br>GEORGIOS PALIKARAS,<br><br>  Defendants. | Civ. Action No. 4:24-cv-1048<br><br>Hon. Sean D. Jordan |

**<u>DEFENDANT JOHN BRDA'S MOTION TO DISMISS</u>**

## **TABLE OF CONTENTS**

**Page**

REQUEST FOR ORAL ARGUMENT ............................................................................. 1

INTRODUCTION ....................................................................................................... 1

ALLEGATIONS AND JUDICIALLY NOTICEABLE FACTS ............................................. 5

I.      Overview of Entities .................................................................................... 5

II.     Public Disclosures ....................................................................................... 5

        A.      Announcement of Proposed Merger and Special Dividend.................... 5

        B.      Definitive Agreement......................................................................... 6

        C.      Torchlight Proxy Statements.............................................................. 7

III.    The Italian Call and Other Public Information ............................................... 8

IV.     The Dividend Record Date and June 2021 ATM Offering............................... 10

LEGAL STANDARDS ............................................................................................... 11

ISSUES TO BE DECIDED ......................................................................................... 12

LEGAL ARGUMENTS............................................................................................... 12

I.      The SEC Fails to Plead Scheme Liability (Counts I and II). ........................... 12

        A.      The Alleged Acts Do Not Constitute Deceptive Conduct. ................... 13

                i.      The Preferred Share Dividend. .............................................. 15

                ii.     Informal Commentaries Regarding a Potential Short Squeeze................ 17

                iii.    The ATM Offering................................................................. 18

        B.      Allegations of 'Intent Only' Manipulation Cannot Show Deceptive Conduct..... 20

        C.      The SEC Fails to Allege Scienter. ..................................................... 23

II.     The SEC Fails to Plead An Actionable Misrepresentation............................... 24

        A.      "Commercially Reasonable Efforts" Statements Were Not Materially False. ..... 25

                i.      The SEC has Not Pled the Required State of Mind................................ 25

                ii.     The Forward-Looking Statements are Protected by the Bespeaks Caution
                        Doctrine and are Non-Actionable Puffery. ............................. 28

                iii.    The Statements Were Not False When Made. ........................... 30

        B.      Mr. Brda is not a "Maker" of any Statement at the Italian Call........................... 31

III.    The SEC Does Not Plead Any Negligence-Based Theory (Count I). .............. 33

IV.     SEC Fails to Allege a Proxy Fraud Claim (Count III)..................................... 34

V.      The SEC Fails to Sufficiently Allege an Aiding and Abetting Claim. ............. 36

        A.      The Section 13(a) False Filing Claim Fails (Count IV)........................ 36

  B. The SEC Fails to Allege an Accounting or Internal Controls Violation. ............. 37

   i. Section 13(b)(2)(A)—Books and Records................................................. 37

   ii. Section 13(b)(2)(B)—Internal Accounting Controls. .............................. 38

VI. Disgorgement And Officer/Director Bar Relief Should Be Stricken. ............................ 39

CONCLUSION..................................................................................................................... 40

# TABLE OF AUTHORTIES

**Page(s)**

**Cases**

*In re Acterna Corp. Sec. Litig.*,
   378 F. Supp. 2d 561 (D. Md. 2005) ...................................................................24

*Alaska Elec. Pension Fund v. Flotek Indus., Inc.*,
   915 F.3d 975 (5th Cir. 2019) ...........................................................................23

*Ashland Inc. v. Morgan Stanley & Co.*,
   652 F.3d 333 (2d Cir. 2011)...............................................................................29

*ATSI Commc'ns, Inc. v. Shaar Fund, Ltd.*,
   493 F.3d 87 (2d Cir. 2007)........................................................................ *passim*

*In re Bank of Am. AIG Disclosure Sec. Litig.*,
   980 F. Supp. 2d 564 (S.D.N.Y. 2013), *aff'd*, 566 F. App'x 93 (2d Cir. 2014).......................24

*Bell Atl. Corp. v. Twombly*,
   550 U.S. 544 (2007)...........................................................................................11

*Biesenbach v. Guenther*,
   588 F.2d 400 (3d Cir. 1978)...............................................................................23

*Bisel v. Acasti Pharma, Inc.*,
   2022 WL 4538173 (S.D.N.Y. Sept. 28, 2022).......................................................36

*Brady v. Top Ships Inc.*,
   2019 WL 3553999 (E.D.N.Y. Aug. 5, 2019), *aff'd sub nom. Onel*, 806 F.
   App'x 64 (2d Cir. 2020)..............................................................................22, 23

*Brand Coupon Network, LLC v. Catalina Mktg. Corp.*,
   748 F.3d 631 (5th Cir. 2014) ..............................................................................9

*Brickman v. Tyco Toys, Inc.*,
   731 F. Supp. 101 (S.D.N.Y. 1990) ....................................................................23

*Burback v. Brock*,
   2023 WL 4532803 (5th Cir. July 13, 2023) (per curiam)......................................12

*Causey v. Sewell Cadillac-Chevrolet, Inc.*,
   394 F.3d 285 (5th Cir. 2004) ..............................................................................9

*City of Roseville Emps.' Ret. Sys. v. Sterling Fin. Corp.*,
   963 F. Supp. 2d 1092 (E.D. Wash. 2013), *aff'd*, 691 F. App'x 393 (9th Cir.
   2017) ................................................................................................................24

*Coates v. Heartland Wireless Commc's, Inc.*,
    55 F. Supp. 2d 628 (N.D. Tex. 1999) ..................................................................26

*Dawes v. Imperial Sugar Co.*,
    975 F. Supp. 2d 666 (S.D. Tex. 2013) ................................................................24

*Decks Appeal v. GTE Directories Sales Corp.*,
    81 F.3d 154 (5th Cir. 1996) (table) ....................................................................34

*Dorsey v. Portfolio Equities, Inc.*,
    540 F.3d 333 (5th Cir. 2008) ..............................................................................11

*SEC v. Egan*,
    994 F. Supp. 2d 558 (S.D.N.Y. 2014).................................................................24

*Fait v. Regions Fin. Corp.*,
    655 F.3d 105 (2d Cir. 2011)................................................................................17

*Faulkner v. Verizon Commc'ns, Inc.*,
    156 F. Supp. 2d 384 (S.D.N.Y. 2001).......................................................... *passim*

*Faulkner v. Verizon Commc'ns, Inc.*,
    189 F. Supp. 2d 161 (S.D.N.Y. 2002).................................................................30

*Finn v. Barney*,
    471 F. App'x 30 (2d Cir. 2012) ..........................................................................19

*In re First Am. Fin. Corp.*,
    2021 WL 4807648 (C.D. Cal. Sept. 22, 2021) ...................................................30

*Fulton Cnty. Emples. Ret. Sys. v. MGIC Inv. Corp.*,
    675 F.3d 1047 (7th Cir. 2012) (Easterbrook, C.J.) .............................................33

*Gavin/Solmonese LLC v. D'Arnaud-Taylor*,
    639 F. App'x 664 (2d Cir. 2016) ........................................................................32

*Golub v. PPD Corp.*,
    576 F.2d 759 (8th Cir. 1978) ..............................................................................23

*In re Grand Canyon Educ., Inc. Sec. Litig.*,
    2021 WL 3491779 (D. Del. Aug. 9, 2021) .........................................................26

*Gruss v. Curtis Publ'g Co.*,
    534 F.2d 1396 (2d Cir. 1976)..............................................................................35

*Gurary v. Winehouse*,
    190 F.3d 37 (2d Cir. 1999)..................................................................................13

*Halperin v. eBanker USA.com, Inc.*,
    295 F.3d 352 (2d Cir. 2002)...........................................................................29

*Harris v. AmTrust Fin. Servs., Inc.*,
    135 F. Supp. 3d 155 (S.D.N.Y. 2015), *aff'd*, 649 F. App'x 7 (2d Cir. 2016)..........................38

*Hudson Bay Master Fund Ltd. v. Patriot Nat'l, Inc.*,
    309 F. Supp. 3d 100 (S.D.N.Y. 2018)...............................................................19, 20

*Hulliung v. Bolen*,
    548 F. Supp. 2d 336 (N.D. Tex. 2008) ...............................................................35, 36

*Hundahl v. United Benefit Life Ins. Co.*,
    465 F. Supp. 1349 (N.D. Tex. 1979) (Higginbotham, J.) ........................................14

*Iowa Pub. Emps.' Ret. Sys. v. MF Glob., Ltd.*,
    620 F.3d 137 (2d Cir. 2010)...........................................................................28

*Iron Workers Local 16 Pension Fund v. Hilb Rogal & Hobbs Co.*,
    432 F. Supp. 2d 571 (E.D. Va. 2006) ...............................................................38

*Janus Capital Grp., Inc. v. First Deriv. Traders*,
    564 U.S. 135 (2011)..............................................................................4, 32, 33

*Kademian v. Ladish Co.*,
    792 F.2d 614 (7th Cir. 1986) .........................................................................22

*Kalnit v. Eichler*,
    264 F.3d 131 (2d Cir. 2001)...........................................................................27

*Kas v. Fin. Gen. Bankshares, Inc.*,
    796 F.2d 508 (D.C. Cir. 1986) .......................................................................22

*Kas v. First Union Corp.*,
    857 F. Supp. 481 (E.D. Va. 1994) ...................................................................30

*Kraft v. Third Coast Mistream*,
    2021 WL 860987 (S.D.N.Y. Mar. 8, 2021) ..............................................14, 16, 19

*Kuwait Inv. Office v. Am. Int'l Grp., Inc.*,
    128 F. Supp. 3d 792 (S.D.N.Y. 2015)................................................................32

*U.S. ex rel. Lam v. Tenet Healthcare Corp.*,
    481 F. Supp. 2d 673 (W.D. Tex. 2006)..............................................................10

*Lentell v. Merrill Lynch & Co.*,
    396 F.3d 161 (2d Cir. 2005)...........................................................................29

*Lessler v. Little*,
    857 F.2d 866 (1st Cir. 1988)...........................................................23

*Liu v. SEC*,
    140 S. Ct. 1936 (2020)...................................................................39

*McConville v. SEC*,
    465 F.3d 780 (7th Cir. 2006) .........................................................38

*Nguyen v. Endologix, Inc.*,
    962 F.3d 405 (9th Cir. 2020) ....................................................26, 27

*In re Overstock Sec. Litig.*,
    119 F.4th 787 (10th Cir. 2024) .................................................*passim*

*In re Overstock Sec. Litig.*,
    2020 WL 5775845 (D. Utah Sept. 28, 2020)...........................*passim*

*In re Overstock Sec. Litig.*,
    2021 WL 4267920 (D. Utah Sept. 20, 2021), *aff'd*, 119 F.4th 787 (10th Cir.
    2024) ...........................................................................................16

*Pedroli v. Bartek*,
    2008 WL 901203 (E.D. Tex. Mar. 31, 2008) ................................35

*Prodanova v. H.C. Wainwright & Co., LLC*,
    993 F.3d 1097 (9th Cir. 2021) ...................................................26, 27

*R2 Invs. LDC v. Phillips*,
    401 F.3d 638 (5th Cir. 2005) ...........................................................5

*Regents of Univ. of California v. Credit Suisse First Bos. (USA), Inc.*,
    482 F.3d 372 (5th Cir. 2007) ...................................................*passim*

*Rice v. Hamilton Oil Corp.*,
    658 F. Supp. 446 (D. Colo. 1987)....................................................20

*In re Rigel Pharms., Inc. Sec. Litig.*,
    697 F.3d 869 (9th Cir. 2012) ...........................................................31

*Rombach v. Chang*,
    355 F.3d 164 (2d Cir. 2004)............................................................28

*Rosenzweig v. Azurix Corp.*,
    332 F.3d 854 (5th Cir. 2003) ..........................................................28

*Santa Fe Indus., Inc. v. Green*,
    430 U.S. 462 (1977)............................................................14, 15, 23

*Schmitt v. China XD Plastics Co., Ltd.*,
    698 F. Supp. 3d 474 (E.D.N.Y. 2023) ......................................................................35

*SEC v. Bankatlantic Bancorp, Inc.*,
    2012 WL 1936112 (S.D. Fla. May 29, 2012) ............................................................39

*SEC v. Berry*,
    2008 WL 4065865 (N.D. Cal. Aug. 27, 2008) ..........................................................39

*SEC v. Coffman*,
    2007 WL 2412808 (D. Colo. Aug. 21, 2007) ............................................................38

*SEC v. Daifotis*,
    2011 WL 2183314 (N.D. Cal. June 6, 2011), *modified on reconsideration on
    other grounds*, 2011 WL 3295139 (N.D. Cal. Aug. 1, 2011) ...................................14

*SEC v. Falstaff Brewing Corp.*,
    629 F.2d 62 (D.C.C. 1980) ...............................................................................35, 36

*SEC v. Felton*,
    2020 WL 7056333 (N.D. Tex. Dec. 2, 2020) ...........................................................18

*SEC v. First Jersey Sec., Inc.*,
    101 F.3d 1450 (2d Cir. 1996) ....................................................................................34

*SEC v. Fowler*,
    6 F.4th 255 (2d Cir. 2021) ........................................................................................40

*SEC v. Gann*,
    565 F.3d 932 (5th Cir. 2009) .................................................................................3, 13

*SEC v. Gilman*,
    2019 WL 4743431 (N.D. Tex. Sept. 26, 2019) .........................................................33

*SEC v. Ginder*,
    752 F.3d 569 (2d Cir. 2014) ......................................................................................34

*SEC v. Kelly*,
    817 F. Supp. 2d 340 (S.D.N.Y. 2011) ......................................................................24

*SEC v. Life Partners Holdings, Inc.*,
    854 F.3d 765 (5th Cir. 2017) .................................................................................4, 36

*SEC v. Lowy*,
    396 F. Supp. 2d 225 (E.D.N.Y. 2003) ......................................................................38

*SEC v. Lucent Tech., Inc.*,
    610 F. Supp. 2d 342 (D.N.J. 2009) .....................................................................13, 21

*SEC v. Lyon*,
    529 F. Supp. 2d 444 (S.D.N.Y. 2008) ...................................................................14

*SEC v. Mapp*,
    240 F. Supp. 3d 569 (E.D. Tex. 2017) ...............................................12, 14, 18, 33

*SEC v. Pentagon Capital Mgmt. PLC*,
    725 F.3d 279 (2d Cir. 2013) ...............................................................................34

*SEC v. Quan*,
    2013 WL 5566252 (D. Minn. Oct. 8, 2013), *aff'd*, 870 F.3d 754 (8th Cir.
    2017) ...............................................................................................................21

*SEC v. Rio Tinto PLC*,
    41 F.4th 47 (2d Cir. 2022) ...............................................................................13

*SEC v. Rio Tinto plc*,
    2019 WL 1244933 (S.D.N.Y. Mar. 18, 2019) .........................................4, 24, 39

*SEC v. Seghers*,
    298 F. App'x 319 (5th Cir. 2008) ....................................................................34

*SEC v. Shanahan*,
    646 F.3d 536 (8th Cir. 2011) ...........................................................................34

*SEC v. Softpoint, Inc.*,
    958 F. Supp. 846 (S.D.N.Y. 1997) ..................................................................37

*SEC v. SolarWinds Corp.*,
    --- F.Supp.3d ----, 2024 WL 3461952 (S.D.N.Y. July 18, 2024) ..........................39

*SEC v. Stanard*,
    2009 WL 196023 (S.D.N.Y. Jan. 27, 2009) ......................................................37

*SEC v. U.S. Envt'l, Inc.*,
    155 F.3d 107 (2d Cir. 1998) .............................................................................23

*SEC v. World-Wide Coin Invs., Ltd.*,
    567 F. Supp. 724 (N.D. Ga. 1983) ...........................................................37, 38, 39

*Selk v. St. Paul Ammonia Prod., Inc.*,
    597 F.2d 635 (8th Cir. 1979) .......................................................................14, 23

*Shivers v. Amerco*,
    670 F.2d 826 (9th Cir. 1982) ...........................................................................22

*In re Skechers USA, Inc. Sec. Litig.*,
    444 F. Supp. 3d 498 (S.D.N.Y. 2020) ..............................................................30

*Southland Sec. Corp. v. INSpire Ins. Sols., Inc.*,
     365 F.3d 353 (5th Cir. 2004) ................................................................11

*Stevelman v. Alias Rsch. Inc.*,
     174 F.3d 79 (2d Cir. 1999)...............................................................4, 31

*Thornton v. Micrografx, Inc.*,
     878 F. Supp. 931 (N.D.Tex.1995) .......................................................26

*In re Turquoise Hill Res. Ltd. Sec. Litig.*,
     625 F. Supp. 3d 164 (S.D.N.Y. 2022)...........................................32, 33

*Virginia Bankshares, Inc. v. Sandberg*,
     501 U.S. 1083 (1991)..........................................................................22

*Wilson v. Merrill Lynch & Co.*,
     671 F.3d 120 (2d Cir. 2011)................................................................19

*Yoshikawa v. Exxon Mobil Corp.*,
     2023 WL 5489054 (N.D. Tex. Aug. 24, 2023) ...................................13

**Statutes and Rules**

15 U.S.C. § 77t(e) ........................................................................................40

15 U.S.C. § 78m(b)(2) ..................................................................................37

15 U.S.C. § 78n(a)(1) ...................................................................................35

15 U.S.C. § 78u-5 ...........................................................................................4

Federal Rule of Civil Procedure 9(b).................................................... *passim*

Federal Rule of Civil Procedure 10(c) ...........................................................1

Federal Rule of Civil Procedure 12(b)(6) ............................................. *passim*

S. Rep. No. 95-114 (1977) ............................................................................37

Pursuant to Federal Rules of Civil Procedure 12(b)(6) and 9(b), Defendant John Brda files this Motion to Dismiss ("**Motion**") the Complaint [Dkt. #1] brought by the Securities and Exchange Commission ("**SEC**").[1]

## REQUEST FOR ORAL ARGUMENT

While Mr. Brda believes the SEC's pleading deficiencies are clear, he acknowledges that some of the underlying facts, as alleged in the Complaint, may not be.  Mr. Brda submits that oral argument would assist in streamlining the issues before the Court, and he therefore respectfully requests that the Court allow argument.  *See* L.R. CV-7(g).

## INTRODUCTION

This is a case in search of a plausible theory.  On June 25, 2024, the SEC filed its Complaint against Mr. Brda and Mr. Palikaras ("**Defendants**") alleging Defendants intended to effectuate an unsuccessful short squeeze, to the detriment of short sellers, through a planned and disclosed merger of Torchlight Energy Resources, Inc ("**Torchlight**") with Metamaterial, Inc. ("**Meta I**") resulting in Meta Materials, Inc. ("**Meta II**").[2]  The SEC alleges Defendants capitalized on this scheme by causing Torchlight to conduct an at-the-market offering ("**ATM Offering**").  [Compl. ¶ 1.]  But these were publicly and fully disclosed corporate actions serving legitimate business purposes for the benefit of *shareholders*.  Short sellers, on the other hand, are fundamentally different from traditional investors.  They are betting that the company will fail and predict that the market has overvalued the company's shares.

In a change of course and despite a longstanding policy of protecting actual *shareholders* (not short sellers), the SEC filed this action based on a novel scheme liability theory alleging

---

[1] Pursuant to Federal Rule of Civil Procedure 10(c), Mr. Brda joins Defendant Georgios Palikaras' concurrently filed motion to dismiss.  The arguments made in Mr. Palikaras' motion are adopted in whole and incorporated herein.
[2] The SEC announced the same day that it and Meta II had reached a settlement agreement as to the claims against Meta II.  *See* "SEC Charges Meta Materials and Former CEOs with Market Manipulation, Fraud and Other Violations," Release 2024-77, *available at* https://www.sec.gov/news/press-release/2024-77.

violations of:  (i) Section 17(a) of the Securities Act of 1933 ("**Securities Act**") and Rule 10b-5(a) and (c), promulgated under Section 10(b) of the Securities Exchange Act of 1934 ("**Exchange Act**") against Defendants (Counts I and II); (ii) Section 14(a) of the Exchange Act and Rule 14a-9 against Defendants (Count III); and (iii) derivative aiding and abetting violations of Sections 13(a), 13(b)(2)(A), and 13(b)(2)(B) of the Exchange Act and Rules 12b-20 and 13a-11 against Mr. Brda (Counts IV and V).  [*See* Compl. ¶¶ 111–43.]  The SEC seeks disgorgement plus prejudgment interest, civil money penalties, and an officer/director bar.  [*See id.* ¶ 144.]  Each of these claims against Mr. Brda, including the relief sought, suffers from numerous, independent infirmities.

*First*, the gravamen of this case is the SEC's novel contention that the former CEOs of Torchlight and Meta I engaged in a scheme to manipulate the market by intending (though ultimately failing) to create a short squeeze of Torchlight stock via the announcement of a special dividend and to "take advantage" of the short squeeze during a pre-merger ATM Offering of Torchlight stock.  [Compl. ¶ 42.]  But the special dividend was lawful, was issued as announced, its nature was fully and accurately disclosed, and the market understood the potential impacts the special dividend could have on short sellers.  *See Regents of Univ. of California v. Credit Suisse First Bos. (USA), Inc.*, 482 F.3d 372, 383 (5th Cir. 2007).  Moreover, the SEC does not, and cannot, assert that the short squeeze, upon which its entire theory is based, even occurred.  [*See* Compl. ¶ 96.]  As a result, the SEC cannot allege facts showing that the market was deceived by Meta II's special dividend—a fundamental element of a manipulation claim.  *See ATSI Commc'ns, Inc. v. Shaar Fund, Ltd.*, 493 F.3d 87, 100 (2d Cir. 2007).

Nor does the SEC allege facts showing that retail investors in the ATM Offering were deceived.  There is no dispute that the ATM Offering, and its terms, were publicly and truthfully

disclosed and that it offered Torchlight shares *at the prevailing market price* that was *indicative of a free market process*—the antithesis of false pricing signals that are characteristic of manipulative conduct. *See In re Overstock Sec. Litig.*, 119 F.4th 787, 802 (10th Cir. 2024) ("Defendants' truthful disclosure of the terms of the upcoming dividend transaction did not deceive investors as to how the market valued Overstock."). The prevailing market prices reflected all publicly available information, including social media chatter of a possible short squeeze. As a matter of law, purchasers in the ATM Offering could not have been deceived or manipulated as to the value of Torchlight stock in these circumstances.

*Second*, the SEC also fails to plead scienter in connection with disclosures that Torchlight would use "commercially reasonable efforts" to sell its oil and gas assets. [Compl. ¶¶ 68–81.] The ATM Offering undisputedly served legitimate business purposes: to ensure that Torchlight's oil and gas assets inured to the benefit of Torchlight legacy shareholders, and to raise capital for the new company. Rather than acknowledge that reality, the SEC's theory of scienter rests on the illogical allegation that Torchlight never intended to sell the assets and instead intended to spin them out into another entity. *See SEC v. Gann*, 565 F.3d 932, 936 (5th Cir. 2009). This scienter theory fails because the sale of the assets was Torchlight's longstanding business plan pre-merger and the spin-out entity's plan post-merger. [*See* Compl. ¶¶ 20–21.] Moreover, Torchlight expressly warned through public disclosures that, if a sale of the assets was not consummated, the assets may be spun-out. *Infra* at pp. 6–8. Thus, the challenged statements are forward-looking predictions protected by the statutory safe harbor and the related bespeaks caution doctrine and are non-actionable expressions of corporate optimism. *Faulkner v. Verizon Commc'ns, Inc.*, 156 F. Supp. 2d 384, 389, 400 (S.D.N.Y. 2001) ("*Faulkner I*") (statements that defendant would "use all commercially reasonable efforts to take" actions to consummate merger "were not actionable

because they were mere predictions"); *see* 15 U.S.C. § 78u-5.  Further, the statements were neither false nor misleading when made.  A securities violation cannot be pled with hindsight as a matter of law.  *Stevelman v. Alias Rsch. Inc.*, 174 F.3d 79, 85 (2d Cir. 1999).

*Third*, the SEC's misrepresentation claim based on a statement in a May 2021 call with purported "Italian investors" regarding the potential value of the special dividend suffers from numerous fatal flaws.  [Compl. ¶¶ 82–88.]  Mr. Brda did not "make" the challenged statement, as required by *Janus Capital Grp., Inc. v. First Deriv. Traders*, 564 U.S. 135, 142 (2011).  In addition, the statement was surrounded by express disclaimers and cautionary language, such as the dividend could be worth "zero," the speaker "cannot give you that prediction," and that a specific valuation was "speculative."  *Infra* at pp. 8–9.  Puffery and opinion statements are not actionable under the securities laws.  It also constitutes a forward-looking statement immunized from liability by the bespeaks caution doctrine.

*Finally*, because the primary claims fail, the SEC's claims of aiding and abetting violations of the Exchange Act [Compl. ¶¶ 130–43] necessarily fail as a matter of law.  *SEC v. Life Partners Holdings, Inc.*, 854 F.3d 765, 778 (5th Cir. 2017); *e.g.*, *SEC v. Rio Tinto plc*, 2019 WL 1244933, at *17, *20 (S.D.N.Y. Mar. 18, 2019) (dismissing derivative aiding and abetting claims).

In short, the SEC's tale of alleged market manipulation and securities violations, spun from an alleged intent to create a short squeeze that did not materialize, was fully disclosed and for legitimate business purposes.  Thus, it cannot survive Rule 12(b)(6) scrutiny.  Mr. Brda engaged in legitimate corporate actions for the benefit of shareholders that were truthfully and fully disclosed.  It is improper to leave Mr. Brda to labor under a cloud of suspicion and to endure costly discovery to refute facially meritless claims.  The Motion should be granted.

## ALLEGATIONS AND JUDICIALLY NOTICEABLE FACTS[3]

### I.    OVERVIEW OF ENTITIES

On June 28, 2021, Meta I and Torchlight engaged in a reverse merger in which Torchlight acquired Meta I, with the combined company re-named to Meta II.  [Compl. ¶ 19.]  Torchlight was a U.S. corporation, headquartered in Plano, Texas that was listed on the Nasdaq under the ticker symbol "TRCH."  [*Id.* ¶ 17.]  Torchlight engaged in the acquisition, exploration, and development of oil and natural gas properties.  [*Id.*]  Torchlight was co-founded by Mr. Brda, who also served as President and CEO of the company.  [*Id.* ¶ 15.]

Following the merger, Meta II carried on Meta I's business, assumed Torchlight's Nasdaq listing, and its stock traded under the ticker symbol "MMAT."  [*Id.* ¶ 19.]  As part of the merger's terms, Meta II acquired Torchlight's oil and gas assets, including the Orogrande and Hazel projects (the "**O&G Assets**").  [*Id.* ¶¶ 20–21.][4]  Meta II subsequently spun out the O&G Assets into an entity called Next Bridge Hydrocarbons Inc. ("**NBH**") on December 14, 2022.  [Compl. ¶ 80.][5]

### II.    PUBLIC DISCLOSURES

#### A.    Announcement of Proposed Merger and Special Dividend

On September 23, 2020, Torchlight filed an 8-K announcing that it and Meta I entered into a non-binding letter of intent ("**LOI**") for a proposed business combination transaction.  [Compl.

---

[3] The fact section of this Motion discusses—and contains hyperlinks to—several SEC filings.  Mr. Brda acknowledges that these hyperlinked filings are not part of the record.  *See* L.R. CV-10(c).  The hyperlinks are included in case the Court desires to review portions of the filings not specifically discussed in this Motion, not because Mr. Brda believes the Court needs to scour corporate reports in order to dismiss the SEC's claims.  Should the Court wish to make any portion of any SEC filing part of the record, the Court may take judicial notice of such filing pursuant to Federal Rule of Evidence 201.  *See R2 Invs. LDC v. Phillips*, 401 F.3d 638, 640 n.2 (5th Cir. 2005).

[4] Meta II Form 10-K/A for the fiscal year ended December 31, 2021, filed May 2, 2022, at 8, *available at* https://www.sec.gov/ix?doc=/Archives/edgar/data/1431959/000095017022006837/mmat-20211231.htm; Torchlight Form 10-K for the fiscal year ended December 31, 2020, filed March 18, 2021, *available at* https://www.sec.gov/ix?doc=/Archives/edgar/data/0001431959/000119983521000148/form-10k.htm.

[5] *See* Meta II Form 8-K filed December 15, 2022, *available at* https://www.sec.gov/ix?doc=/Archives/edgar/data/1431959/000119312522305648/d433696d8k.htm.

¶ 33.][6]  In the release, Mr. Palikaras highlighted the "significant value" for Meta I "in having a national exchange listing in the United States that will provide better access to the capital markets" and noted that, "[t]his transaction will enhance our ability to pursue a broad range of opportunities.[7] The LOI stated that "Torchlight legacy shareholders will be entitled to a special dividend distribution of any values attributable" to the O&G Assets.[8]  Neither the Form 8-K, nor the LOI, characterized the form of the special dividend (which was still subject to negotiation).

**B.    <u>Definitive Agreement</u>**

On December 14, 2020, Torchlight announced that it and Meta I signed the Definitive Agreement for the merger with the agreement publicly disclosed as an exhibit to Torchlight's SEC filing that day.    [Compl. ¶ 33.][9]  Investors were informed that pursuant to the Definitive Agreement:  (1) Torchlight shareholders would own 25 percent of the resulting combined company; (2) Meta I shareholders would own 75 percent; and (3) that a reverse split was contemplated in order to regain and maintain compliance with Nasdaq listing standards.[10] Torchlight further disclosed that the special dividend would take the form of a preferred share dividend (*i.e.*, not a cash dividend), that would be payable "immediately prior" to the closing of the transaction, indicating that the dividend record date would be a date in close proximity to the merger close.[11]

---

[6]      Torchlight    Form    8-K    filed    September    23,    2020,    *available    at* https://www.sec.gov/ix?doc=/Archives/edgar/data/1431959/000119983520000245/form-8k.htm.

[7]      Torchlight    Form    8-K    filed    September    23,    2020,    Ex.    99.1,    *available    at* https://www.sec.gov/ix?doc=/Archives/edgar/data/0001431959/000119983520000245/form-8k.htm.

[8] Torchlight Form 8-K filed September 23, 2020, at 3 ("Torchlight legacy shareholders will be entitled to a special dividend distribution of any values attributable to the sale of Torchlight's existing oil and gas business assets.").

[9]      Torchlight    Form    8-K    filed    December    14,    2020,    *available    at* https://www.sec.gov/ix?doc=/Archives/edgar/data/1431959/000119983520000329/form-8k.htm; Ex. 2.1 (Definitive Agreement), *available at* https://www.sec.gov/Archives/edgar/data/1431959/000119983520000329/ex2-1.htm.

[10] *Id.*

[11] Torchlight Form 8-K filed December 14, 2020, Ex. 2.1 at 17 (definition of "RTO Acquiror Preferred Stock").

The Definitive Agreement provided that Torchlight would use "commercially reasonable efforts" to sell its O&G Assets.[12]  It specified that the asset sale must occur prior to the earlier of December 31, 2021, or six months from the closing of the merger; otherwise, the combined company would effect a spin-off of those assets, with the preferred shareholders receiving their pro rata equity interest in the spin-off entity.[13]  Torchlight's preliminary and definitive proxy statements reiterated that a sale of the O&G Assets may not occur and in the absence of a sale, any unsold assets may be spun off from Meta II.[14]  In other words, the Definitive Agreement and the preliminary and final proxy statements repeatedly disclosed and warned investors that a spin-out was a potential outcome in the event Torchlight and/or Meta II was unable to sell the assets.

## C.  __Torchlight Proxy Statements__

On February 4, 2021, Torchlight filed its preliminary proxy statement.  [Compl. ¶ 39.] Among other things, it informed Torchlight shareholders that a special meeting would be held— at a date to be determined—for shareholders to vote on the Torchlight-Meta I merger.[15]  The preliminary proxy statement repeated the 25/75 post-close respective ownership between Torchlight and Meta I shareholders, reminded shareholders of the preferred share dividend that would be paid immediately prior to the merger close, and reiterated that if a sale of the O&G Assets did not occur, then those assets would be spun off from Meta II.[16]

On March 3, 2021, Torchlight received a comment letter from the SEC that its preliminary proxy was under review.[17]  As it worked through the SEC's additional requests and comments,

---

[12] Torchlight Form 8-K filed December 14, 2020.
[13] Torchlight Form 8-K filed December 14, 2020, Ex. 2.1 at Schedule J, Section 3(a).
[14] *See* Torchlight Preliminary Proxy Statement filed February 4, 2021 at 31, *available at* https://www.sec.gov/Archives/edgar/data/1431959/000119312521027524/d117540dprem14a.htm.
[15] *See* Torchlight Preliminary Proxy Statement filed February 4, 2021.
[16] *See id.* at 38.
[17] Letter from SEC to Torchlight filed March 3, 2021, *available at* https://www.sec.gov/Archives/edgar/data/1431959/000000000021002567/filename1.pdf.

Torchlight amended its Definitive Agreement several times to extend the deadlines relating to the merger close.[18]  On May 3, 2021, Torchlight issued a press release announcing a further extension of the merger close deadlines, which also reaffirmed that the dividend record date "will be determined after the [Torchlight] Stockholder Meeting is held."[19]

On May 7, 2021, Torchlight filed its definitive proxy statement.  [Compl. ¶ 39.]  The definitive proxy reminded shareholders that Torchlight would declare and issue a dividend, in the form of preferred shares, payable immediately prior to the merger close.[20]  The proxy also disclosed that the parties expected to close the merger "on or about June 18, 2021," after the shareholder vote on June 11, 2021—though the dividend record date was still "to be determined."[21]

## III.     **The Italian Call and Other Public Information**

On May 13, 2021, a few days following the filing of the definitive proxy statement, Mr. Palikaras attended a Zoom call with a group of investors in Italy that he believed held shares of Torchlight common stock (the "**Italian Call**").  [Compl. ¶ 61.]  A partial unauthorized audio recording of a portion of this meeting was later posted online in early June 2021 by an unknown individual with the Stocktwits username "KingOneFolle."  [*Id.* ¶ 50.]  The Complaint's selective excerpts of that call include statements made by Mr. Palikaras which, in isolation, allegedly constituted false and misleading statements.  [*Id.* ¶ 61.]

---

[18]     *See, e.g.*, Torchlight Form 8-K filed March 15, 2021, *available at* https://www.sec.gov/ix?doc=/Archives/edgar/data/1431959/000119983521000114/form8-k.htm; Torchlight Form 8-K filed April 1, 2021, *available at* https://www.sec.gov/ix?doc=/Archives/edgar/data/1431959/000119983521000173/form-8k.htm; Torchlight Form 8-K filed April 15, 2021; Torchlight Form 8-K filed May 4, 2021, *available at* https://www.sec.gov/ix?doc=/Archives/edgar/data/1431959/000119983521000251/form-8k.htm.
[19]     Torchlight Form 8-K filed May 4, 2021, Ex. 99.1, *available at* https://www.sec.gov/Archives/edgar/data/1431959/000119983521000251/ex99-1.htm.
[20]   *See* Torchlight Definitive Proxy Statement at 31.
[21]   *See id.* at 20 (definition of "Series A Preferred Record Date"), 37 (citing "on or about June 18, 2021" for closing).

But Mr. Palikaras heavily caveated his statements regarding the potential for a short squeeze on the call:[22]  (i) "And we believe, or at least we expect, that there will be, *if the market conditions allow*, a potential jump towards the close.  **We don't know by how much, and we don't know if it's going to happen.**" (ii) "And if [a short squeeze] happens, then I mean, if the [Torchlight] stock obviously goes to four dollars, five dollars, whatever it goes to, *or one dollar*. You know, *if the markets collapse you know, there's always that delta*."; and (iii) "So, it could be very positive, it could be also negative depending on the market conditions."

When Mr. Palikaras received questions relating to the potential value of the preferred share dividend, he responded as follows:  (i) "frankly nobody can predict if this is going to be a one dollar or a twenty-dollar dividend"; (ii) "it could be a dollar to more than twenty dollars"; (iii) "twenty . . . could also be a low number"; (iv) the dividend "could be worth zero"; (v) "it's difficult to predict where it's going to end up"; (v) "I cannot give you that prediction [regarding the dividend price].  I am not part of management of Torchlight, also I'm not an expert in oil and gas assets."; (vi) "we did not want to touch the dividends, because we on the Meta side could not even predict the price of oil six months ago or where this Biden administration would create potentially additional reasons for the assets to be more valuable"; and (vii) "Like honestly, today, I know that whatever it was valued at last year it's more.  That's the only thing I can tell you just based on the price of oil and what the Biden administration has done.  Other than that, *everything else is speculative*."  Ex. A-1.

---

[22] A transcribed copy of the Italian Call recording, upon which the Complaint cites to and relies, is attached as **Exhibit A-1**.  The Court may consider documents attached to a defendant's motion to dismiss if they are both referred to in the complaint and central to the claims.  *See Causey v. Sewell Cadillac-Chevrolet, Inc.*, 394 F.3d 285, 288 (5th Cir. 2004); *Brand Coupon Network, LLC v. Catalina Mktg. Corp.*, 748 F.3d 631, 635 (5th Cir. 2014).  The Italian Call recording is referenced in in the Complaint and central to the claims.  [*See* Compl. ¶¶ 50, 61, 82–88, 126.]

Months before the May 2021 Italian Call, the possibility of a short squeeze and speculation about the dividend value had been swirling in the public domain on various social media platforms.[23]

## IV.   THE DIVIDEND RECORD DATE AND JUNE 2021 ATM OFFERING

On May 28, 2021, Torchlight filed a shelf registration covering an offering (or series of offerings) not to exceed $250 million in the aggregate.[24]   Once again, the shelf registration disclosed key terms of the merger, including the preferred share dividend structure.[25]   In addition to the terms, the Form S-3 noted that the proceeds would be used for "general corporate purposes," including "additions to [Torchlight's] working capital" and "capital expenditures."[26]   Pursuant to this registration, Torchlight sold shares via the ATM Offering in June 2021.

Torchlight shareholders approved the merger on June 11, 2021.[27]  Later that day, Torchlight's Board of Directors formally declared the preferred dividend, setting June 24, 2021 as the dividend record date.[28]  Torchlight's disclosures as early as December 2020 had already put the public on notice that the dividend would be issued "immediately prior" to the merger close, and the definitive

---

[23] *See, e.g., Torchlight Energy Resources: Special Dividend Likely To Be Of Limited Value*, SEEKING ALPHA (Mar. 10, 2021), http://seekingalpha.com/article/4412814-torchlight-energy-resources-special-dividend-likely-to-be-of-limited-value; @aadiit, REDDIT, r/TRCH, *How will shorts give out preferred shares* (Apr. 20, 2021), https://www.reddit.com/r/TRCH/comments/mv7lx8/how_will_shorts_give_out_preferred_shares/ ("In case of shorting the shorts have to pay dividend.  Is it possible for shorts to issue preferred shares?  If not then we have a OSTK kind of situation here.  The more they short it the bigger the squeeze."); Jordan Belfort (@BamaTrader7), TWITTER (Mar. 15, 2021, 9:31 AM), https://x.com/BamaTrader7/status/1371469212728823815 ("ALL shorts must cover their positions prior to the merger with $MMAT (Metamaterial)."); d ny (@vvsdan999), TWITTER (Jan. 28, 2021, 10:35 PM), https://x.com/vvsdan999/status/1355011545206501382 ("Special dividend, 40%+ of the float is being shorted – shorts will have to cover before the merger"); *Torchlight Energy Resources Stock Appears To Be Significantly Overvalued*, YAHOO FINANCE (Mar. 28, 2021), attached as **Exhibit A-2**.  Mr. Brda respectfully requests the Court take judicial notice of these articles for the limited purpose of the existence of these statements in the public domain.  *See U.S. ex rel. Lam v. Tenet Healthcare Corp.*, 481 F. Supp. 2d 673, 680 (W.D. Tex. 2006).

[24]      Torchlight      Form      S-3      filed      May      28,      2021,      *available      at* https://www.sec.gov/Archives/edgar/data/1431959/000119983521000349/form-s3.htm.

[25] Torchlight Form S-3 filed May 28, 2021, at 10.

[26] *Id.* at 11.

[27] Torchlight      Press      Release      dated      June      25,      2021,      *available      at* https://www.sec.gov/Archives/edgar/data/1431959/000119312521203407/d189140dex991.htm

[28]      Torchlight      8-K      filed      June      16,      2021,      *available      at* https://www.sec.gov/ix?doc=/Archives/edgar/data/1431959/000119983521000381/form-8k.htm.

proxy statement in May 2021 disclosed that the parties expected the merger close to occur on June 18, 2021 or thereabouts.[29]   Then, on June 16, 2021, Torchlight announced a sales agreement with its financial advisor to sell shares at the market.  [Compl. ¶ 106.][30]  And between June 16 and June 24, 2021, Torchlight conducted the ATM Offering, selling common shares for aggregate gross proceeds of approximately $137.5 million.  [Compl. ¶ 106.][31]

## LEGAL STANDARDS

Under Federal Rule of Civil Procedure 12(b)(6), "[f]actual allegations must be enough to raise a right to relief above the speculative level."  *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007).  "[W]hen the allegations in a complaint . . . [can]not raise a claim of entitlement to relief, this basic deficiency should . . . be exposed at the point of minimum expenditure of time and money by the parties and the court."  *Id.* at 558 (internal citation omitted).

In addition, "Federal Rule of Civil Procedure 9(b) . . . requires the plaintiffs in securities fraud causes to plead with particularity the circumstances constituting the alleged fraud."  *Southland Sec. Corp. v. INSpire Ins. Sols., Inc.*, 365 F.3d 353, 362 (5th Cir. 2004).  The Fifth Circuit "'interprets Rule 9(b) strictly, requiring a plaintiff pleading fraud to specify the statements contended to be fraudulent, identify the speaker, state when and where the statements were made, and explain why the statements were fraudulent.'"  *Dorsey v. Portfolio Equities, Inc.*, 540 F.3d 333, 338–39 (5th Cir. 2008) (internal citation omitted).  "Put simply, Rule 9(b) requires the complaint to set forth 'the who, what, when, where, and how' of the events at issue."  *Id.* (internal citation omitted).

---

[29] *See* Torchlight Form 8-K filed December 14, 2020; Torchlight Definitive Proxy Statement.
[30]    Torchlight Final Prospectus on Form 424B5 filed June 16, 2021, *available at* https://www.sec.gov/Archives/edgar/data/1431959/000119983521000383/form-424b5.htm.
[31] Meta II 10-K/A for the year ended December 31, 2021, filed May 2, 2022, at 95.

## ISSUES TO BE DECIDED

The issue to be decided by the Court is whether Plaintiff has stated a claim under Federal Rules of Civil Procedure 12(b)(6) and 9(b).  As set forth in the argument section below, that issue includes the following sub-issues:  (1) whether the Complaint states a cognizable scheme liability theory, (2) whether the Complaint states an actionable misrepresentation or omission, (3) whether the Complaint pled any negligence-based theory, (4) whether the Complaint alleges a Proxy Fraud Claim, (5) whether the Complaint sufficiently alleges an aiding and abetting claim, and (6)whether the Complaint's requested relief should be stricken.

## LEGAL ARGUMENTS

The SEC's five alleged violations each fails to state a claim under Rule 12(b)(6) and 9(b). Thus, dismissal with prejudice is warranted.

## I.    THE SEC FAILS TO PLEAD SCHEME LIABILITY (COUNTS I AND II).

The SEC alleges Mr. Brda violated Section 17(a) of the Securities Act and Section 10(b) of the Exchange Act and Rule 10b-5 thereunder.  [Compl. ¶¶ 112–23.]  The SEC relies on a "market manipulation scheme" liability theory.  [*See id.* ¶ 62.]  This "scheme liability theory [is] recognized by a few courts . . . but not by the Fifth Circuit, itself, which, . . . limit[s] the reach of § 10(b) and Rule 10b–5 to a material misrepresentation or omission where there is a recognized duty to disclose."  *SEC v. Mapp*, 240 F. Supp. 3d 569, 585 (E.D. Tex. 2017) (quoting *In re Enron Corp. Sec., Derivative & ERISA Litig.*, 586 F. Supp. 2d 732, 793 (S.D. Tex. 2008)); *accord Burback v. Brock*, 2023 WL 4532803, at *7 (5th Cir. July 13, 2023) (per curiam) (affirming dismissal despite claim that district court failed to account for "scheme liability" because allegations deemed insufficient on other grounds).  In the Fifth Circuit, "'deception' within the meaning of § 10(b) requires that a defendant fail to satisfy a duty to disclose material information

***to a plaintiff***." *Regents*, 482 F.3d at 384, 391 (holding manipulation is only "conduct that affects the marketplace indirectly can violate § 10(b) only if it constitutes deception") (emphasis added).

In either event, to state a scheme liability claim under Rule 10b-5(a) and (c), the SEC must, at a minimum, "allege (1) that the defendant committed a deceptive or manipulative act, (2) in furtherance of the alleged scheme to defraud, (3) with scienter[.]" *SEC v. Lucent Tech., Inc.*, 610 F. Supp. 2d 342, 350 (D.N.J. 2009); *accord Yoshikawa v. Exxon Mobil Corp.*, 2023 WL 5489054, at *3 (N.D. Tex. Aug. 24, 2023). "[M]isstatements and omissions can form part of a scheme liability claim, but an actionable scheme liability claim also requires something beyond misstatements and omissions, such as dissemination." *SEC v. Rio Tinto PLC*, 41 F.4th 47, 49 (2d Cir. 2022). Without more, "a fully disclosed corporate transaction" is not considered manipulative or deceptive. *Overstock*, 119 F.4th at 793. Independently, the SEC also fails to plead scienter or "a mental state embracing intent to deceive, manipulate, or defraud." *Gann*, 565 F.3d at 936 (internal quotation marks omitted). And thus, the SEC's scheme liability claims fail as a matter of law and should be dismissed.

## A.   The Alleged Acts Do Not Constitute Deceptive Conduct.

A market manipulation claim "require[s] a showing that an alleged manipulator engaged in market activity aimed at deceiving investors as to how other market participants have valued a security." *ATSI*, 493 F.3d at 100. "The gravamen of manipulation is deception of investors into believing that [the] prices at which they purchase and sell securities are determined by the natural interplay of supply and demand, not rigged by manipulators." *Gurary v. Winehouse*, 190 F.3d 37, 45 (2d Cir. 1999).

In particular, the Fifth Circuit considers whether defendants have engaged in deceptive conduct which has "the effect of either creating the false impression that certain market activity is occurring when in fact such activity is unrelated to actual supply and demand or tampering with

the price itself." *Regents*, 482 F.3d at 390 (citing *Hundahl v. United Benefit Life Ins. Co.*, 465 F. Supp. 1349, 1360 (N.D. Tex. 1979) (Higginbotham, J.)).  As the Supreme Court explained in *Santa Fe Indus., Inc. v. Green*, "'[m]anipulation' is virtually a term of art when used in connection with securities markets" and manipulative practices include "wash sales, matched orders, or rigged prices, that are intended to mislead investors by artificially affecting market activity."  430 U.S. 462, 472, 476 (1977).  What differentiates a "manipulation" from other forms of fraud under Section 10(b) is "activity that is outside the 'natural interplay of supply and demand,'" that is, "whether a transaction sends a false pricing signal to the market." *ATSI*, 493 F.3d at 100.  Thus, "[m]anipulation requires that a defendant act directly in the market for the relevant security." *Regents*, 482 F.3d at 390.

The SEC's claim is foreclosed by the Supreme Court, the Fifth Circuit, and district courts unanimously holding there can be no market manipulation absent deception. *Santa Fe*, 430 U.S. at 476; *Regents*, 482 F.3d at 391; *Mapp*, 240 F. Supp. 3d at 586.  And courts have consistently rejected attempts to label publicly disclosed fundamental corporate decisions or transactions as "deceptive conduct." *See, e.g.*, *Overstock*, 119 F.4th at 802 (corporation's public plan to issue dividend was not deceptive conduct); *SEC v. Lyon*, 529 F. Supp. 2d 444, 445 (S.D.N.Y. 2008) ("The Court finds this characterization of a short sale inaccurate and not reflective of what occurs in the market."); *Kraft v. Third Coast Mistream*, 2021 WL 860987, at *23 (S.D.N.Y. Mar. 8, 2021) (reduction in dividend with alleged intent to artificially suppress stock price was not market manipulation); *see also Selk v. St. Paul Ammonia Prod., Inc.*, 597 F.2d 635, 637 (8th Cir. 1979) (rejecting Sections 10(b) and 14(a) claims over the "true motivation of corporate management" in pursuing a corporate merger where facts were publicly disclosed); *SEC v. Daifotis*, 2011 WL 2183314, at *9 (N.D. Cal. June 6, 2011), *modified on reconsideration on other grounds*, 2011 WL

3295139 (N.D. Cal. Aug. 1, 2011) ("The marketing of an ultra-short bond fund was not inherently deceptive conduct.").

In stark contrast, none of the alleged conduct at issue here—(1) a preferred stock dividend, (2) social media commentaries, and (3) the ATM Offering—carried any indicia of manipulation described above.  None sent "false price signals" to the market.  None injected inaccurate information into the market.  And none created a false impression of how market participants valued Torchlight stock—all essential elements of a market manipulation claim.  The SEC is attempting to fit publicly disclosed corporate conduct into the term "manipulative," a "term of art" that has no application here.  *Santa Fe*, 430 U.S. at 476.

### i.    *The Preferred Share Dividend.*

The announcement and subsequent issuance of the preferred share dividend could not and did not deceive the market, nor was it a sham.  The SEC does not allege that the preferred share dividend was unlawful.  The announcement itself did not "inject[] 'inaccurate information' into the market or otherwise create[] a false impression of market activity" of the preferred share dividend. *Overstock*, 119 F.4th at 802.  Instead, Torchlight accurately and publicly informed the market of its business decision to issue a lawful dividend and accurately described the nature of the dividend:  that owners of Torchlight stock would receive a preferred share dividend for every Torchlight share owned on the dividend record date, shortly before merger close.  Simply stated, Meta II could not manipulate a market with "truthful disclosure of the terms of the upcoming dividend transaction." *Id.* at 803.  While the announcement might have been construed as deceptive if Meta II did not ultimately issue the preferred share dividend but, Meta II *did* issue the dividend.  No one was deceived about the dividend.

The SEC asserts the preferred share dividend was somehow deceptive because it purportedly was designed to cause a squeeze on short sellers.  [*See* Compl. ¶¶ 3, 30–32.]  This argument fails for

two reasons.  *First*, the public record does not substantiate the SEC's view.  Instead, the public record establishes that the overarching and animating purpose of the preferred share dividend was to provide a means for the legacy Torchlight shareholders to benefit from the O&G Assets.[32]

*Second*, the preferred share dividend was not deceptive because the market was aware of the potential impact of the dividend on short sellers.  The possibility of a short squeeze for short sellers was merely a "collateral consequence[]" of the lawful preferred share dividend that was "apparent" in the market.  *In re Overstock Sec. Litig.*, 2020 WL 5775845, at *10 (D. Utah Sept. 28, 2020) ("*Overstock I*") (rejecting argument that the digital dividend supported manipulation claims because it allegedly was designed "to create short covering"); *In re Overstock Sec. Litig.*, 2021 WL 4267920, at *10–12 (D. Utah Sept. 20, 2021) ("*Overstock II*"), *aff'd*, 119 F.4th 787 (10th Cir. 2024) (same). The market was aware that Torchlight was one of the most heavily shorted stocks on the stock market (*see supra* at p. 10 n.23) and that non-cash dividends could result in short sellers being required to cover.  *See Overstock II*, 2021 WL 4267920, at *11 (no market manipulation where market "knew the potential ramifications of" decision to issue unregistered digital dividend).  Torchlight "could not manipulate the market . . . via a dividend that everyone immediately knew would impact short sellers."  *Id.*; *see also Kraft*, 2021 WL 860987, at *23 (corporate decisions that led to change in stock price did "not allege a false price signal; the nub of [claim was] that the price signal was accurate, but just not what it should have been had [the company] made other decisions").

In sum, the dividend announcement (and issuance) was not deceptive conduct—*even if* Mr. Brda understood that the dividend might negatively affect short sellers.  The dividend did not send a "false signal" to the market regarding supply or demand; it did not create the false

---

[32] *See, e.g.*, Torchlight Preliminary Proxy Statement filed February 4, 2021, at 100 (dividend would allow "Torchlight stockholders to maintain a beneficial interest in the O&G Assets"); Torchlight Definitive Proxy Statement filed May 7, 2021, at 109 (same).

appearance of liquidity; and it did not "deceiv[e] investors as to how other market participants ha[d] valued" Torchlight stock. *ATSI*, 493 F.3d at 100. Therefore, that business decision cannot support a market manipulation scheme claim.

ii.     *Informal Commentaries Regarding a Potential Short Squeeze.*

The SEC points to certain informal statements—such as Mr. Brda tweeting "a video discussing short squeezes in the contexts of other stocks," [Compl. ¶ 63], Mr. Palikaras' tweet depicting Torchlight shorts with flames [*id.* ¶ 64], his "T plus 2 rule" tweet [*id.* ¶ 90], and an alleged statement made in a March 2021 conference [*see id.* ¶¶ 44, 60]—as evidence of "promoting" a short squeeze. These and other statements regarding a potential short squeeze cannot support a market manipulation claim for several reasons.

*First*, the SEC does not contend that any of the statements were false or misleading because it cannot. The commentaries were nothing more than accurate observations of potential natural consequences resulting from regular market dynamics. Because "estimate[s] of the fair value of . . . assets will vary depending on the particular methodology and assumptions used," "'[t]here may be a range of prices with reasonable claims to being fair market value.'" *Fait v. Regions Fin. Corp.*, 655 F.3d 105, 110–11 (2d Cir. 2011) (citation omitted).

*Second*, the market could not have been deceived by statements repeating information that was already public knowledge and incorporated into the market's analysis. *See, e.g.*, *Regents*, 482 F.3d at 383 (in an efficient market "the market price reflect[s] all publicly available information").

*Third*, the statements did not have any attributes of market manipulation. They did not send a false pricing signal to the market. They did not inject inaccurate information into the market. And they did not deceive investors into believing that the price of Torchlight security was determined by anything other than the natural interplay of supply and demand. *See Overstock I*, 2020 WL 5775845, at *10.

DEFENDANT JOHN BRDA'S MOTION TO DISMISS – PAGE 17

*Fourth*, in the Complaint, the March 2021 conference is devoid of any specificity, which is required to satisfy Rule 9(b). Instead, it relies on an annotated, out-of-context excerpt from a "note-taker" at the conference. [Compl. ¶¶ 44, 60 ("15 things driving our stock price, last thing before closing, is a short position, is hard to deliver dividend if short on closing").] This single vague and non-specific allegation cannot support a securities fraud claim. *See Mapp*, 240 F. Supp. 3d at 579 (citing Rule 9(b)). Among others, this out-of-context excerpt begs the question of (i) what stock is the note-taker referring to, (ii) what were the fourteen other price drivers, and (iii) what else did the note-taker write? "Such broad, conclusory allegations simply do not carry weight under Rule 9(b)." *SEC v. Felton*, 2020 WL 7056333, at *6 (N.D. Tex. Dec. 2, 2020) (citing *Lovelace v. Software Spectrum, Inc.*, 78 F.3d 1015, 1019 (5th Cir. 1996)).

*Finally*, the only other communication alleged to have been made by Mr. Brda to investors was a tweet of "a video discussing short squeezes ***in the contexts of other stocks***," [Compl. ¶ 63 (emphasis added)], which on its face could not constitute him "act[ing] directly in the market for the relevant security," *i.e.*, Torchlight. *Regents*, 482 F.3d at 390.

### iii.    *The ATM Offering.*

The SEC's claim that the June 2021 ATM Offering somehow constituted deceptive conduct that was part of the purported scheme fares no better. [*See* Compl. ¶¶ 42–45.] The SEC's theory appears to be that Torchlight manipulated the market to "take advantage of the squeeze" by conducting the ATM Offering during the squeeze. [*Id.* ¶ 42.] The SEC, however, does not (and cannot) allege that a short squeeze even actually occurred and thus, its "taking advantage of the squeeze" theory is unmoored to any factual allegation.

This fundamental flaw aside, the ATM Offering could not, by definition, send "false pricing signals" to the market because it offered Torchlight shares at the prevailing market price. *ATSI*, 493 F.3d at 100. Because market manipulation requires deception, courts repeatedly reject

manipulation claims where all relevant conditions were known to the market.  *See, e.g.*, *Kraft*, 2021 WL 860987, at *23 (no market manipulation where "the market accurately understood the message that [the defendant's] decisions were sending"); *Hudson Bay Master Fund Ltd. v. Patriot Nat'l, Inc.*, 309 F. Supp. 3d 100, 118 (S.D.N.Y. 2018) (plaintiffs could not "allege how the [defendants'] authorized short-selling, after the public announcement of [a private investment in public equity transaction], deceived investors or sent a false pricing signal in the market").

Such is the case here.  Torchlight disclosed the terms of the offering (which are not alleged to be false).  Those disclosures provided that the ATM Offering was being made pursuant to the shelf registration statement filed on May 28, 2021, which previously informed the market that Torchlight might sell shares via an offering such as an ATM.[33]  And Torchlight had already disclosed its plan to issue a preferred share dividend before merger close.[34]  Given the accurate disclosures, the SEC cannot show that the market was deceived when Torchlight in fact did as it said and engaged in the ATM Offering.  *See, e.g.*, *Wilson v. Merrill Lynch & Co.*, 671 F.3d 120, 124, 133 (2d Cir. 2011) ("practice of 'support bid[ding],' or using its own capital to place bids in order to prevent the failure of auctions for which it served as sole or lead dealer," was not manipulative where defendant disclosed "that it 'may routinely' place such bids"); *Finn v. Barney*, 471 F. App'x 30, 33 (2d Cir. 2012) ("defendants' disclosures preclude[d] plaintiffs' claim that the defendants' conduct was manipulative").

Nor is there merit in the SEC's speculation that Mr. Brda "took advantage" of the non-existent short squeeze because "a rise or fall in a stock price as a result of such [disclosed] acts is ***indicative of a free market process***."  *Hundahl*, 465 F. Supp. at 1362 (emphasis added).  In other words, the prevailing market price of the ATM Offering reflected the market's judgment of the

---

[33] *See generally* Torchlight Form S-3 filed May 28, 2021.
[34] Torchlight Form 8-K filed September 23, 2020.

value of Torchlight stock, "consider[ing] whatever was disclosed about the dividend policy" and the offering. *Id.* In short, "by the time the [company sold shares in the ATM Offering], the existence of the [preferred share dividend and the ATM] had already been made public and therefore, the [company was] not acting upon any information that was not available to the investing public at-large." *Hudson Bay*, 309 F. Supp. 3d at 118; *see also Wilson*, 671 F.3d at 132. As a matter of law, Torchlight's sale of securities in the ATM Offering could not be deceptive. *See Overstock*, 119 F.4th at 807 (affirming dismissal with prejudice; no deceptive conduct where terms were disclosed and public not deceived); *Hudson Bay*, 309 F. Supp. 3d at 118 (no deceptive conduct where transactions based on publicly available information and no investors deceived); *Rice v. Hamilton Oil Corp.*, 658 F. Supp. 446, 448 (D. Colo. 1987) ("Plaintiffs cannot reasonably claim that they were deceived by alleged omissions when they had knowledge of the information claimed to be omitted.").

## B.  Allegations of 'Intent Only' Manipulation Cannot Show Deceptive Conduct.

The SEC appears to disregard the well settled legal principles above, basing deceptive conduct solely on Defendants' allegedly manipulative intent. [*See* Compl. ¶ 5 ("Without publicly revealing that they were the source of the short squeeze narrative or fully disclosing their intent or plan, Defendants intended their deceptive promotional efforts to artificially inflate the price of Torchlight stock . . ..").] That theory finds scant support in the law, appears only in cases involving trading activity (not corporate acts), is inapplicable where the conduct was for legitimate purposes, and runs afoul of longstanding precedent, rejecting liability on intent alone. It simply has no application here.

Even if an "intent-only" approach were viable (it is not), "[l]egitimate business transactions that do not have a deceptive purpose or effect cannot form the basis of scheme liability." *SEC v. Quan*, 2013 WL 5566252, at *14 (D. Minn. Oct. 8, 2013), *aff'd*, 870 F.3d 754 (8th Cir. 2017); *see*

*Lucent*, 610 F. Supp. 2d at 360–61 (failure to disclose "real terms" of sales did not support scheme liability claims because the underlying sales were legitimate business transactions; alleged scheme "must involve 'sham' or 'inherently deceptive' transactions"); *see also Overstock I*, 2020 WL 5775845, at *11. Thus, to succeed on its claim, the SEC still must show that the challenged corporate actions lacked a "legitimate" purpose or economic reason. It cannot.

Incidentally, the SEC's theory that Mr. Brda intended to create a short squeeze is inconsistent with its allegations that Torchlight intended to defraud retail investors through the ATM Offering. [Compl. ¶ 97.] If Torchlight wanted to squeeze short sellers as the SEC claims, it would not introduce significant liquidity in the market via the ATM Offering (or an earlier underwritten offering in February 2021) that would allow the shorts to cover their positions and remove the scarcity that causes a short squeeze in the first place.

The Complaint squarely establishes Torchlight's legitimate purpose for issuing the preferred share dividend: to ensure that the benefits of the O&G Assets inured to the benefit of the legacy Torchlight shareholders.[35] Because the dividend had a legitimate purpose, a scheme liability claim based on market manipulation will fail as a matter of law. *See Overstock I*, 2020 WL 5775845, at *10–11 (dismissing market manipulation claim; the "dividend had a legitimate business purpose" "to bolster Overstock's transition away from being only an online retail business"). The informal commentaries regarding a potential short squeeze likewise do not support a claim. As mentioned above, the SEC does not plausibly allege that the statements— which merely repeated information that was already in the market—were false. The ATM Offering had the legitimate business purpose of raising capital. Moreover, to the extent the public

---

[35] *See* Compl. ¶ 25 ("As part of the merger structure, issue a dividend—in the form of preferred stock issued to Torchlight stockholders of record at closing . . . ostensibly to allocate proceeds from the sale of Torchlight's oil and gas assets to legacy Torchlight shareholders.").

was speculating that a short squeeze was occurring, selling shares via the ATM Offering would reduce volatility in the stock price resulting from a squeeze. Decreasing the potential for stock price volatility is a legitimate corporate goal.

The SEC's 'intent-only' theory defies *Virginia Bankshares, Inc. v. Sandberg*, where the Supreme Court refused to extend Section 14(a) liability based "on [executives'] mere disbelief or undisclosed motive." 501 U.S. 1083, 1096 (1991). The Supreme Court warned that imposing liability where investors were not misled about objective, factual details of corporate transactions would "authorize [] litigation confined solely to . . . the 'impurities' of a director's 'unclean heart.'" *Id.* (quoting *Stedman v. Storer*, 308 F. Supp. 881, 887 (S.D.N.Y. 1969)).

Decades of lower court precedent likewise holds that a company is not required to disclose "impure motives for entering [an] allegedly improper transaction"—even where the motive at issue is an alleged intent to artificially alter the stock price. *Kademian v. Ladish Co.*, 792 F.2d 614, 627 (7th Cir. 1986) (dismissing Section 10(b) claims where the defendant intentionally suppressed value of its stock before a merger via a "market freeze" of the shares); *Hundahl*, 465 F. Supp. at 1355 (rejecting claims based on "alleged scheme to manipulate the price of [a] stock" via corporate dividend policy).[36] Similarly, when multiple corporate acts are disclosed and are not deceptive, a plaintiff may not "bootstrap" those acts into a "securities violation." *Kademian*, 792 F.2d at 627. So long as investors are informed about the objective, factual details of corporate transactions, the "federal securities laws do not impose any requirement that officers and directors or courts engage in public psychoanalysis about the real motives of corporate officers and directors for reaching a decision." *Kas v. Fin. Gen. Bankshares, Inc.*, 796 F.2d 508, 513 (D.C. Cir. 1986) ("[W]here the

---

[36] *See also Shivers v. Amerco*, 670 F.2d 826, 829 (9th Cir. 1982) ("doubt[ing]" that plaintiff could bring market manipulation claim based on publicly disclosed reverse stock splits, even where intent was allegedly to decrease stock price); *Brady v. Top Ships Inc.*, 2019 WL 3553999, at *7 (E.D.N.Y. Aug. 5, 2019), *aff'd sub nom. Onel*, 806 F. App'x 64 (2d Cir. 2020) (rejecting claims based on alleged scheme to artificially increase stock price via reverse stock splits).

failure to disclose involves the 'true' motivations of the directors and so would require a court to probe the business judgment of the directors, *Santa Fe* holds that the claim states no cause of action under the 1934 Act.").[37]  The SEC's claims based on Mr. Brda's alleged "motivations" for the merger, the preferred share dividend, and the ATM Offering—all of which were legitimate business decisions accurately disclosed to the market—are precluded.  [Compl. ¶ 50.][38]

In sum, the SEC does not identify a single element of the purported scheme that lacked a legitimate business purpose or went beyond merely reiterating information that was already present in the market.  The SEC does not plead a market manipulation claim as a matter of law, even if the dubious intent-only theory could apply.

## C.    The SEC Fails to Allege Scienter.

The SEC's alleged claim does not satisfy the heightened standard for pleading scienter— particularized facts that Mr. Brda acted with "a mental state embracing intent to deceive, manipulate, or defraud." *Alaska Elec. Pension Fund v. Flotek Indus., Inc.*, 915 F.3d 975, 981 (5th Cir. 2019).  "For purposes of 10(b) liability, a defendant must have acted with, at minimum, severe recklessness."  *Id.*  "To withstand a motion to dismiss, an inference of scienter must be more than merely plausible or reasonable—it must be cogent and at least as compelling as any opposing inference of nonfraudulent intent."  *Id.* at 982.  "The SEC must 'allege facts that give rise to a strong inference of fraudulent intent.'"  *Rio Tinto*, 2019 WL 1244933, at *13 (quoting *SEC v.*

---

[37] *See e.g.*, *Lessler v. Little*, 857 F.2d 866, 876 (1st Cir. 1988) (rejecting Section 10(b) and 14(a) claims over "management's characterization" of information where "all of the relevant *factual* details" were disclosed such that "reasonably intelligent shareholders were made aware of the substance of the proposed transaction"); *Biesenbach v. Guenther*, 588 F.2d 400, 402 (3d Cir. 1978) (rejecting claims based on alleged "true purpose" of defendant); *Brickman v. Tyco Toys, Inc.*, 731 F. Supp. 101, 105 (S.D.N.Y. 1990) ("defendants were under no obligation to disclose their 'true' or subjective purpose"); *Selk*, 597 F.2d at 637; *Golub v. PPD Corp.*, 576 F.2d 759, 765 (8th Cir. 1978) (rejecting claim that company violated securities laws by failing to disclose "the true motivation" for selling assets).

[38] Further, the "intent-only" theory "improperly conflate[s] conduct with the separate issue of scienter."  *Overstock I*, 2020 WL 5775845, at *11; *see SEC v. U.S. Envt'l, Inc.*, 155 F.3d 107, 111 (2d Cir. 1998).  Alleging "that defendants' conduct was manipulative because they did not tell shareholders that their conduct was manipulative" is "a classic example of circular reasoning and conclusory pleading."  *Brady*, 2019 WL 3553999, at *8.  The SEC makes just that sort of allegation here.

**DEFENDANT JOHN BRDA'S MOTION TO DISMISS – PAGE 23**

*Egan*, 994 F. Supp. 2d 558, 565 (S.D.N.Y. 2014)).  The SEC has not plead the requisite scienter to establish scheme liability.

The SEC has not alleged any facts that give rise to any inference of fraudulent intent by Mr. Brda, much less a strong inference.  Indeed, Torchlight's full and accurate disclosures of the dividend undermines any inference of scienter.  *See, e.g.*, *In re Bank of Am. AIG Disclosure Sec. Litig.*, 980 F. Supp. 2d 564, 586 (S.D.N.Y. 2013) (defendant's "general and categorical public disclosures also weigh heavily against an inference of scienter"), *aff'd*, 566 F. App'x 93 (2d Cir. 2014); *In re Acterna Corp. Sec. Litig.*, 378 F. Supp. 2d 561, 577 (D. Md. 2005) (public disclosure "militates against an inference of scienter").  The dividend's overarching legitimate business purpose further defeats any inference of scienter and negligence.  There can be no scienter (or even negligence) through the act of repeating truthful information already in the public domain because truthful disclosures inform, rather than deceive, investors.  *See City of Roseville Emps.' Ret. Sys. v. Sterling Fin. Corp.*, 963 F. Supp. 2d 1092, 1132 (E.D. Wash. 2013), *aff'd*, 691 F. App'x 393 (9th Cir. 2017) (public disclosure of truthful information "negates an inference of scienter").

Absent an allegation of scienter on the part of Mr. Brda, backed by particularized facts that satisfy Rule 9(b), the SEC's securities fraud claims against him cannot stand.  *See Dawes v. Imperial Sugar Co.*, 975 F. Supp. 2d 666, 700 (S.D. Tex. 2013) (dismissing securities fraud claim for failure to allege scienter).

## II.    THE SEC FAILS TO PLEAD AN ACTIONABLE MISREPRESENTATION.

"Scheme liability . . . hinges on the performance of an inherently deceptive act that is distinct from an alleged misstatement."  *SEC v. Kelly*, 817 F. Supp. 2d 340, 344 (S.D.N.Y. 2011).  Here, the SEC's allegations blur the line of deceptive acts and alleged misstatements by primarily relying on: (i) the "commercially reasonable efforts" Torchlight and Meta II would take to sell Torchlight's O&G Assets [*see* Compl. ¶¶ 67–81, 114, 120, 126, 132–33]; and (ii) Mr. Palikaras'

statement at the Italian Call that the dividend could be worth "$1 to $20." [*Id.* ¶¶ 82–88, 114, 120, 126, 132–33.] Neither statement is actionable as to Mr. Brda.

A.    **"Commercially Reasonable Efforts" Statements Were Not Materially False.**

The SEC alleges Mr. Brda misrepresented that Torchlight and Meta II would take "commercially reasonable efforts" to sell Torchlight's O&G Assets. [*See* Compl. ¶¶ 67–81, 114, 120, 126, 132–33.] The SEC contends those statements were false because Torchlight allegedly failed to take any efforts to sell the assets due to an alleged secret intent not to sell. This theory is legally and factually flawed as pled.

First, the SEC has neither pled scienter nor negligence. Second, the statements are not actionable because they were forward looking, protected by the bespeaks caution doctrine, and were non-actionable expressions of corporate optimism. Third, because the SEC cannot plead that any of its proposed steps to sell the assets were "commercially reasonable," it cannot adequately plead falsity. Finally, the public record contains substantial support that Torchlight did undertake appropriate efforts given the prevailing economic conditions.

i.    *The SEC has Not Pled the Required State of Mind.*

The SEC's theory of liability hinges on its assertion that Torchlight, through Mr. Brda, never really wanted to sell the O&G Assets and instead, planned to spin out the assets all along, but nonetheless represented it would use "commercially reasonable efforts" to sell the assets within six months of merger close. [*See* Compl. ¶¶ 75–77.] This theory "encounters an immediate first-level problem." *Nguyen v. Endologix, Inc.*, 962 F.3d 405, 415 (9th Cir. 2020). The SEC's contradictory theory ignores: (i) Torchlight's entire business plan prior to the merger was to develop the O&G Assets for sale, (ii) Mr. Brda would not have obtained a materially different benefit from a spin-out over a sale, and (iii) the spin-out entity's plan was to sell the O&G Assets post-merger. The SEC's theory "does not make a whole lot of sense," *id.*, and is "divorced from

common experience." *Prodanova v. H.C. Wainwright & Co., LLC*, 993 F.3d 1097, 1107 (9th Cir. 2021).   It is insufficient to plead scienter as a matter of law.   *See Nguyen*, 962 F.3d at 408 ("Allegations that are implausible do not create a strong inference of scienter."); *Coates v. Heartland Wireless Commc's, Inc.*, 55 F. Supp. 2d 628, 643 (N.D. Tex. 1999) (dismissing complaint where "alleged motive to commit fraud is not plausible as pleaded"); *Thornton v. Micrografx, Inc.*, 878 F. Supp. 931, 938 (N.D. Tex. 1995) (concluding that no showing of scienter had been made where defendants allegedly committed fraud to inflate stock price yet waited for weeks while the stock price slid downward before selling their stock).   Nor can it support a claim for negligence.

It is undisputed that Torchlight's long-standing business plan prior to the merger was to sell its O&G Assets at commercially reasonable terms to purchasers with sufficient resources to fully develop the land.   [*See* Compl. ¶ 20–21.]   The SEC pleads no plausible explanation as to why Torchlight would suddenly abandon this original intent after the merger announcement, only to resurrect it post-merger in the spin-off entity whose purpose was to sell the O&G Assets.   *See In re Grand Canyon Educ., Inc. Sec. Litig.*, 2021 WL 3491779, at *18 (D. Del. Aug. 9, 2021), *report and recommendation adopted*, 2021 WL 3726014 (D. Del. Aug. 23, 2021) ("the zig-zagging nature of Defendants' alleged mindset suggests a less-than-cogent narrative").   There is none.

The SEC vaguely alleges that Mr. Brda's communications in December 2020 reflected groundwork for a potential spin-out of the O&G Assets into NBH.   [*See* Compl. ¶ 78.]   Not only does this vague allegation fail to satisfy the heightened pleading standard of fraud, but also the communication does not demonstrate an intent not to sell.   Rather, it reflects a potential spin-off

of some or all of the O&G Assets, which Torchlight disclosed was an alternative back-up plan in the event a sale was not consummated within six months after merger close.[39]

Far from showing negligence (let alone fraudulent intent), Torchlight's actions reflected responsible and prudent measures to protect the O&G Assets.  The existence of a qualified offer for the O&G Assets at a commercially reasonable price pre-merger would have obviated the need for preparations for a spin-off.  But there is no dispute that there was no such qualified offer at that time.  The SEC does not allege otherwise and its competing speculation—that Torchlight never intended to sell—"has no basis in logic or common experience" or the Complaint.  *Nguyen*, 962 F.3d at 408; *see Prodanova*, 993 F.3d at 1107, 1113 (same).

Equally fatal is the absence of a plausible motive for Mr. Brda to misrepresent the intended disposition of the O&G Assets.  "Motives that are generally possessed by most corporate directors and officers do not suffice; instead, plaintiffs must assert a concrete and personal benefit to the individual defendants resulting from the fraud."  *Kalnit v. Eichler*, 264 F.3d 131, 139 (2d Cir. 2001).  The SEC has not sufficiently pled that Mr. Brda obtained a "concrete and personal benefit" from a spin-off, as opposed to a sale, of the O&G Assets different from benefits received by other legacy Torchlight shareholders.   Nor did a spin-off provide a "clear financial incentive" to Mr. Brda over a sale.  *See Prodanova*, 993 F.3d at 1107 (no scienter where plaintiff's theories did not "provide a clear financial incentive").  Because the SEC has not pled specific facts showing that Torchlight, through Mr. Brda, never intended to sell the O&G Assets, a misrepresentation claim based on the "commercially reasonable efforts" statements is not cognizable.

---

[39] Preliminary Proxy Statement at 31, 35, 38, 47, 90, 101, 125, 151; Definitive Proxy Statement at 31, 49, 50, 97, 110.

ii.    *The Forward-Looking Statements are Protected by the Bespeaks Caution Doctrine and are Non-Actionable Puffery.*

Forward-looking statements accompanied by adequate cautionary language are not actionable as a matter of law under the bespeaks caution doctrine. *Rombach v. Chang*, 355 F.3d 164, 173 (2d Cir. 2004). Under that well established doctrine, a "forward-looking statement accompanied by sufficient cautionary language is not actionable because no reasonable investor could have found the statement materially misleading." *Iowa Pub. Emps.' Ret. Sys. v. MF Glob., Ltd.*, 620 F.3d 137, 141 (2d Cir. 2010).

The "commercially reasonable efforts" statements were forward looking and, on their face, concerned an uncertain future action. Definitive Proxy at 31 ("*will* use commercially reasonable efforts"). The proxy disclosed that use of the word "will" was "intended to identify [a] forward-looking statement" and that "any forward-looking statements are not guarantees of future performance."[40] Investors were informed that the "commercially reasonable efforts" statements were mere predictions, not guarantees of future events. Such statements are not actionable. *See Faulkner I*, 156 F. Supp. 2d at 389, 400 (statements that defendant would "use all commercially reasonable efforts to take" actions to consummate merger "were not actionable because they were mere predictions"). These "generalized, positive statements about the company's . . . future prospects are not actionable because they are immaterial." *Rosenzweig v. Azurix Corp.*, 332 F.3d 854, 869 (5th Cir. 2003).

The proxy also contained extensive cautionary language, explicitly and implicitly warning that a sale of the O&G Assets might not occur. It stated "[u]ltimately, the Combined Company may not be able to consummate an Asset Sale Transaction" and identified as a potential risk, "[t]he

---

[40] Investors were informed that forward-looking statements "involve a number of risks and uncertainties, all of which are difficult or impossible to predict accurately and many of which are beyond our control," and thus, "actual results may differ significantly from those expressed in any forward looking statements." Definitive Proxy at 2.

possibility that the Combined Company may not be able to sell all of the O&G Assets[.]" Definitive Proxy at 50, 110.  It disclosed no less than three times that if an asset sale was not consummated, Torchlight could pursue a spin-off of the O&G Assets.[41]  That is precisely what ultimately occurred; Torchlight was unable to sell the O&G Assets during the relevant time period and therefore spun the assets out to NBH.  It is axiomatic that a securities claim does not lie when the company "disclosed the very . . . risks about which [plaintiff] claim[s] to have been misled." *Ashland Inc. v. Morgan Stanley & Co.*, 652 F.3d 333, 338 (2d Cir. 2011); *see also Lentell v. Merrill Lynch & Co.*, 396 F.3d 161, 177 (2d Cir. 2005) (plaintiff could not establish claim where "substantial indicia of the risk that materialized" were "unambiguously apparent on the face of the disclosures alleged to conceal the very same risk"); *Halperin v. eBanker USA.com, Inc.*, 295 F.3d 352, 361 (2d Cir. 2002) ("The allegedly omitted facts were either disclosed or implied in the offering memoranda.").  The SEC's attempt to overcome Torchlight's ample disclosures by its repeated conclusory statement that Torchlight never intended to sell the O&G Assets, is implausible as shown above and cannot defeat Torchlight's abundant warnings.  As a result, the "commercially reasonable efforts" statements are not actionable as a matter of law under the bespeaks caution doctrine.

In addition, the "commercially reasonable efforts" statements are non-actionable puffery because courts routinely hold that statements that a party will use "commercially reasonable efforts" or "best efforts" are expressions of corporate optimism or puffery that are not actionable. *See*, *e.g.*, *Faulkner I*, 156 F. Supp. 2d at 389, 400 (statement that defendant would "use all commercially reasonable efforts to take" actions to consummate the merger was "not actionable"

---

[41] The proxy provided "[i]n the event that any O&G Assets has not been sold in an Asset Sale Transaction that is consummated prior to the Asset Sale Expiration Date, the Combined Company will, to the extent permitted by applicable law, declare a Spin-Off Dividend to distribute beneficial ownership of the [remaining O&G] Assets to the holders of Series A Preferred Stock."  Definitive Proxy at 31, 49, 97.

because they were "statements of opinion"); *Kas v. First Union Corp.*, 857 F. Supp. 481, 484 (E.D. Va. 1994) (because statement that defendants would use "best efforts" to consummate merger at earliest practicable date "were no more than 'expressions of optimism' about the future consummation of the merger, they are not actionable under § 10(b) or Rule 10b-5"); *see also In re First Am. Fin. Corp.*, 2021 WL 4807648, at *4 (C.D. Cal. Sept. 22, 2021) (dismissing claims based on defendant's statement that it would use its 'best efforts" to protect customer data).

### iii.    The Statements Were Not False When Made.

The SEC attempts to gloss over the non-actionable nature of the "commercially reasonable efforts" statements by contending that Torchlight made no efforts to attempt to sell the O&G Assets because (once again) Mr. Brda always intended to spin off the assets.  As shown in Section III.A(i) *supra*, the SEC cannot plausibly allege that Mr. Brda never intended to sell the assets, which will doom its ability to prove falsity.  *See Faulkner v. Verizon Commc'ns, Inc.*, 189 F. Supp. 2d 161, 173 (S.D.N.Y. 2002) ("*Faulkner II*") (allegations that defendant "harbored a secret intent" to ultimately terminate merger agreement was insufficient to plead falsity of statements that it would use "commercially reasonable efforts" to consummate merger).

But even *assuming arguendo* that Torchlight took no action to sell the O&G Assets, that inaction would not necessarily render the statements false when made.  That is because pleading falsity as to the "commercially reasonable" efforts statements requires pleading *particularized facts* showing that *there were commercially reasonable efforts* available, under prevailing market conditions, that Torchlight *did not take.  See In re Skechers USA, Inc. Sec. Litig.*, 444 F. Supp. 3d 498, 519 (S.D.N.Y. 2020) (failure to adequately plead falsity for statement that "SG&A expenses would grow at a rate lower than the projected sales growth rate," as even if the court "assume[d] that management was expecting the SG&A expenses to grow at a significant rate," the challenged statements "would not necessarily be false" without additional allegations about expected sales);

*cf. In re Rigel Pharms., Inc. Sec. Litig.*, 697 F.3d 869, 882 (9th Cir. 2012) (dismissing for failure to "allege any specific facts" showing that statement was false).

Without particularized facts alleging that "commercially reasonable efforts" were available, the SEC cannot show that failure to take action was contrary to the challenged statement. *Accord Faulkner I*, 156 F. Supp. 2d at 397 (allegations that defendant fraudulently represented it was taking "commercially reasonable efforts" to consummate a merger were conclusory). Of course, as a matter of law, a securities violation cannot be pled with hindsight of fact. *Stevelman*, 174 F.3d at 85.  In other words, the relevant inquiry is not whether "commercially reasonable efforts" were taken, but rather, whether "commercially reasonable efforts" were intended when the statement was made pre-merger in Torchlight's Form 8-K dated September 23, 2020 and leading up to the merger.  [*See* Compl. ¶¶ 69–74.]  For the foregoing reasons, the "commercially reasonable efforts" statements were not actionable, materially false, or misleading statements when made and cannot support a securities fraud claim.

### B.    Mr. Brda is not a "Maker" of any Statement at the Italian Call.

The SEC alleges Mr. Brda violated Sections 10(b), 17(a), and 14(a), based on Mr. Palikaras' statement at the Italian Call that the dividend could be worth "$1 to $20."  [*See* Compl. ¶¶ 82–88, 114, 120, 126, 132–33.]  The SEC contends that such statement was false and misleading because it omitted a Meta I employee's internal opinion that the "dividend was never going to be worth more than $1."  [*Id.* ¶ 87.]  Mr. Brda, however, did not "make" the statement. And even if he had, the statement is non-actionable puffery, non-actionable opinion, and/or a non-actionable forward-looking statement.  [*See* Palikaras Motion to Dismiss.]

Even if the Complaint adequately alleged actionable misstatements (it does not), Mr. Brda cannot be primarily liable for statements he did not make.  The Supreme Court limited primary liability to the "maker" of a statement, meaning "the person or entity with ultimate authority over

the statement, including its content and whether and how to communicate it." *Janus*, 564 U.S. at 142; *see Gavin/Solmonese LLC v. D'Arnaud-Taylor*, 639 F. App'x 664, 669 (2d Cir. 2016) ("liability for misrepresentations does not extend 'beyond the person or entity that ultimately has authority over the false statement'"). "Without control, a person or entity can merely suggest what to say, not 'make' a statement in its own right." *Janus*, 564 U.S. at 142.

Here, Mr. Brda is not a "maker" of the $1–$20 oral statement because Mr. Brda did not make the statement. Rather, the statement was made by Mr. Palikaras, in his capacity as CEO for Meta I, a counterparty to Torchlight. "[I]t is the speaker who takes credit—or blame—for what is ultimately said." *Id.* at 143. Mr. Brda did not have "ultimate authority" over Meta I or its CEO in May 2021. Torchlight and Meta I remained legally (and factually) separate and distinct entities at the time of the May 2021 Italian Call.

In *Janus*, the Supreme Court held an investment advisor did not have ultimate authority over a speaking fund where the advisor and fund "remain[ed] legally separate entities," the fund's board was independent, and it was "undisputed that the corporate formalities were observed[.]" *Janus*, 564 U.S. at 145–46; *In re Turquoise Hill Res. Ltd. Sec. Litig.*, 625 F. Supp. 3d 164, 203–04 (S.D.N.Y. 2022) (similar); *Kuwait Inv. Office v. Am. Int'l Grp., Inc.*, 128 F. Supp. 3d 792, 809 (S.D.N.Y. 2015) ("Where, as here, the defendants have no role in the business structure of the speaking entity and are instead officers of a separate entity, and there is no allegation that corporate formalities have not been observed, generalized allegations that the defendants had as much authority over the speaking entity's statements as its own officers are insufficient to state plausibly a claim that the separate entity's officers 'made' the speaker's statements.").

While "[i]t is not uncommon for two businesses who engage in a joint venture to attempt to coordinate the statements regarding that joint venture," any obligation of each party "to ensure

that its statements are consistent with the statements of the other does not make each such party the 'maker' of the statements by the other." *Turquoise Hill*, 625 F. Supp. 3d at 207. Rather, "'[u]ltimate authority' is critical." *Id.* Nor would Torchlight's invitation to Mr. Palikaras to attend the Italian Call give rise to ultimate authority. "That line of argument cannot be squared with *Janus* []." *Fulton Cnty. Emples. Ret. Sys. v. MGIC Inv. Corp.*, 675 F.3d 1047, 1051 (7th Cir. 2012) (Easterbrook, C.J.) (rejecting argument that "by inviting" employees of a third party to speak at the company's quarterly earnings call, the company "effectively 'made' their statements itself"). In short, the SEC cannot rely on the Italian Call to attribute a misrepresentation claim to Mr. Brda.

## III.    The SEC Does Not Plead Any Negligence-Based Theory (Count I).

The SEC's tag-along claim under Section 17(a) based on the same "scheme to manipulate" fails. [*See* Compl. ¶ 113.] "Section 17(a) merely extends Rule 10b–5 liability to cover both buyers *and sellers*, offering *and selling securities*. Section 17(a) does not give the Commission carte blanche to prescribe liability where Rule 10b–5 falls short." *Mapp*, 240 F. Supp. 3d at 586 (dismissing Section 17(a) claim for failure to allege facts to support plausible claim) (emphasis in original). "Like claims for § 10(b) and Rule 10b-5 violations, claims for section 17(a)(1) violations must be supported by allegations of scienter or intent to defraud, whereas claims for violations of sections 17(a)(2) and (a)(3) do not have a scienter requirement." *SEC v. Gilman*, 2019 WL 4743431, at *9 (N.D. Tex. Sept. 26, 2019) (citing *Aaron v. SEC*, 446 U.S. 680, 696–97 (1980)). "Rule 17(a) claims are frequently analyzed under the same framework as Rule 10b-5 claims; however, negligence is sufficient for claims under sections 17(a)(2) and (a)(3)." *Id.*

Because the elements of a Section 17(a)(1) claim are "essentially the same elements" as a Section 10(b) claim, *SEC v. First Jersey Sec., Inc.*, 101 F.3d 1450, 1467 (2d Cir. 1996), the Section 17(a)(1) claims against Mr. Brda fail for the same reasons applicable to the Section 10(b) claims discussed above. *See SEC v. Pentagon Capital Mgmt. PLC*, 725 F.3d 279, 285 (2d Cir. 2013).

Similarly, because Sections 17(a)(2) and (a)(3) are virtually identical to Rule 10b-5(c), a tag-along claim will fail for the same reasons afflicting a Rule 10b-5(c) claim, with the exception of the requisite mental state.  To prove that a defendant violated Section 17(a)(2) or Section 17(a)(3), the SEC must allege "that the defendant acted with negligence," *SEC v. Seghers*, 298 F. App'x 319, 327 (5th Cir. 2008), but here the SEC fails to identify any negligence-based theory against Mr. Brda.  *See Decks Appeal v. GTE Directories Sales Corp.*, 81 F.3d 154, at *2 (5th Cir. 1996) (table) (no "viable cause for negligence" when a party fails "to allege any cognizable duty that could support a negligence claim"); *SEC v. Ginder*, 752 F.3d 569, 576 (2d Cir. 2014) (rejecting negligence-based theories where SEC did not put on evidence of appropriate standard of care, noting "SEC ultimately succumbs to its strategic choice at trial to pursue a theory of scienter or nothing"); *SEC v. Shanahan*, 646 F.3d 536, 546 (8th Cir. 2011) ("[W]e agree with the district court that the SEC's failure to present any evidence that he nonetheless violated an applicable standard of reasonable care was fatal to its case.").  Notwithstanding the SEC's inability to allege a negligence-based theory, the public record demonstrates that Mr. Brda acted with reasonable care as a matter of law with respect to the merger, the preferred share dividend, and the ATM Offering.

## IV.    <u>SEC Fails to Allege a Proxy Fraud Claim (Count III).</u>

Section 14(a) ("**Proxy Fraud Claim**") applies only to those who "solicit" or "permit the use of name to solicit" a proxy vote.  15 U.S.C. § 78n(a)(1).[42]  "To state a Proxy Fraud Claim, a plaintiff must show that (1) defendants misrepresented or omitted a material fact in a proxy statement; (2) defendants acted at least negligently in distributing the proxy statement; and (3) the false or misleading proxy statement was an essential link in causing the loss-generating corporate

---

[42] The second prong of Section 14(a) requires "a substantial connection between the use of the person's name and the solicitation effort."  *SEC v. Falstaff Brewing Corp.*, 629 F.2d 62, 68 (D.C.C. 1980).  The Complaint has no allegations to support this prong.

actions." *Hulliung v. Bolen*, 548 F. Supp. 2d 336, 339 (N.D. Tex. 2008).[43] "The plain language of Rule 14a-9 requires a plaintiff to show both materiality and a false or misleading statement as a result of the omission.  Omission of information from a proxy statement will violate these provisions if either the SEC regulations specifically require disclosure of the omitted information . . . or the omission makes other statements in the proxy statement materially false or misleading." *Schmitt v. China XD Plastics Co., Ltd.*, 698 F. Supp. 3d 474, 485–86 (E.D.N.Y. 2023).

*First*, the SEC fails to identify any negligence-based theory, let alone one that satisfies Rule 9(b).  *See* Section III supra; *accord Gruss v. Curtis Publ'g Co.*, 534 F.2d 1396, 1403 (2d Cir. 1976) (reversed and remanded with instruction to dismiss complaint; "we cannot sustain the district court's conclusion that failure to [include certain language in the Proxy Statement] constituted negligence by [defendant] – the standard of culpability we have held applicable as a minimum in damage suits for violations of the Proxy Rules").

*Second*, the Proxy Fraud Claim attempts to shoehorn the SEC's scheme liability theory into a Section 14(a) claim by relying on the exact same alleged misrepresentations or omitted material facts: (i) all alleged motives for the merger [Compl. ¶¶ 39–46]; and (ii) Torchlight's "commercially reasonable efforts."  [*Id.* ¶¶ 67–81.][44]  Both of which fail for the reasons set forth above.  *See supra* Sections I.B and II.A.  Further, the Supreme Court has already foreclosed a Proxy Fraud Claim that hinges on the theory the SEC relies.  *See Va. Bankshares*, 501 U.S. at 1096 ("the temptation to rest an otherwise nonexistent § 14(a) action on psychological enquiry alone would threaten just the sort of strike suits and attrition by discovery that *Blue Chip Stamps* sought to discourage").

---

[43] *Pedroli v. Bartek*, 2008 WL 901203, at *3 (E.D. Tex. Mar. 31, 2008) (Rule 9(b) applies to § 14(a) claim for fraud).
[44] To the extent the SEC's Proxy Fraud Claim attempts to attribute any alleged "solicitation" in the Italian Call to Mr. Brda [Compl. ¶¶ 82–88], this fails because Mr. Brda is not a "maker."  *See supra* Section II.B.

*Finally*, the SEC's Proxy Fraud Claim fails to identify an "'essential link" between the proxies at issue and the harm they have alleged . . . *directly authorized* by the proxy solicitation." *Hulling*, 548 F. Supp. 2d at 340 (emphasis in original).  Crucially, "the proxy solicitation itself, rather than the particular defect in the solicitation materials, was an essential link in the accomplishment of the transaction."  *Bisel v. Acasti Pharma, Inc.*, 2022 WL 4538173, at *7 (S.D.N.Y. Sept. 28, 2022).  The SEC has not identified any link; its Proxy Fraud Claim fails.

## V.    THE SEC FAILS TO SUFFICIENTLY ALLEGE AN AIDING AND ABETTING CLAIM.

The SEC fails to allege elements to state an aiding and abetting claim:  "(1) a primary violation of the securities laws; (2) that the aider and abettor had knowledge of this violation and of his or her role in furthering it; and (3) that the aider and abettor knowingly provided substantial assistance in the commission of the primary violation."  *SEC v. Life Partners Holdings*, *Inc.*, 854 F.3d 765, 778 (5th Cir. 2017).  The derivative claims fail because there is no primary violation.

### A.    The Section 13(a) False Filing Claim Fails (Count IV).

Section 13(a) of the Exchange Act "requires all issuers subject to the Act's registration requirements to submit periodic reports to the Commission containing such information as the Commission may direct through its rules," including, for example, Forms 8-K and 10-K.  *SEC v. Falstaff Brewing Corp.*, 629 F.2d 62, 70 (D.C. Cir.), *cert. denied*, 449 U.S. 1012 (1980).  A false-filing claim under Section 13(a) requires allegations that the SEC filings at issue were "materially false."  *SEC v. Stanard*, 2009 WL 196023, at *31 (S.D.N.Y. Jan. 27, 2009).  Again, the Section 13(a) claim is tacked onto the SEC's scheme liability theory and relies on the same alleged misrepresentations or omitted material facts regarding Torchlight's "commercially reasonable efforts," [Compl. ¶¶ 67–71; 75–81], which fails for the reasons set forth above.

**B.**    **The SEC Fails to Allege an Accounting or Internal Controls Violation.**

To allege a violation of Section 13(b)(2), the SEC must claim that Mr. Brda failed to keep books and records that "fairly reflect the transactions and dispositions" of its assets or failed to "devise and maintain a system of internal accounting controls sufficient to provide reasonable assurances" in conformity with applicable accounting regulations.  15 U.S.C. § 78m(b)(2)(A)–(B).  The touchstone for liability under these provisions is "reasonableness" because "management must exercise judgment" and "must necessarily estimate and evaluate the cost/benefit relationships of the steps to be taken in fulfillment of its responsibilities."  S. Rep. No. 95-114, at 8 (1977); *see also SEC v. Softpoint, Inc.*, 958 F. Supp. 846, 866 (S.D.N.Y. 1997); *SEC v. World-Wide Coin Invs., Ltd.*, 567 F. Supp. 724, 751 (N.D. Ga. 1983).

Here, the SEC fails to allege an accounting violation, much less any inadequacy in Torchlight's internal controls.  In support of its claim, the SEC alleges that a series of payments made to stock-support consultants who rendered services to the company were insufficiently recorded by "generic consulting contracts."  [Compl. ¶ 140.]  The allegation is not that the service was not documented in the books and records, but rather that the contract was too generic.

*i.*    ***Section 13(b)(2)(A)—Books and Records.***

Section 13(b)(2)(A), referred to as the books and records provision, "has three basic objectives," none of which are implicated here.  *World-Wide Coin*, 567 F. Supp. at 748.  To prevail on such a claim, "the SEC must establish that [the defendant] directly or indirectly, falsified or caused to be falsified, any book, record or account that the company was required to maintain under the" Exchange Act.  *SEC v. Lowy*, 396 F. Supp. 2d 225, 240 (E.D.N.Y. 2003).  Further, the SEC cannot claim a violation "absent proof of a violation" of the accounting standard.  *SEC v. Coffman*, 2007 WL 2412808, at *15 (D. Colo. Aug. 21, 2007).  The Complaint fails to meet this standard.

Although a reasonableness standard applies, courts routinely dismiss claims where—as here—there are no allegations that a restatement was required or made.  *See Harris v. AmTrust Fin. Servs., Inc.,* 135 F. Supp. 3d 155, 172–73 (S.D.N.Y. 2015), *aff'd*, 649 F. App'x 7 (2d Cir. 2016) (dismissing claim of accounting violation "[i]n the absence of a restatement or allegations pointing to objective facts that Defendants' accounting methods violated" applicable accounting standards); *Iron Workers Local 16 Pension Fund v. Hilb Rogal & Hobbs Co.*, 432 F. Supp. 2d 571, 588 (E.D. Va. 2006).  Taken on their own terms, the allegations cannot establish that Torchlight violated any applicable accounting standards.  The SEC's allegation is not that Mr. Brda failed to provide the contracts with the consultants to the accounting department or that he falsified the information in the contracts.  The crux of the SEC's accounting claim is that the contracts were too generic.  This allegation does not pass muster and should be dismissed

### ii.     *Section 13(b)(2)(B)—Internal Accounting Controls.*

Section 13(b)(2)(B) addresses, in part, the internal accounting controls element of a company's control system, and is designed to "give statutory content to an aspect of management stewardship responsibility, that of providing shareholders with reasonable assurances that the business is adequately controlled." *World-Wide Coin*, 567 F. Supp. at 750.  "By its terms, Section 13(b)(2)(B) does not govern *every internal system* a public company uses to guard against unauthorized access to its assets, but only those qualifying as 'internal accounting' controls." *SEC v. SolarWinds Corp.*, --- F.Supp.3d ----, 2024 WL 3461952, at *51 (S.D.N.Y. July 18, 2024).  The SEC's internal controls claim should be dismissed for two independent reasons.

First, the Complaint alleges insufficient facts regarding Torchlight's system of internal accounting controls.  "Examples of internal controls include manual or automated review of records to check for completeness, accuracy and authenticity; a method to record transactions completely and accurately; and reconciliation of accounting entries to detect errors." *McConville*

*v. SEC*, 465 F.3d 780, 790 (7th Cir. 2006).  No facts regarding any such controls are alleged here, rather, the SEC alleges that Torchlight "failed to implement internal accounting controls and maintain adequate books and records by failing to account properly for the disposition of corporate assets or recognition of legitimate expenses . . .."  [Compl. ¶ 139.]  This on its face warrants dismissal.  *See, e.g., SEC v. Bankatlantic Bancorp, Inc.*, 2012 WL 1936112, at *24 (S.D. Fla. May 29, 2012) (dismissing claim where there were not "sufficient allegations relating to the types of internal accounting controls contemplated by § 13(b)(2)(B)").  "The mere fact that accounting controls may have been circumvented does not state a claim for a violation of Section 13(b)(2)(B) of the Exchange Act." *Rio Tinto*, 2019 WL 1244933, at *19.  Internal controls need only provide "reasonable assurances" of accurate records, not airtight guarantees that withstand any circumvention. *World-Wide Coin*, 567 F. Supp. at 751 (neither SEC nor Congress "intended that the statute should require that each affected issuer install a fail-safe accounting control system").

## VI.    DISGORGEMENT AND OFFICER/DIRECTOR BAR RELIEF SHOULD BE STRICKEN.

The Complaint's requested remedies [Compl. ¶ 144]—in particular, disgorgement and officer/director bar—are legally deficient and unsupported by factual allegations, and thus should be stricken at the pleadings stage.  *See SEC v. Berry*, 2008 WL 4065865, at *9 (N.D. Cal. Aug. 27, 2008) (striking relief sought at pleadings stage when "allegations in support of [the] request . . . were lacking").

The SEC is seeking a disgorgement order from Mr. Brda.  But there is no justification, as pled, for any disgorgement award against Mr. Brda because the SEC cannot tie any alleged ill-gotten gains to the alleged scheme.  Disgorgement must be limited to a defendant's ill-gotten gains, namely, the "wrongdoer's net unlawful profits." *Liu v. SEC*, 140 S. Ct. 1936, 1943 (2020).  Allowing the SEC to obtain excessive "net unlawful profits" violates the "equitable principle that the wrongdoer should not be punished by 'pay[ing] more than a fair compensation to the person

wronged.'" *Id.*  The disgorgement amount must "be a reasonable approximation of profits *causally connected to the violation*."  *SEC v. Fowler*, 6 F.4th 255, 267 (2d Cir. 2021) (emphasis added).

Likewise, the SEC's prayer for an officer and director bar against Mr. Brda is unsupported as pled because the Complaint fails to allege any facts "demonstrat[ing]" Mr. Brda's "unfitness to serve as an officer or director."  15 U.S.C. § 77t(e).

## <u>CONCLUSION</u>

For the foregoing reasons, Defendant Brda respectfully requests the Court dismiss with prejudice the SEC's Complaint for failure to state a claim upon which relief can be granted.

Dated:  January 17, 2025.

Respectfully submitted,

/s/ Jason S. Lewis

Jason S. Lewis
  Texas Bar No. 24007551
  jason.lewis@us.dlapiper.com
Jason M. Hopkins
  Texas Bar No. 24059969
  jason.hopkins@us.dlapiper.com
Ryan D. Lantry
  Texas Bar No. 24125130
  ryan.lantry@us.dlapiper.com
**DLA PIPER LLP**
1900 N. Pearl Street, Suite 2200
Dallas, Texas 75201
Telephone:  214.743.4546
Facsimile:  214.743.4545

*ATTORNEYS FOR DEFENDANT JOHN BRDA*

## CERTIFICATE OF SERVICE

I certify that I served the foregoing brief on all counsel of record via the Court's CM/ECF

system on January17, 2025.

/s/ Jason S. Lewis

Jason S. Lewis