# UNITED STATES DISTRICT COURT
## EASTERN DISTRICT OF TEXAS

| | |
|---|---|
| SECURITIES AND EXCHANGE COMMISSION, | |
| Plaintiff, | |
| v. | Civ. Action No. 4:24-cv-1048-SDJ |
| JOHN BRDA, GEORGIOS PALIKARAS, | |
| Defendants. | |

## PLAINTIFF'S OMNIBUS RESPONSE IN OPPOSITION TO DEFENDANTS' MOTIONS TO DISMISS

Plaintiff Securities and Exchange Commission ("**SEC**") files this omnibus response in opposition to the motions to dismiss (ECF Nos. 44 & 45, the "**Motions**") filed by Defendants John Brda ("**Brda**") and Georgios Palikaras ("**Palikaras**") (together, "**Defendants**"). For the reasons stated below, the SEC respectfully asks the Court to deny the Motions in their entirety.

Dated: February 28, 2025

Respectfully submitted,

_/s/ Patrick Disbennett_
Patrick Disbennett
Texas Bar No. 24094629
Christopher Rogers
Texas Bar No. 24051264
Securities and Exchange Commission
801 Cherry Street, Suite 1900
Fort Worth, Texas 76102
Tel: 817-978-3821
disbennettpa@sec.gov
rogerschri@sec.gov

_ATTORNEYS FOR PLAINTIFF_

i

# TABLE OF CONTENTS

I.     SUMMARY ................................................................................................................1

II.    STATEMENT OF ISSUES TO BE DECIDED ....................................................3

III.   BACKGROUND ......................................................................................................3

IV.   OBJECTION TO CERTAIN SOURCES OUTSIDE THE COMPLAINT ...........................9

V.    ARGUMENT ..........................................................................................................10

    A.  The Complaint Properly Alleges Misrepresentation Claims Against Defendants..........10

        1.  The Complaint adequately alleges material misrepresentations and omissions.........................................................................................................11

        2.  Brda's arguments for dismissal of the claims arising out of his "commercially reasonable efforts" misstatements and omissions should be denied..................16

            i.  Brda's bespeaks caution and puffery defenses fail .................................16

           ii.  Brda's "falsity" argument fails ...............................................................19

        3.  Palikaras' arguments for dismissal of the claims based on his misstatements during the Italian Investor Call should be denied ...............................................19

            i.  Palikaras fails to show his misstatements are immaterial per se ............19

           ii.  Palikaras' "maker" and "omission liability" arguments do not warrant dismissal of any of the misrepresentation claims against him................22

           iii.  The Complaint plausibly alleges the "in connection with" element of the Rule 10b-5 claims against Palikaras .......................................................23

           iv.  The Complaint plausibly alleges that Palikaras obtained money or property by means of misstatements to sustain the Section 17(a)(2) claim ...............................................................................................................24

B. The Complaint Properly Alleges That Defendants Engaged In A Fraudulent Scheme..26

    1. The Complaint adequately alleges that each Defendant engaged in deceptive or manipulative acts in furtherance of a fraudulent scheme....................................26

    2. Defendants' arguments do not defeat the well-pled allegations that they engaged in deceptive or manipulative acts in furtherance of the fraudulent scheme........30

        i. Defendants' "open market" and "fully disclosed" arguments fail..........30

        ii. Defendants' promotional efforts were deceptive or manipulative..........35

        iii. Brda's "legitimate purpose" defense and "intent only" arguments fail..38

        iv. The Complaint alleges deceptive or manipulative conduct by Palikaras separate and apart from his misstatements and omissions....................40

C. The Complaint Adequately Pleads Each Defendant's Scienter......................................42

D. The Complaint Adequately Pleads Brda's Negligence..................................................45

E. The Complaint Adequately Pleads Proxy Fraud Claims Against Defendants...............46

F. The Complaint Adequately Pleads Aiding And Abetting Claims Against Brda............48

G. Brda's Request To Strike Remedies From The Complaint Is Meritless........................49

H. Alternative Request for Leave to Amend the Complaint...............................................50

VI. CONCLUSION.............................................................................................................50

# TABLE OF AUTHORITIES

## Federal Cases

*Am. S. Ins. Co. v. Buckley*,
748 F. Supp. 2d 610 (E.D. Tex. 2010) ................................................................. 50

*Ashcroft v. Iqbal*,
556 U.S. 662 (2009) ........................................................................................ 10

*ATSI Commc'ns, Inc. v. Shaar Fund, Ltd.*,
493 F.3d 87 (2d Cir. 2007) ........................................................... 29, 33, 37, 38, 39

*Bell Atl. Corp. v. Twombly*,
550 U.S. 544 (2007) ........................................................................................ 10

*Benchmark Elecs., Inc. v. J.M. Huber Corp.*,
343 F.3d 719 (5th Cir. 2003) ................................................................. 10, 37, 44

*Brown v. Ivie*,
661 F.2d 62–67 (5th Cir. 1981) ................................................................. 15, 40

*CFTC v. Gorman*,
587 F. Supp. 3d 24 (S.D.N.Y. 2022) ................................................................. 38

*Collmer v. U.S. Liquids, Inc.*,
268 F. Supp. 2d 718 (S.D. Tex. 2001) ................................................................. 16, 22

*Dolphin & Bradbury, Inc. v. SEC*,
512 F.3d 634 (D.C. Cir. 2008) ........................................................................ 17

*Ernst & Ernst v. Hochfelder*,
425 U.S. 185 (1976) ................................................................................ 26, 27, 28

*Foman v. Davis*,
371 U.S. 178 (1962) ........................................................................................ 50

*Geman v. SEC*,
334 F.3d 1183 (10th Cir. 2003) ........................................................................ 47

*Jacobowitz v. Range Res. Corp.*,
596 F. Supp. 3d 659 (N.D. Tex. 2022) ........................................................... 20

*Janus Capital Grp., Inc. v. First Derivative Traders*,
564 U.S. 135 (2011) ........................................................................... 22, 40, 46

*Kademian v. Ladish Co.*,
792 F.2d 614 (7th Cir. 1986) ........................................................................ 39

*Karp v. First Connecticut Bancorp, Inc.*,
    69 F.4th 223 (4th Cir. 2023) ..................................................... 46

*Lorenzo v. SEC*,
    587 U.S. 71 (2019) ........................................................... 22, 40

*Lormand v. US Unwired, Inc.*,
    565 F.3d 228 (5th Cir. 2009) ..................................... 12, 13, 16, 17-18, 21

*Mills v. Elec. Auto-Lite Co.*,
    396 U.S. 375 (1970) ........................................................ 46, 48

*Oklahoma Firefighters Pension & Ret. Sys. v. Six Flags Ent. Corp.*,
    58 F.4th 195 (5th Cir. 2023) .................................................. 18, 19, 20

*Oliver Sch., Inc. v. Foley*,
    930 F.2d 248 (2d Cir. 1991) ................................................... 50

*Polnac v. City of Sulphur Springs*,
    555 F. Supp. 3d 309–27 (E.D. Tex. 2021) .......................................... 9

*Ramirez v. Exxon Mobil Corp.*,
    334 F. Supp. 3d 832 (N.D. Tex. 2018) ........................................... 18

*Santa Fe Indus., Inc. v. Green*,
    430 U.S. 462 (1977) ........................................................... 26

*Scanlan v. Texas A&M Univ.*,
    343 F.3d 533 (5th Cir. 2003) ................................................... 9, 10

*SEC v. AgFeed Industries, Inc.*,
    2016 WL 10934942 (M.D. Tenn. July 21, 2016) .................................... 24

*SEC v. Big Apple Consulting USA, Inc.*,
    783 F.3d 786 (11th Cir. 2015) .................................................. 22

*SEC v. Blackburn*,
    156 F. Supp. 3d 778 (E.D. La. 2015) ............................................ 46

*SEC v. Blavin*,
    760 F.2d 706 (6th Cir. 1985) ................................................... 2, 47

*SEC v. Bowen, No. 3:22-CV-1415-S*,
    2023 WL 6166780 (N.D. Tex. Sept. 21, 2023) .................................... 22

*SEC v. Brown*,
    878 F. Supp. 2d 109 (D.D.C. 2012) .............................................. 42

*SEC v. Caledonian Bank Ltd.*,
    145 F.Supp.3d 290 (S.D.N.Y. 2015) ............................................. 50

*SEC v. Cammarata*,
   2023 WL 5644689 (E.D. PA Aug. 31, 2023) ........................................................ 24

*SEC v. Church-Koegel, No. CV 20-8480 FMO*
   (JCX), 2021 WL 6104157 (C.D. Cal. Sept. 29, 2021) .................................. 49-50

*SEC v. Cole, No. 12-cv-8167,*
    2015 WL 5737275 (S.D.N.Y. Sept. 19, 2015) ........................................................ 45

*SEC v. Couch, No. 3:14-CV-1747-D,*
   2014 WL 7404127 (N.D. Tex. Dec. 31, 2014) ............................................... 23, 47

*SEC v. Curshen*,
   888 F. Supp. 2d 1299 (S.D. Fla. 2012) ............................................................... 36

*SEC v. Daifotis*,
   2011 WL 3295139 (N.D. Cal. Aug.1, 2011) ....................................................... 22

*SEC v. Das, No. 8:10CV102,*
   2010 WL 4615336 (D. Neb. Nov. 4, 2010) ........................................................ 47

*SEC v. DeFrancesco*,
   699 F. Supp. 3d 228 (S.D.N.Y. 2023) .......................................................... 18, 36

*SEC v. Delphi Corp.*,
   2008 WL 4539519 (E.D. Mich. Oct. 8, 2008) .................................................... 25

*SEC v. Farmer, No. 4:14-CV-2345,*
   2015 WL 5838867 (S.D. Tex. Oct. 7, 2015) ............................................... 29, 35-36

*SEC v. Feng*,
   2017 WL 6551107 (C.D. Cal. Aug. 10, 2017) .................................................... 24

*SEC v. Fitzgerald*,
   135 F. Supp. 2d 992 (N.D. Cal. 2001) .............................................................. 45

*SEC v. Gallagher, No. 21-CV-8739*
   (PKC), 2023 WL 6276688 (S.D.N.Y. Sept. 26, 2023) ....................................... 38

*SEC v. Glantz, No. 94-cv-5737,*
   1995 WL 562180 (S.D.N.Y. Sept. 20, 1995) ................................................. 24-25

*SEC v. Goldsworthy*,
   2008 WL 8901272 (D. Mass. June 11, 2008) .................................................... 45

*SEC v. Hopper, No. 4:04-CV-1054,*
   2006 WL 778640 (S.D. Tex. Mar. 24, 2006) ............................................... 29, 30

*SEC v. Hui Feng*,
   935 F.3d 721 (9th Cir. 2019) ............................................................................. 30

vi

*SEC v. Hwang*,
    692 F. Supp. 3d 362 (S.D.N.Y. 2023) ................................................. 26

*SEC v. ITT Educ. Servs., Inc.*,
    303 F. Supp. 3d 746–66 (S.D. Ind. 2018) ............................................ 42

*SEC v. Jackson*,
    908 F. Supp. 2d 834 (S.D. Tex. 2012) ................................................. 49

*SEC v. Joseph Schlitz Brewing Co.*,
    452 F. Supp. 824 (E.D. Wis. 1978) ..................................................... 47

*SEC v. Levin*,
    232 F.R.D. 619 (C.D. Cal. 2005) ......................................................... 50

*SEC v. Life Partners Holdings, Inc.*,
    854 F.3d 765 (5th Cir. 2017) ......................................................... 2, 47

*SEC v. Lorin*,
    877 F. Supp. 192 (S.D.N.Y. 1995) ...................................................... 29

*SEC v. Medallion Fin. Corp., No.*
    21-CV-11125 (LAK), 2024 WL 4227753 (S.D.N.Y. Sept. 18, 2024) ................... 49

*SEC v. Mercury Interactive, LLC, No. C 07-2822 JF*
    (RS), 2009 WL 2984769 (N.D. Cal. Sept. 15, 2009) ............................... 47

*SEC v. Moss, No. 4:20-CV-972-SDJ*,
    2022 WL 757226 (E.D. Tex. Mar. 11, 2022) ........................................ 42

*SEC v. Mueller, No. SA-21-CV-00785-XR*,
    2024 WL 400897 (W.D. Tex. Jan. 11, 2024) ........................................ 45

*SEC v. Narayan, No. 3:16-CV-1417-M*,
    2017 WL 4652063 (N.D. Tex. Aug. 28, 2017) .................................. 40, 41

*SEC v. Reynolds, No. CIV.A.3-08-CV-0384-B*,
    2008 WL 3850550 (N.D. Tex. Aug. 19, 2008) ...................................... 20

*SEC v. Rio Tinto PLC*
    41 F.4th 47 (2d Cir. 2022) ......................................................... 28, 29

*SEC v. Sethi*,
    910 F.3d 198 (5th Cir. 2018) ...................................................... 10, 45

*SEC v. Shanahan*,
    646 F.3d 536 (8th Cir. 2011) .......................................................... 45

*SEC v. Silea, No. 4:20-CV-737-SDJ*,
    2022 WL 269105 (E.D. Tex. Jan. 27, 2022) ....................... 11, 14, 15, 18, 42

*SEC v. Stoker*,
    865 F. Supp. 2d 457 (S.D.N.Y. 2012) ........................................................... 25, 26, 37

*SEC v. Sugarman, No. 19CV5998*,
    2020 WL 5819848 (S.D.N.Y. Sept. 30, 2020) ........................................................... 30

*SEC v. Syron*,
    934 F. Supp. 2d 609 (S.D.N.Y. 2013) ........................................................... 25

*SEC v. Thompson*,
    238 F. Supp. 3d 575 (S.D.N.Y. 2017) ........................................................... 16

*SEC v. Tourre*,
    2014 WL 61864 (S.D.N.Y. 2014) ........................................................... 26

*SEC v. Verges*,
    716 F. Supp. 3d 456 (N.D. Tex. 2024) ........................................... 26, 29, 30, 42, 43

*SEC v. Wey*,
    246 F. Supp. 3d 894 (S.D.N.Y. 2017) ........................................................... 30

*SEC v. Wolfson*,
    539 F.3d 1249 (10th Cir. 2008) ........................................................... 25-26

*SEC v. World Tree Fin., LLC*,
    43 F.4th 448 (5th Cir. 2022) ........................................... 2, 11, 12, 14, 23, 24

*Set Cap. LLC v. Credit Suisse Grp. AG*,
    996 F.3d 64 (2d Cir. 2021) ........................... 17, 26, 29, 31, 33, 34, 38, 39

*Sharette v. Credit Suisse Int'l*,
    127 F. Supp. 3d 60 (S.D.N.Y. 2015) ........................................................... 29, 33

*Shintech Inc. v. Olin Corp.*,
    723 F. Supp. 3d 546 (S.D. Tex. 2024) ........................................................... 50

*United States v. Eisenberg, No. 23-CR-10*
    (AS), 2023 WL 8720295 (S.D.N.Y. Dec. 18, 2023) ........................................................... 40

*United States v. Phillips, No. 22-CR-138*
    (LJL), 2024 WL 1300269 (S.D.N.Y. Mar. 27, 2024) ........................................................... 38

*United States v. Regan*,
    937 F.2d 823 (2d Cir. 1991) ........................................................... 40

*Virginia Bankshares, Inc. v. Sandberg*,
    501 U.S. 1083 (1991) ........................................................... 39

*Wilson v. Merrill Lynch*,
    671 F.3d 120 (2d Cir. 2011) ........................................... 17, 32, 33, 39-40

## **Statues and Rules**

Securities Act of 1933

Section 17(a)
[15 U.S.C. § 77q(a)] ........................................................................................ 9, 22, 24, 47

Section 17(a)(1)
[15 U.S.C. § 77q(a)(1)] ...................................................................................3, 22, 26, 45

Section 17(a)(2)
[15 U.S.C. § 77q(a)(2)] .......................................................................3, 10, 22, 24, 25, 42, 45

Section 17(a)(3)
[15 U.S.C. § 77q(a)(3)] ...............................................................................3, 26, 37, 42, 45

Section 21(d)(2)
[15 U.S.C. § 77u(d)(2)] ...........................................................................................50

Securities Exchange Act of 1934

Section 10(b)
[15 U.S.C. § 78j(b)] ........................................................... 3, 9, 10, 26, 33, 35, 45

Section 13(a)
[15 U.S.C. § 78m(a)] .............................................................................. 9, 48

Section 13(b)(2)(A)
[15 U.S.C. § 78m(b)(2)(A)] ..................................................................... 9, 48

Section 13(b)(2)(B)
[15 U.S.C. § 78m(b)(2)(B)] ..................................................................... 9, 48

Section 14(a)
[15 U.S.C. § 78n(a)] ...............................................................3, 5, 9, 39, 46, 47

Section 21(d)
[15 U.S.C. § 78u(d)] ...........................................................................47

Section 21(d)(7)
[15 U.S.C. § 78u(d)(7)] ....................................................................47, 50

Securities Exchange Act Rules

Rule 9(b)
[17 C.F.R. § 240.9(b)] .......................................................................... 10, 37, 44

Rule 10b-5
    [17 C.F.R. § 240.10b-5] ................................................................. 2, 3, 15, 23, 29, 40, 45, 47
Rule 10b-5(a)
    [17 C.F.R. § 240.10b-5(a)] ................................................................. 22, 23, 40
Rule 10b-5(b)
    [17 C.F.R. § 240.10b-5(b)] ................................................................. 22, 23
Rule 10b-5(c)
    [17 C.F.R. § 240.10b-5(c)] ................................................................. 22, 23, 40
Rule 12b-20
    [17 C.F.R. § 240. 12b-20] ................................................................. 9, 48
Rule 13a-11
    [17 C.F.R. § 240. 13a-11] ................................................................. 9, 48
Rule 14a-9
    [17 C.F.R. § 240.14a-9] .................................................................9, 46, 47

<u>Federal Rules of Civil Procedure</u>

FED. R. CIV. P. 9(b) .................................................................10, 44

FED. R. CIV. P. 15) .................................................................50

## I.    SUMMARY

In June 2021, the price of Torchlight Energy Resources, Inc.'s ("**Torchlight**") publicly-traded stock skyrocketed—soaring over 200% in a single week. (Compl. ¶¶ 1, 95). During this brief price surge, Torchlight—which months earlier had a $30 million market capitalization—raised $137.5 million by selling millions of shares to investors over a five-day at-the-market offering ("**ATM Offering**"). (*Id.* ¶¶ 1, 8, 109). Unbeknownst to investors, these events were not serendipitous or the result of natural market forces. (*Id.* ¶¶ 1, 25, 29-105). Rather, they were part of an elaborate, undisclosed scheme that Defendants carefully planned, coordinated, and carried out over the preceding eight months. (*Id.*)

The SEC's 46-page Complaint details each Defendant's deceptive and manipulative acts pursuant to their fraudulent scheme to artificially inflate Torchlight's stock price and sell that stock to investors at inflated prices. (*Id.* ¶¶ 20-107). It also specifies multiple, material misstatements and omissions that each Defendant made to further mislead investors to buy or hold Torchlight stock during the price surge. (*Id.* ¶¶ 38-50, 67-88). And it spells out several communications and factual circumstances that demonstrate Defendants acted with scienter. (*Id.* ¶¶ 20-111).

Defendants seek to dismiss the Complaint on sprawling grounds, but their primary contentions turn on fact-intensive issues that cannot be resolved in their favor on the pleadings. For example, Defendants repeatedly argue for dismissal based on what they contend "the market" knew at different times, but their arguments rely on social media posts and other questionable sources outside the Complaint that are inappropriate to consider at this stage and that, even if accepted, do not defeat the well-pleaded allegations that Defendants misled and deceived investors. Defendants also claim that their misstatements and omissions were immaterial, but "[m]ateriality is a fact-specific inquiry…and assessing the significance of the inferences a reasonable investor would draw from a given set of facts is peculiarly within the competence of

the trier of fact[.]" *SEC v. World Tree Fin., LLC*, 43 F.4th 448, 465 (5th Cir. 2022) (citations omitted). That is especially true in this case, given the specific and concrete facts Defendants allegedly misrepresented or omitted (e.g., Palikaras' reference to a $1–$20 dividend or Brda's failure to disclose his fully-formed plans to spin off Torchlight's assets) and the factual allegations demonstrating the importance of the information they failed to disclose to investors. Likewise, Defendants contest scienter without addressing their own communications detailed in the Complaint that clearly show their knowledge and intentions to engage in the fraudulent scheme.

Defendants' discrete arguments for dismissal of specific claims also fail. Palikaras' argument that the Complaint's Rule 10b-5 claim must identify a specific shareholder who bought or sold securities based on his misstatements is contrary to Fifth Circuit law, which holds "[i]t is not necessary for a specific trade or a specific purchaser or seller to be identified to satisfy the in-connection-with element [of a Rule 10b-5 claim]." *World Tree Fin.*, 43 F.4th at 461. Similarly, Defendants make a causation-like argument for dismissal of the proxy fraud claim, which is contrary to the rule that the SEC, unlike private litigants, "'is not required to prove that…the misrepresentations caused any investor to lose money.'" *SEC v. Life Partners Holdings, Inc.*, 854 F.3d 765, 779 (5th Cir. 2017) (quoting *SEC v. Blavin*, 760 F.2d 706, 711 (6th Cir. 1985)). The Complaint also plausibly alleges that Brda aided and abetted Torchlight's corporate books and records/internal controls violations by, among other things, secretly funneling $20,000 per month to a new management team in connection with his post-merger spin-out plans. Finally, Brda fails to show any basis for striking the Complaint's statutorily-authorized remedies at the pleadings stage. For these reasons and those further explained below, the SEC requests that the Court deny Defendants' Motions.

## II.    STATEMENT OF ISSUES TO BE DECIDED

1.    Does the Complaint sufficiently allege each Defendant's material misrepresentations and/or omissions for the claims under Section 17(a)(2) of the Securities Act of 1933 ("**Securities Act**") and Section 10(b) of the Securities Exchange Act of 1934 ("**Exchange Act**") and Rule 10b-5(b) thereunder?

       a.    Does the Complaint plausibly allege the "maker" and "in connection with" elements of the Rule 10b-5(b) claim against Palikaras?

       b.    Does the Complaint plausibly allege that Palikaras obtained money or property by means of misstatements or omissions in violation of Section 17(a)(2)?

2.    Does the Complaint sufficiently allege each Defendant engaged in a deceptive or manipulative act in furtherance of a fraudulent scheme for the claims under Sections 17(a)(1) and (a)(3) of the Securities Act, Section 10(b) of the Exchange Act, and Rules 10b-5(a) and (c)?

3.    Does the Complaint sufficiently allege each Defendant's scienter for the claims under Section 17(a)(1) of the Securities Act and Section 10(b) of the Exchange Act and Rule 10b-5 thereunder?

4.    Does the Complaint sufficiently allege Brda's negligence for the claims under Sections 17(a)(2) and 17(a)(3) of the Securities Act and Section 14(a) of the Exchange Act?

5.    Does the Complaint sufficiently allege a proxy fraud claim against each Defendant?

6.    Does the Complaint sufficiently allege aiding and abetting claims against Brda?

7.    Has Brda shown that two statutorily-authorized remedies should be struck?

## III.    BACKGROUND

Brda is the former CEO of Torchlight, an oil and gas company that was publicly traded on the Nasdaq before it merged with Metamaterial, Inc. ("**Meta I**") on June 28, 2021 to form Meta Materials, Inc. ("**Meta II**"). (Compl. ¶¶ 15, 17). Palikaras is the former CEO of Meta I, a materials technology company that traded on the Canadian Securities Exchange before the merger. (*Id.* ¶¶16, 18). After the merger, Palikaras became CEO and a board member of Meta II, a publicly traded materials technology company that assumed Torchlight's Nasdaq listing. (*Id.* ¶¶ 16, 19). Leading up to the June 2021 merger, Defendants schemed to (1) artificially inflate Torchlight's stock price and (2) sell Torchlight stock to investors at inflated prices via the ATM Offering. (*Id.* ¶¶ 1-9).

Brda first devised the scheme in early 2020 in response to Torchlight's deteriorating financial condition. (*Id.* ¶¶ 2, 20-25). At the time, Torchlight had oil and gas leases on "only a few early-stage, exploratory properties," which generated minimal revenue. (*Id.* ¶¶ 20-23). Torchlight had unsuccessfully tried to sell the assets for years, and had no prospective buyers. (*Id.*). It also had significant debt and seemingly no ability to raise capital to pay ongoing drilling expenses. (*Id.*) Torchlight's stock price fell below $1.00 per share in October 2019—prompting a delisting notice from the Nasdaq—and continued to fluctuate below $1.00 per share throughout 2020. (*Id.* ¶ 23).

Rather than address Torchlight's underlying financial health, Brda hatched a scheme. (*Id.* ¶ 25). By at least June 2020, Brda had devised a series of transactions to effectuate his scheme. (*Id.* ¶¶ 3, 29-32). Those included a merger agreement between Torchlight and another company, along with a dividend—in the form of preferred stock issued to shareholders of record at closing—that purportedly entitled shareholders to receive the net proceeds of the sale of Torchlight's oil and gas assets (the "**Preferred Dividend**"). (*Id.*) Brda designed the Preferred Dividend to "not be registered" or made available for immediate trading on any exchange. (*Id.* ¶¶ 3, 31). By this design, Brda believed, and intended to lead investors to believe, that the Preferred Dividend would trigger a short squeeze[1] because of the difficulty he believed short sellers would have in obtaining and delivering the Preferred Dividend to lenders in the future. (*Id.* ¶¶ 3, 31). In turn, Brda aimed to artificially and temporarily inflate Torchlight's stock price, on which he planned to capitalize by selling Torchlight shares at inflated prices via an ATM Offering and by causing Torchlight's convertible debtholders to convert their debt to equity at inflated prices, thereby avoiding repayment obligations. (*Id.* ¶¶ 22, 29-32, 36). Brda intended to use the capital raised from his

---

[1] A "short squeeze" refers to the pressure on short sellers to cover their positions as a result of share price increases or difficulty in borrowing the security that the sellers are short. A rush by short sellers to cover their positions produces additional upward pressure on the price of the stock, which then can cause an even greater squeeze. (Compl. ¶ 24); *see also* (*id.* ¶ 24 n.3 (describing what a "short seller" is)).

scheme, in part, to fund the drilling expenses on Torchlight's assets and pay his compensation, neither of which Torchlight could afford. (*Id.* ¶¶ 21-22, 25, 111).

In September 2020, Brda identified Meta I as a suitable merger partner to enable his scheme. (*Id.* ¶¶ 26-28). Meta I fit Brda's scheme because: (a) it was *not* interested in Torchlight's oil and gas leases (thus, giving Brda an excuse to issue the Preferred Dividend), but (b) Meta I "nonetheless wanted to merge with Torchlight to acquire its Nasdaq listing." (*Id.*).

Palikaras, as CEO of Meta I, expressly learned about Brda's scheme from the outset of their merger discussions. (*Id.* ¶¶ 35-37). In early September 2020, Brda explained to Palikaras and Meta I's Board that he expected the proposed transactions to "raise enough money when the shorts get squeezed to eliminate all [Torchlight's] debt," and that he planned to use "an At-The-Market (ATM) Offering…to raise the capital." (*Id.*) Knowing this, Palikaras secured Meta I's approval of Brda's proposed merger structure and helped carry out Brda's scheme. (*Id.*)

Defendants initially believed that merely emphasizing the Preferred Dividend in a press release announcing the merger would trigger a short squeeze and then a surge in Torchlight's stock price. (*Id.* ¶¶ 5, 52-54). But when the market did not immediately react following that announcement, Defendants engaged in a deceptive promotional campaign designed to spread the short squeeze narrative to certain groups of investors (e.g., retail investors active on social media and select institutional investors), while concealing "that they were the source of the short squeeze narrative" and without disclosing their scheme or plans to the investing public. (*Id.*) For example, Brda caused Torchlight to retain "stock-support consultants" to spread the short squeeze narrative, instructed these consultants to make sure investors "understand the dividend properly," and caused Torchlight to keep inadequate books and records and to maintain inadequate internal controls

regarding these consultants to conceal the deceptive purpose for which they were generously paid "$3,000 to $5,000 per month plus stock warrants." (*Id.* ¶¶ 55-57).

Publicly, neither Defendant disclosed that they expected the Preferred Dividend to cause a short squeeze or that they had discussed and planned to use the ATM Offering to sell Torchlight shares at inflated prices. (*Id.* ¶¶ 38-50). In fact, Brda caused Torchlight to publicly state in its 2020 Form 10-K filed in March 2021—which was incorporated by reference in Torchlight's May 7, 2021 definitive proxy statement soliciting investors to approve the merger—that "we have no reason to believe our shares would be the target of a short squeeze." (*Id.* ¶¶ 43, 44).

But outside of Torchlight's public filings, Defendants promoted the short squeeze narrative to select groups of investors. At investor meetings in March and May 2021, Defendants explained to select investors—primarily those who Defendants believed held or may acquire sizeable positions in Torchlight—precisely how they expected the Preferred Dividend to squeeze short sellers, and thereby drive up Torchlight's stock price before closing. (*Id.* ¶¶ 60-61). Defendants also worked in close coordination to discretely promote the short squeeze to retail investors on social media. (*Id.* ¶¶ 62-66, 89-95). On June 7, 2021, after Brda posted a video about short squeezes on Twitter, Palikaras texted Brda: "I don't think you should be sharing posts on the short squeeze…yet." (*Id.* ¶ 63). A week later, on June 13, Palikaras tweeted a shorts-in-flames graphic, signaling to his retail-investor followers that the Preferred Dividend "would set Torchlight's 'shorts' on fire by triggering a short squeeze." (*Id.* ¶¶ 64-66). The next day, June 14, Brda caused Torchlight to announce the Preferred Dividend Record Date, which Palikaras followed with a series of tweets designed to subtly promote the short squeeze narrative. (*Id.* ¶¶ 64-66, 89-93).

Defendants also made misrepresentations and omissions to investors about the Preferred Dividend. (*Id.* ¶¶ 67-88). In Torchlight's public filings and proxy statements, Brda misrepresented

6

that "Torchlight would make 'commercially reasonable efforts' to sell its oil and gas assets and distribute the net proceeds to holders of the Preferred Dividend within six months of the merger closing," when in fact, "a sale of Torchlight's oil and gas assets within six months of the merger closing was not possible." (*Id.* ¶¶ 68-76). In reality, Brda developed plans to spin out (i.e., not sell) the assets in December 2020 and began funneling payments to the management team of the new Spin-Off Entity starting in January 2021, which he never disclosed. (*Id.* ¶¶ 77-81). As for Palikaras, during a virtual meeting with a group of Italian shareholders on May 13, 2021 (the "**Italian Investor Call**"), he misrepresented that Torchlight was speaking to the "right potential buyers and that "based on 'the analysis,' the value of the Preferred Dividend could be between $1–$20 per share," when in fact, that valuation "was wholly unsupported" and "there was no 'analysis' supporting his statement." (*Id.* ¶¶ 61, 83-85, 87). Defendants' misstatements and omissions misled "investors to acquire or hold Torchlight common stock through the Record Date to be eligible to receive the Preferred Dividend," which in turn further inflated Torchlight's stock price. (*Id.* ¶ 88).

As Defendants planned and intended, Torchlight's stock price and trading volume exponentially increased between June 14, 2021 (when Torchlight announced the Preferred Dividend Record Date) and June 24, 2021 (the Preferred Dividend Record Date).[2] (*Id.* ¶¶ 7, 89-94). During this period, the average trading volume exceeded 80 million shares per day—up from 5 million shares per day on average in May 2021. (*Id.* ¶ 94). Torchlight's stock price—which traded below $1.00 per share before the merger's announcement—increased to $3.58 per share on

---

[2] As Palikaras told his followers on Twitter, shareholders needed to acquire or hold Torchlight stock through June 22, 2021 (the T+2 Date) to ensure that they were shareholders of record as of June 24, 2021—the Preferred Dividend Record Date—and thus, eligible to receive the Preferred Dividend. (Compl. ¶ 90). Consistent with Defendants' plans, Torchlight's stock price and trading volume peaked on or near June 22 (the T+2 Date) and generally declined thereafter up to the merger closing on June 28, 2021. (*Id.* ¶¶ 93-97).

June 14, $5.07 per share on June 15, $5.99 per share on June 16, and peaked at $10.88 per share on June 21—an increase of over 200% in a single week. (*Id.* ¶¶ 7, 95).

Before the ATM Offering, Brda also tried to leverage the situation to get Meta I to agree to use proceeds from the ATM Offering to pay Torchlight's drilling expenses. (*Id.* ¶¶ 98-100). On June 16, 2021, he wrote Palikaras: "I believe I can get my board to approve if META would agree to lend a decent portion of the raise to [Torchlight]…Otherwise, we have no inclination to raise capital now as it only dilutes our oil and gas assets….The ducks are quacking, time to feed them!" (*Id.* ¶ 99). Palikaras recommended Brda's proposal to Meta I's Board, writing that it "takes advantage of the potential best pricing due to any short covering effect prior to the Ex-Date.'" (*Id.* ¶ 101). Although Meta I allegedly did not agree to Brda's proposal, Torchlight moved forward with the ATM Offering and part of the proceeds were later used to pay Torchlight's drilling costs for the oil and gas assets—consistent with Brda's plan and proposal. (*Id.* ¶ 102).

Over a five-day period between Friday, June 18, 2021 and Thursday, June 24, 2021, Torchlight conducted the ATM Offering, during which it sold 16.2 million shares to investors at an average price of $8.50 per share for a total of $137.5 million raised. (*Id.* ¶¶ 103-106). On June 18, the first day of the ATM Offering, Brda wrote Palikaras: "[w]e need to be selling more than we are, the shorts always push down at the end of the day… ***We have two days to take advantage of the squeeze***, today should have been a 5 million share day at 6," to which Palikaras responded: "Go ahead to $5.75. 5m shares. Fill her up[.]" (*Id.* ¶¶ 104-05).

Torchlight's stock price fell dramatically after the ATM Offering. (*Id.* ¶ 107). Meanwhile, Palikaras took over as CEO of Meta II, a company suddenly flush with cash raised from Defendants' pre-merger scheme. (*Id.* ¶¶ 8, 16). For his efforts, Brda requested and received a "'bonus of $1.5 million in cash.'" (*Id.* ¶¶ 108-11). In justifying his bonus, Brda noted his success

in manipulating Torchlight's "'market cap…from $30 million to nearly $1.44 billion,'" and that Torchlight "would not have sufficient funds to pay a $1.5 million bonus *or its existing obligations*, but for the proceeds of the ATM Offering." (*Id.*) (emphasis in original).

Following an investigation, the SEC filed its Complaint alleging Defendants violated Section 17(a) of the Securities Act, Sections 10(b) and 14(a) of the Exchange Act, and Rules 10b-5 and 14a-9; and that Brda aided and abetted Meta II's violations of Sections 13(a), 13(b)(2)(A), and 13(b)(2)(B) of the Exchange Act and Rules 12b-20 and 13a-11 thereunder. (*Id.* ¶¶ 9, 112-43).

## IV.    OBJECTION TO CERTAIN SOURCES OUTSIDE THE COMPLAINT

"In determining whether to grant a motion to dismiss, the district court must not go outside the pleadings," with certain limited exceptions. *Scanlan v. Texas A&M Univ.*, 343 F.3d 533, 536 (5th Cir. 2003). The SEC objects to the articles, social media posts, and YouTube videos that Defendants cite in their Motions that purport to show what the market knew. (Palik. Mot. at 27 & 7 n. 11, 12; Brda Mot. at 16).[3] None of these are "documents that are referred to in the plaintiff's complaint" or "central to the plaintiff's claim." *Scanlan*, 343 at 536. Nor should the Court take judicial notice, because what the market knew at particular times in this case is not "generally known within the trial court's territorial jurisdiction" and cannot be "accurately and readily determined from sources whose accuracy cannot be questioned." *Polnac v. City of Sulphur Springs*, 555 F. Supp. 3d 309, 326–27 (E.D. Tex. 2021) (quoting Fed. R. Evid. 201(b)) (declining to take judicial notice of Facebook postings not mentioned or referenced in the complaint).

---

[3] Palikaras also cites an SEC enforcement action, *SEC v. Constantin, et al*, 4:22-cv-04306 (S.D. Tex. Dec. 13, 2022). But *Constantin* involved different defendants and an unrelated scheme to promote *several* stocks on social media while secretly selling those stocks, and a *different time period* for the Torchlight sales—February 10-23, 2021, see *Constantin*, ECF No. 1 at ¶¶ 89-102, whereas this case alleges manipulation and a fraudulent offering in June 2021.

# V.    ARGUMENT

To survive a Rule 12(b)(6) motion to dismiss, the Complaint must state a plausible claim. *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007). A claim is plausible if the facts alleged allow "the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009). All well-pled factual allegations must be accepted as true and construed in a light most favorable to the SEC. *Scanlan*, 343 F.3d at 537. Rule 9(b) provides that a party must plead "with particularity the circumstances constituting fraud," FED. R. CIV. P. 9(b), which "requires the who, what, when, where and how to be laid out" for a fraud claim. *Benchmark Elecs., Inc. v. J.M. Huber Corp.*, 343 F.3d 719, 724 (5th Cir. 2003) (citation omitted). However, "[m]alice, intent, knowledge, and other conditions of a person's mind may be alleged generally." FED. R. CIV. P. 9(b).

## A.    The Complaint Properly Alleges Misrepresentation Claims Against Defendants.

To prove a violation of Section 10(b) of the Exchange Act and Rule 10b-5(b) thereunder, "the SEC must prove three elements: (1) a material misrepresentation or materially misleading omission, (2) in connection with the purchase or sale of a security, (3) made with scienter." *SEC v. Sethi*, 910 F.3d 198, 206 (5th Cir. 2018). To establish a claim under Section 17(a)(2) of the Securities Act, the SEC must establish the defendant: (1) obtained money or property by means of (2) a material misrepresentation or materially misleading omission (3) in the offer or sale of a security, and (4) acted with negligence.[4] *Id.*; 15 U.S.C. § 77q(a). As this Court has explained:

> The standard for misrepresentation is whether the information disclosed, understood as a whole, would mislead a reasonable potential investor, and a statement or omitted fact is material if there is a substantial likelihood that a reasonable investor would consider the information important in making a decision to invest.…[A]n omitted fact is material if disclosure of the omitted fact would have…significantly altered the total mix of information made available. Thus, the

---

[4] This section (V.A) focuses on the elements of the misrepresentation claims other than scienter and negligence, which are discussed below under sections V.C and V.D.

> antifraud provisions of the securities statutes and regulations impose a duty to
> disclose material facts that are necessary to make disclosed statements, whether
> mandatory or volunteered, not misleading.

*SEC v. Silea*, No. 4:20-CV-737-SDJ, 2022 WL 269105, at *11 (E.D. Tex. Jan. 27, 2022) (Jordan, J.) (internal citations omitted). Further, "[m]ateriality is a fact-specific inquiry…and assessing the significance of the inferences a reasonable investor would draw from a given set of facts is peculiarly within the competence of the trier of fact[.]" *World Tree Fin.*, 43 F.4th at 465.

### 1. The Complaint adequately alleges material misrepresentations and omissions.

The Complaint plausibly alleges, with particularity, material misrepresentations and materially misleading omissions by each Defendant, including the following.

*First*, Brda repeatedly misrepresented to investors—in Torchlight's definitive proxy statement, public filings, and press releases—that "Torchlight would make 'commercially reasonable efforts' to sell its oil and gas assets and distribute the net proceeds to holders of the Preferred Dividend within six months of the merger closing." (Compl. ¶¶ 68-74). These statements were false or misleading, since "a sale of Torchlight's oil and gas assets within six months of the merger closing was not possible." (*Id.* ¶¶ 75-76). That's because "Torchlight had no prospects to sell the oil and gas assets," it "had taken no actions to lay the groundwork for the sale," and "it would take at least a year, if not longer, simply to complete the due diligence that a specialized buyer would undertake before completing the sale of Torchlight's assets." (*Id.*) Investors, thus, were misled to believe that Preferred Dividend holders may "receive a return on their investment in the form of a distribution of net proceeds from Torchlight's sale of its oil and gas assets shortly after the merger," when there were no prospects of that happening. (*Id.* ¶¶ 6, 68).

Brda also failed to disclose material facts that were necessary to make his "commercially reasonable efforts" statements not misleading. (*Id.* ¶ 77). Specifically, Brda failed to disclose that: (i) "Torchlight had unsuccessfully tried to sell [its] assets for years," (ii) "Torchlight had no plans

in place to use 'commercially reasonable efforts' to complete the sale of its assets within six months of the merger closing," (iii) "a sale of those assets within six months of the merger closing was not possible given the lack of prospects or candidates," or (iv) "he had laid the foundation for a spin-off of Torchlight's oil and gas assets" just days after the merger agreement was signed. (*Id.*)

Brda's misstatements and omissions were material. Brda misled Torchlight's legacy shareholders by encouraging them to hold their shares through the Record Date to be eligible to receive the Preferred Dividend. Those legacy shareholders forewent the opportunity to sell at inflated prices in June 2021—based on the mistaken belief that Defendants would use "commercially reasonable efforts" to sell Torchlight's assets and distribute the net proceeds to holders of the Preferred Dividend within six months of the merger. (*Id.* ¶¶ 6, 88). Investors who purchased Torchlight shares at inflated prices in June 2021 were similarly misled. (*Id.*) A reasonable investor in these circumstances would have found important that "a sale of Torchlight's oil and gas assets within six months of the merger closing was not possible," and thus, no distribution would be made. (*Id.* ¶¶ 75-76). Brda's failure to disclose that Torchlight had *no* plans to sell the assets within six months of the merger—and, instead, Brda had fully-formed plans to spin the assets out—would also be important to a reasonable investor, because they show that a sale and distribution was impossible or at least unlikely. (*Id.* ¶¶ 77, 88); *see Lormand v. US Unwired, Inc.*, 565 F.3d 228, 248 (5th Cir. 2009) ("The omission of a known risk, its probability of materialization, and its anticipated magnitude, are usually material to any disclosure discussing the prospective result from a future course of action.").

*Second*, during the Italian Investor Call, Palikaras made misstatements on two topics to a group of shareholders that he believed held significant positions in Torchlight. (*Id.* ¶¶ 61, 83). As to the first topic, Palikaras misrepresented "that Torchlight was speaking to 'the right potential

buyers' for its oil and gas assets and that the buyers were 'top tier,'" when in fact, "Torchlight had not identified *any* potential buyers" and Palikaras later admitted he "had no knowledge of potential buyers or active negotiations" when he made this statement. (*Id.* ¶ 84). As to the second, Palikaras misrepresented that "based on 'the analysis,' the value of the Preferred Dividend could be between $1–$20 per share." (*Id.* ¶¶ 84-85, 87). In reality, the $1–$20 valuation "was wholly unsupported" and "there was no 'analysis' supporting his statement." (*Id.*) Indeed, Palikaras "had reviewed [Torchlight's] investment bank's third-party asset valuation" (the **Asset Valuation Report**"), "which implied an estimated asset value of less than $1.00 per share." (*Id.*)

Palikaras' misstatements were material. Palikaras' misstatements about Torchlight speaking to "the right potential buyers" created "the false impression that Torchlight had made some progress toward selling its oil and gas assets," (*id.* ¶ 88), which a reasonable investor would find important for the same reasons discussed above as to Brda's material misstatements and omissions. For the same reasons, a reasonable investor would find important that Palikaras' $1–$20 range had no basis in fact, that no "analysis" supporting that range existed, and that the Preferred Dividend "was never going to be worth more than $1." (*Id.* ¶¶ 85, 87).

Moreover, the Complaint explains that by June 11, 2021—just days before Torchlight's stock price began to surge on June 14—Palikaras' misstatements were posted on social media via a partial audio recording of the Italian Investor Call. (*Id.* ¶ 86). Thereafter, a "common refrain" from social media users following the Torchlight coverage "was that the company's post-merger CEO (Palikaras) estimated that the Preferred Dividend would be worth $20 per share." (*Id.*). Indeed, the surge in Torchlight's stock price and trading volume between June 14-24 were attributable, in part, to "defrauded investors purchasing Torchlight's stock to…obtain the Preferred Dividend that they believed was worth $1–$20." (*Id.* ¶ 96). These facts further demonstrate

materiality. *See World Tree Fin.*, 43 F.4th at 465 (although "the SEC was not required to prove that any investor actually relied on Defendants' misrepresentations," investor's testimony about information he "would have wanted to know" further showed materiality).

*Third*, Brda misrepresented to investors in Torchlight's 2020 Form 10-K filed March 18, 2021—which Torchlight's definitive proxy statement incorporated by reference—that "we have no reason to believe our shares would be the target of a short squeeze." (*Id.* ¶¶ 43, 44). However, just one day earlier—March 17, 2021—Brda privately told an investor the opposite: that he believed the Preferred Dividend would cause a short squeeze and thereby drive up Torchlight's stock price before the merger closing. (*Id.* ¶ 44). His misrepresentation was material, because a reasonable investor would find important that Torchlight's management was planning for and expecting the Preferred Dividend to drive up the stock price near closing through a short squeeze.

*Lastly*, Brda failed to "disclose material facts that [were] necessary to make disclosed statements" about the Preferred Dividend in Torchlight's definitive proxy statement "not misleading." *Silea*, 2022 WL 269105, at *11. For instance, Brda represented to investors that "[t]he *anticipated and intended impact*" of the Preferred Dividend was to maintain Torchlight legacy shareholder's interests in the oil and gas assets. (Compl. ¶¶ 38-40, 42) (emphasis in original). But that was false or misleading, because Brda failed to disclose that his "anticipated and intended impact of the Preferred Dividend was that it would cause a short squeeze" or lead certain investors to believe a short squeeze would occur in order to artificially inflate Torchlight's stock price and capitalize on that inflation via the ATM Offering. (*Id.*) Brda made similarly misleading statements about the supposed "reasons" for the Preferred Dividend without disclosing that at least one of those reasons—if not the primary reason—was that Brda expected the Dividend to artificially increase Torchlight's stock price as part of his scheme. (*Id.* ¶ 41). He also misrepresented that Meta

14

I "suggested that the parties structure the transaction" to include the Preferred Dividend for the benefit of Torchlight legacy shareholders, but in fact, Brda proposed the transaction structure to Meta I in early September 2020 and explained his plan to inflate Torchlight's stock price and raise capital with an ATM Offering—none of which Brda disclosed to investors. (*Id.* ¶¶ 36, 45).

Likewise, Palikaras failed to disclose material facts that rendered his statements to investors about the Preferred Dividend false or misleading. For example, during the Italian Investor Call, Palikaras detailed how the Preferred Dividend was "set up" to cause "a potential jump towards the close" through a short squeeze. (*Id.* ¶ 61). And in June 2021, he sent his social media followers a "series of tweets designed to promote the short squeeze theory and encourage investors to purchase Torchlight's common stock." (*Id.* ¶¶ 64, 86). But in touting the Preferred Dividend and its purported benefits, Palikaras failed to disclose that he and Brda had discussed and planned to use the Preferred Dividend to temporarily inflate Torchlight's stock price as part of their undisclosed scheme to raise capital at inflated prices to shareholders' detriment. (*Id.* ¶¶ 47-48); *see Brown v. Ivie*, 661 F.2d 62, 66–67 (5th Cir. 1981) (finding complaint properly alleged a claim under Rule 10b-5 based on allegations that defendants misrepresented the "purpose" of an agreement and "fraudulently omitted…that they sought the agreement in order to obtain [the investor's] stock at less than fair value"); *In re Bed Bath & Beyond Corp. Sec. Litig.*, 687 F. Supp. 3d 1, 11-12 (D.D.C. 2023) (concluding defendant's "moon-emoji tweet was plausibly misleading because it was perceived as a rallying cry to buy Bed Bath's stock" and as "an expert insider's direction to buy or hold," even though the defendant had "soured on Bed Bath").

**2. Brda's arguments for dismissal of the claims arising out of his "commercially reasonable efforts" misstatements and omissions should be denied.[5]**

      *i.*       *Brda's bespeaks caution and puffery defenses fail.*

Brda claims his "commercially reasonable efforts" misstatements are not actionable under the bespeaks caution and puffery defenses. (Brda Mot. at 28-30). Neither warrants dismissal.

"The 'bespeaks caution' doctrine is a defense to securities fraud claims," which holds that forward-looking misstatements may be rendered immaterial when "accompanied by meaningful cautionary statements and specific warnings of the risks involved." *Collmer v. U.S. Liquids, Inc.*, 268 F. Supp. 2d 718, 742 (S.D. Tex. 2001). However, where "reasonable minds could…disagree as to whether the mix of information in the [allegedly actionable] document is misleading," the bespeaks caution doctrine "cannot provide the basis for dismissal as matter of law." *Lormand v. US Unwired, Inc.*, 565 F.3d 228, 248 (5th Cir. 2009) (citation omitted).[6] As follows, the bespeaks caution doctrine does not render Brda's misstatements immaterial as a matter of law.

*First*, the doctrine does not apply to Brda's omissions—such as that he had been secretly funneling payments to the Spin Off Entity's new management team five months before the merger—which concern then-existing facts and not forward-looking predictions. (Compl. ¶ 77)[7]; *see Collmer*, 268 F. Supp. 2d 744 (doctrine did not apply to defendants' omission of material facts because "the doctrine applies only to forward-looking, i.e., predictive, statements or omissions").[8]

---

[5] This section addresses three of Brda's arguments attacking the misrepresentation claims, see (Brda Mot. at 28-31). His challenges to scienter and negligence (*id.* at 25-27, 33-34) are addressed *infra* under sections V.C and V.D.

[6] Some cases, such as the Fifth Circuit's opinion in *Lormand*, discuss both the common-law bespeaks caution doctrine and a related safe harbor defense under the Private Securities Litigation Reform Act ("**PSRLA**"), without distinguishing the two. However, only the common law doctrine applies in this case—the PSLRA does not apply in SEC enforcement actions. *See, e.g.*, *SEC v. Thompson*, 238 F. Supp. 3d 575, 602 (S.D.N.Y. 2017) (discussing bespeaks caution and PSLRA safe harbor, noting only the former applies in SEC enforcement actions).

[7] *See also supra* section V.A.1 (discussing Brda's omissions of material facts).

[8] *See also SEC v. Thompson*, 238 F. Supp. 3d 575, 602–03 (S.D.N.Y. 2017) ("[M]any of the allegations [defendant] identifies are not covered by the [bespeaks] doctrine because they are statements concerning present facts, not forward-looking statements.").

*Second*, the Complaint plausibly alleges that Brda's misstatements were misleading despite Torchlight's risk disclosures. (Compl. ¶ 68 (discussing risk disclosures in proxy statements)). Brda highlights warnings "that a sale of the O&G Assets *might* not occur" and that "Torchlight *could* pursue a spin-off of the O&G Assets" if the assets were not sold within six months of the merger. (Brda Mot. at 28-29) (emphasis added). But at best, these are materially misleading half-truths. *See Set Cap. LLC v. Credit Suisse Grp. AG*, 996 F.3d 64, 85 (2d Cir. 2021) (quoting *Wilson v. Merrill Lynch*, 671 F.3d 120, at 130 (2d Cir. 2011) ("[T]he law is well settled that so-called 'halftruths'—literally true statements that create a materially misleading impression—will support claims for securities fraud.")). Because "Torchlight had no prospects to sell the oil and gas assets and had taken no actions to lay the groundwork for a sale when the statements were made," the reality was that the "sale of Torchlight's oil and gas assets within six months of the merger closing was not possible" and a spin-out of the assets post-merger—which Brda had already planned— was a near certainty. (Compl. ¶¶ 75-80). The bespeaks caution doctrine "provides no protection to someone who warns his hiking companion to walk slowly because there might be a ditch ahead when he knows with near certainty that the Grand Canyon lies one foot away." *In re Prudential Sec. Inc. Partnerships Litig.*, 930 F. Supp. 2d 68, 72 (S.D.N.Y. 1996).[9] At a minimum, it is plausible that "reasonable minds could…disagree as to whether the mix of information in [Torchlight's disclosures] is misleading," and therefore, dismissal is not warranted. *Lormand*, 565 F.3d at 248 (misstatements not immaterial as a matter of law, because they "were not accompanied

---

[9] *See also Set Capital*, 996 F.3d at 85 (citing *Dolphin & Bradbury, Inc. v. SEC*, 512 F.3d 634, 640 (D.C. Cir. 2008)) ("there is a 'critical distinction between disclosing the risk a future event might occur and disclosing actual knowledge that the event will occur'—particularly where that distinction holds 'enormous significance' for investors."); *Kosmos Energy*, 955 F. Supp. 2d at 668 ("Numerous detailed cautionary statements will not shield a defendant from liability for projections it knows or should know to be false, even if they disclose in general terms the risks that the defendant knows have materialized.").

by specific, concrete explanations that clearly identified and quantified the clearly present financial dangers").[10]

*Third*, the doctrine also fails because the Complaint plausibly alleges that Brda did not "genuinely or reasonably" believe his misstatements. (Compl. ¶ 81)[11]; *see SEC v. DeFrancesco*, 699 F. Supp. 3d 228, 240 (S.D.N.Y. 2023) (quoting *In re Int'l Bus. Machs. Corp. Sec. Litig.*, 163 F.3d 102, 107 (2d Cir. 1998)) ("Forward-looking statements are actionable…if the speaker does not genuinely or reasonably [believe] them."). In sum, the Complaint's well-pled allegations plausibly support at least three different grounds for finding the bespeaks doctrine inapplicable.

For similar reasons, Brda's misstatements and omissions are not mere "puffery." "Statements are non-actionable puffery when they are of the vague and optimistic type and contain no concrete factual or material misrepresentation." *Oklahoma Firefighters Pension & Ret. Sys. v. Six Flags Ent. Corp.*, 58 F.4th 195, 220 (5th Cir. 2023) (citation and alterations omitted). Brda argues that the words "commercially reasonable efforts," read in isolation, are mere aspirational puffery. (Brda Mot. at 29). But these words must be read in view of "the 'total mix' of information made available." *Silea*, 2022 WL 269105, at *11. And the surrounding context shows that Brda assured investors that "commercially reasonable efforts" would be undertaken to sell Torchlight's assets within a *specific timeline* (six months after the merger closing), and he further provided investors a *specific method* by which the "net proceeds" from such a sale would be distributed. (Compl. ¶¶ 68-74). The Complaint also details specific facts that Brda failed to disclose (*id.* ¶¶ 77-81), which Brda never challenges as non-actionable puffery (nor could he). In short, because the Complaint details specific misstatements and omissions by Brda, his puffery arguments do not

---

[10] *See also Ramirez v. Exxon Mobil Corp.*, 334 F. Supp. 3d 832, 851 (N.D. Tex. 2018) (rejecting bespeaks caution doctrine as basis for dismissal).
[11] *See also infra* section V.C (discussing allegations plausibly establishing Brda's scienter).

warrant dismissal. *See Six Flags*, 58 F.4th at 220 ("Statements describing construction as 'continuing' and 'progressing' in the context of confirming the park timelines are not puffery ….").

### ii.    *Brda's "falsity" argument fails.*

Brda also contends that the Complaint fails to allege his misstatements were false, because it does not specify "that *there were commercially reasonable efforts* available…that Torchlight *did not take*." (Brda Mot. 30). But the Complaint does allege a failure to undertake commercially reasonable efforts. For instance, it states that "only a small number of companies were possible candidates to purchase Torchlight's assets" and that Torchlight had no record of any discussions with any such candidates or prospective buyers in 2020 or 2021. (Compl. ¶ 75). Moreover, even if Torchlight had actually reached the point of discussions with a specific buyer by May 2021—when Brda last made the misrepresentations in Torchlight's definitive proxy statement—the Complaint explains "it would take at least a year, if not longer, simply to complete the due diligence that a specialized buyer would undertake before completing the sale of Torchlight's assets." (*Id.* ¶ 76). Thus, even if commercially reasonable efforts had been undertaken after Brda last made his misstatements, a sale of Torchlight's assets within six months of the merger *was not possible*, because Brda/Torchlight had failed to use commercially reasonable efforts to lay the groundwork for a sale. Brda's representations and omissions to the contrary were false and misleading.

### 3.    Palikaras' arguments for dismissal of the claims based on his misstatements during the Italian Investor Call should be denied.[12]

### i.    *Palikaras fails to show his misstatements are immaterial per se.*

Similar to Brda, Palikaras argues that his misstatements on the Italian Investor Call were mere "puffery and statements of opinion" and that no reasonable investor would have found them

---

[12] This section addresses Palikaras' arguments attacking the misrepresentation claims, see (Palik. Mot. at 17-24, 35-37), except for his scienter argument, which is addressed *infra* under section V.C.

significant in light of disclosures in Torchlight's public filings. (Palikaras Mot. at 18-20). Neither argument shows Palikaras' misstatements to be immaterial as a matter of law.

Palikaras' "puffery" argument is without merit. His misstatements during the Italian Investor Call were not "vague" or "optimistic generalizations." Instead, he referenced specific facts—including a specific range of values for the Preferred Dividend, a supposed "analysis" supporting that range, and Torchlight's supposed ongoing discussions with "the right potential buyers" to liquidate its assets—which a reasonable investor would consider important in evaluating Torchlight's stock. That alone distinguishes this case from those cited by Palikaras. *See, e.g.*, *SEC v. Reynolds*, No. CIV.A.3-08-CV-0384-B, 2008 WL 3850550, at *5 (N.D. Tex. Aug. 19, 2008) (finding statements immaterial because they did not "reference…any actual facts upon which an investor might evaluate a business"). Moreover, Palikaras' reference to "the right potential buyers" was not a generalized opinion. Rather, it concerned an existing fact that was objectively and verifiably false: that Torchlight was having ongoing discussions with potential buyers, when in fact, it was not. *See Six Flags*, 58 F.4th at 220 ("Statements such as,…that the 'parks are progressing nicely' are not 'vague' or 'generalized, positive statements,' because they confirmed the projections previously provided by Defendants."); *Jacobowitz v. Range Res. Corp.*, 596 F. Supp. 3d 659, 683 (N.D. Tex. 2022) (puffery are statements that lack "specific or objective factual representations").

Palikaras also argues that his misstatements were immaterial, because Torchlight attached an Asset Valuation Report[13] to its proxy statement that "implied an estimate asset value of less than $1.00," which conflicted with his $1–$20 range. (Palik. Mot. at 20). But Palikaras' misstatements during the Italian Investor Call were made on May 13, 2021—*after* Torchlight

[13] See (Compl. ¶ 85) and *supra* section V.A.1 for discussion of the Asset Valuation Report.

attached the Asset Valuation Report to its May 7, 2021 proxy statement. When Palikaras made his misstatements, he knew the Asset Valuation Report "implied an estimated asset value of less than $1.00 per share." (Compl. ¶ 85). Yet, he told investors that, "based on 'the analysis,' the value of the Preferred Dividend could be between $1–$20 per share." (*Id.* ¶¶ 84-85, 87). He never specified or suggested that the Asset Valuation Report was the "analysis" purportedly supporting his valuation range. (*Id.*)  To the contrary, he falsely suggested he had reviewed some other "analysis" that showed a much higher range. Thus, it is plausible that a reasonable investor would have been misled to believe that a corporate insider like Palikaras had access to a different "analysis"— separate from the Asset Valuation Report—to support his $1–$20 range, and that a reasonable investor would have, therefore, found Palikaras' misstatements material or important. *See also supra* section V.A.1 (discussing how investors on social media frequently cited Palikaras' $1–$20 range during Torchlight's price surge, which further shows materiality); (Compl. ¶¶ 86-87, 90-93).

In addition, the Asset Valuation Report does not render Palikaras' misstatements immaterial as a matter of law, because it did not provide the investors on the Italian Investor Call "specific, concrete explanations that clearly" identify the misinformation in Palikaras' later statements, as needed to render his misstatements immaterial at this stage. *Lormand*, 565 F.3d at 248; *see also In re Bank of Am. Corp. Sec., Derivative, & Emp. Ret. Income Sec. Act (ERISA) Litig.*, 757 F. Supp. 2d 260, 302 (S.D.N.Y. 2010) (refusing to find "at the Rule 12(b)(6) stage, without further context, [that] the cited articles speak to the [misrepresented information] with a degree of intensity and credibility that effectively counterbalances" the alleged misstatements). And the Asset Valuation Report has no bearing on Palikaras' misstatements about Torchlight speaking with the "right potential buyers," which concerned a purported then-existing fact that

was unrelated to the Report. *See Collmer*, 268 F. Supp. 2d 744 ("only … forward-looking, i.e., predictive, statements or omissions" may be defeated by risk disclosures or warnings).

> ### ii.    *Palikaras' "maker" and "omission liability" arguments do not warrant dismissal of any of the misrepresentation claims against him.*

Palikaras next argues that the Complaint's misrepresentation claim under Rule 10b-5(b) fails because "Palikaras is not the 'maker' of the Screenshot or the Incomplete Secret Recording" that were purportedly "made and disseminated on social media" by third parties. (Palikaras' Mot. at 21). But for its Rule 10b-5(b) claim against Palikaras,[14] the SEC does not claim that Palikaras is the "maker" under *Janus Capital Grp., Inc. v. First Derivative Traders*, 564 U.S. 135 (2011) of the "Screenshot" or the so-called "Incomplete Secret Recording" or any other third-party publications of his misstatements during the Italian Investor Call. Instead, the SEC alleges, and there is no question, that Palikaras was the "maker" of ***his own misstatements*** to investors ***during the Italian Investor Call***, and that those misstatements are actionable under Rule 10b-5(b) even if they had never been posted online. (Compl. ¶ 82) ("During the Italian Investor Call,…Palikaras made false and misleading statements…."); *see also In re Longtop Financial Technologies Ltd. Sec. Litig.*, 2012 WL 2512280, at *9 (S.D.N.Y. June 29, 2012) (defendant was maker under *Janus* of oral statements he made during investor conference calls); *In re Textron, Inc.*, 811 F. Supp. 2d 564, 574 (D.R.I. 2011) (defendant was maker under *Janus* of oral statements he made during investor conference calls); *SEC v. Daifotis*, 2011 WL 3295139, at *3 (N.D. Cal. Aug.1, 2011) (defendant concedes he was maker under *Janus* of oral statement he made during conference call).

---

[14] Palikaras only argues for dismissal of the Rule 10b-5(b) claim based on his "maker" argument. (Palikaras Mot. at 21). His "maker" argument under *Janus* does not apply to the SEC's claims under Section 17(a) or Rule 10b-5(a) and (c), which can rely (in part) on allegations that Palikaras' misstatements were posted and disseminated on social media. See *Lorenzo v. SEC*, 587 U.S. 71, 74-85 (2019) (finding "maker" requirement under *Janus* does not foreclose liability under Rule 10b-5(a) and (c)); *SEC v. Big Apple Consulting USA, Inc.*, 783 F.3d 786, 796 (11th Cir. 2015) ("maker" requirement under *Janus* does not foreclose liability under "§ 17(a)(1) and (3), on which Rule 10b–5(a) and (c) are modeled"); *SEC v. Bowen*, No. 3:22-CV-1415-S, 2023 WL 6166780, at *5 (N.D. Tex. Sept. 21, 2023) (collecting cases for conclusion that *Janus*'s definition of 'maker' does not extend to claims under Section 17(a)(2)).

Palikaras also argues that the SEC cannot establish "omission liability" for his failure to correct or address the Screenshot or Incomplete Secret Recording. (Palikaras' Mot. at 22-23). The SEC does not rely on this theory for any of its claims. Nonetheless, this does not foreclose or limit the SEC's claims arising out of Palikaras' misstatements or omissions *during* the Italian Investor Call or any of the other materially misleading omissions discussed above. *See supra* section V.A.1.

### iii. The Complaint plausibly alleges the "in connection with" element of the Rule 10b-5 claims against Palikaras.[15]

Palikaras also seeks dismissal of the Rule 10b-5 claim (*see* Compl. ¶¶ 118-123) because he contends the Complaint fails to allege that his misstatements or misconduct during the Italian Investor Call were "in connection with" the purchase or sale of securities. (Palik. Mot. at 35). He argues that the SEC must identify specific Torchlight shareholders on the Italian Investor Call and allege that they "purchased or sold [Torchlight] shares based on Palikaras' statements." (*Id.*)

Palikaras' arguments are wrong as a matter of law. As the Fifth Circuit has explained, "[i]t is not necessary for a specific trade or a specific purchaser or seller to be identified to satisfy the in-connection-with element." *World Tree Fin.*, 43 F.4th at 461 (citation omitted). Also, "the SEC, unlike private litigants, need not prove the elements of reliance, proximate causation, or harm." *SEC v. Couch*, No. 3:14-CV-1747-D, 2014 WL 7404127, at *7 (N.D. Tex. Dec. 31, 2014). Rather, "[t]o satisfy the in-connection-with element, the fraudulent scheme [or misstatements] and sale of securities need only 'coincide.'" *World Tree Fin.*, 43 F.4th at 461.

Here, the Complaint alleges that Palikaras' misstatements and omissions during the Italian Investor Call were made in connection with Defendants' fraudulent scheme to *sell* Torchlight

---

[15] This section addresses the "in connection with" element for the claims against Palikaras under both Rule 10b-5(b) (misrepresentations) and Rule 10b-5(a) and (c) (scheme liability). This discussion only addresses those claims to the extent they arise out of the Italian Investor Call, because Palikaras only challenges those allegations for this element. Nonetheless, the same arguments hereunder would apply in terms of his deceptive or manipulative acts (e.g., deceptive marketing) satisfying the "in connection with" element for scheme liability under Rule 10b-5(a) and (c).

securities to investors at artificially inflated prices. (Compl. ¶¶ 5-6, 47-50, 59, 61, 82-88). It also alleges that his misstatements and omissions were made to "a group of Italian shareholders…that he believed held a significant number of shares of Torchlight common stock," that the "stated purposes" of the Call were to "solicit the Italian shareholders' proxy votes in favor of the merger" and "encourage the investors to hold the common stock of the post-merger company," that he discussed Torchlight's securities during the Call, and that he made misstatements that "incentivized investors to acquire or hold Torchlight common stock through the Record Date to be eligible to receive the Preferred Dividend." (*Id.*) And it alleges that the surge in Torchlight's stock price and trading volume between June 14-24 were attributable, in part, to "defrauded investors purchasing Torchlight's stock to…obtain the Preferred Dividend that they believed was worth $1–$20." (*Id.* ¶¶ 86, 96). These allegations plausibly show that Palikaras' misstatements and conduct on the Italian Investor Call "coincided" with the purchase or sale of securities, and thus, satisfy the "in connection with" element for Rule 10b-5. *World Tree Fin.*, 43 F.4th at 461.[16]

### iv.    The Complaint plausibly alleges that Palikaras obtained money or property by means of misstatements to sustain the Section 17(a)(2) claim.

Lastly, Palikaras asks to dismiss the Section 17(a)(2) claim because he contends that the Complaint does not adequately allege that he obtained money or property by means of any alleged misrepresentations. (Palikaras' Mot. at 35-36). Some courts have sustained Section 17(a)(2) liability where the defendant "indirectly" receives money or property. *See, e.g.*, *SEC v. Glantz*, No. 94-cv-5737, 1995 WL 562180, *5 (S.D.N.Y. Sept. 20, 1995) ("The plain language of the statute specifically imposes liability on all those who 'obtain money or property' through fraud,' not only

---

[16] *See also SEC v. Feng*, 2017 WL 6551107, *10 (C.D. Cal. Aug. 10, 2017) (concluding that when defendants failed to disclose their financial interest while promoting investments in regional center securities to their clients, their "omissions 'coincided' with a securities transaction," satisfying the "in connection with" requirement); *SEC v. Cammarata*, 2023 WL 5644689, *11 (E.D. PA Aug. 31, 2023) (applying flexible approach in finding in connection with satisfied); *SEC v. AgFeed Industries, Inc.*, 2016 WL 10934942, *16-*17 (M.D. Tenn. July 21, 2016) (same).

on those who 'profit' from such activity."); *SEC v. Stoker*, 865 F. Supp. 2d 457, 463 (S.D.N.Y. 2012). (concluding that "it is sufficient under Section 17(a)(2) for the SEC to allege that Stoker obtained money or property for his employer while acting as its agent, or, alternatively, for the SEC to allege that Stoker personally obtained money indirectly from the fraud.").[17]

Here, the Complaint alleges that Palikaras' misstatements "furthered Defendants' scheme to manipulate the market by artificially inflating the value of Torchlight's stock," which was then sold to investors at inflated prices, resulting in $137.5 million raised. (Compl. ¶¶ 6-8, 88). "These proceeds primarily benefitted" Meta II, the company for which Palikaras served as President, CEO, and a member of the board of directors. (*Id.* ¶¶ 8, 16). Some courts have found this sufficient to satisfy the money or property requirement where, as here, defendant used the misstatements and omissions in the course of his employment with the purpose of benefitting the company. *See SEC v. Delphi Corp.*, 2008 WL 4539519, *9, 20 (E.D. Mich. Oct. 8, 2008); *Stoker*, 865 F. Supp. 2d at 463; *but cf. Syron*, 934 F. Supp. 2d at 638-40).

In addition, it is more than plausible that the SEC will be able to prove at trial that Meta II paid Palikaras a salary and other compensation[18] from the $137.5 million in cash raised from the misstatements and omissions in furtherance of the fraudulent scheme, and thereby Palikaras obtained money or property by means of misstatements or omissions.[19] *See SEC v. Wolfson*, 539

---

[17] *But see SEC v. Syron,* 934 F. Supp. 2d 609, 638-40 (S.D.N.Y. 2013) (although noting that Section 17(a)(2) "clearly creates liability where a defendant 'indirectly' obtains money or property," concluding that defendant must "personally gains money or property from the fraud" to establish claim).

[18] Torchlight's Definitive Proxy Statement, cited in Palikaras' Motion (at 6 n.10), shows Palikaras received a salary in 2019 and 2020, a bonus in 2020, and stock options. Definitive Proxy at 78-80. He also held over 16% of Meta I's common stock as of May 5, 2021. *Id.* at 129-30. The Definitive Proxy Statement also noted that Palikaras would own 11.88% of Meta II's common stock after the merger. *Id.* at 131-32. It also noted that "the current management of Torchlight will resign and be replaced by George Palikaras as" CEO, among others, after the merger. *Id.* at 36.

[19] To the extent necessary, the SEC respectfully asks leave to add the following facts to the Complaint: (1) the ATM Offering proceeds constituted the substantial majority of Meta II's cash reserves after the merger ($137.5 million of $154.6 million or 89%), according to Meta II's Form 10-Q filed August 13, 2021; and (2) Meta II restated its 2021 Form 10-K in September 2023 to disclose a previously-undisclosed bonus awarded to Palikaras "of $300,000 based upon the successful completion of the reverse merger with Torchlight." Meta II Form 10-K/A filed September 6, 2023, https://www.sec.gov/ix?doc=/Archives/edgar/data/1431959/000095017023046757/mmat-20221231.htm.

F.3d 1249, 1264 (10th Cir. 2008) (consultants obtained money or property when they were paid for services preparing public filings); *SEC v. Tourre*, 2014 WL 61864, *4 (S.D.N.Y. 2014) (base salary earned during relevant period can be sufficient to support money and property requirement); *SEC v. Stoker*, 865 F. Supp. 2d 457, 464 (S.D.N.Y. 2012) (sufficient that defendant's increase in compensation was partly attributable to actions in furtherance of fraud).

## B.    The Complaint Properly Alleges That Defendants Engaged In A Fraudulent Scheme.

"Section 17(a)(1) and (3) of the Securities Act and Section 10(b) of the Securities Exchange Act and Rules 10b–5(a) and (c) thereunder create what courts have called 'scheme liability' for those who, with scienter, engage in deceitful conduct." *SEC v. Hwang*, 692 F. Supp. 3d 362, 378 (S.D.N.Y. 2023) (citation omitted). To state scheme liability, the SEC must allege the defendant, with the requisite state of mind: "(1) committed a deceptive or manipulative act; (2) in furtherance of the alleged scheme to defraud[.]" *SEC v. Verges*, 716 F. Supp. 3d 456, 467 (N.D. Tex. 2024).

### 1.    The Complaint adequately alleges that each Defendant engaged in deceptive or manipulative acts in furtherance of a fraudulent scheme.

A defendant's conduct is "deceptive" if it "has the purpose and effect of creating a false appearance." *Verges*, 716 F. Supp. 3d at 466. Manipulative conduct "refers generally to practices…that are intended to mislead investors by artificially affecting market activity," and "connotes intentional or willful conduct designed to deceive or defraud investors by controlling or artificially affecting the price of securities." *Set Cap.*, 996 F.3d at 76 (citing *Santa Fe Indus., Inc. v. Green*, 430 U.S. 462, 476 (1977); *Ernst & Ernst v. Hochfelder*, 425 U.S. 185, 199 (1976)).

Here, the Complaint plausibly alleges that each Defendant engaged in deceptive or manipulative acts in furtherance of a scheme to artificially inflate the price of Torchlight stock and sell Torchlight stock to investors at inflated prices. (Compl. ¶ 1). Brda conceived and began developing the scheme by at least June 2020 in response to Torchlight's deteriorating financial

26

condition and inability to fund its drilling expenses or sell its few remaining oil and gas assets. (*Id.* ¶¶ 20-25). In furtherance of the scheme, Brda conceived, designed, and implemented the Preferred Dividend to either trigger a "short squeeze in Torchlight's stock" or "lead investors to believe" a short squeeze would occur—the ultimate goal being to cause "an artificial and temporary increase in Torchlight's stock price." (*Id.* ¶¶ 29-34). In September 2020, Brda identified a suitable merger partner—i.e., Meta I and Palikaras—and negotiated a merger structure to include the Preferred Dividend and the ability to deploy the ATM Offering. (*Id.* ¶¶ 35-37).

Brda told Palikaras about his scheme at the outset of their discussions. (*Id.*) Between September 2020 and June 25, 2021, Defendants closely coordinated and carried out a campaign to market and promote "the Preferred Dividend in hopes of spreading th[e] short squeeze narrative" to certain—but not all—investors, while concealing that Defendants and Torchlight "were the source of the short squeeze narrative" and without revealing their overall scheme. (*Id.* ¶¶ 5, 35-66, 113, 119). Defendants' conduct pursuant to this deceptive or manipulative campaign included:

- Pursuant to his plan—which he proposed to Palikaras—to "[p]lay up the [preferred share] dividend to make sure the shorts understand their dilemma," Brda caused Torchlight to issue press releases in September and December 2020 emphasizing the Preferred Dividend over other aspects of the merger agreement. (*Id.* ¶¶ 52-54).

- When "the market did not appear to immediately react the way the Defendants intended" after Torchlight's press releases, Brda hired his trusted consultants "to spread the short squeeze narrative for Torchlight," and "instructed the consultants on how they should message the Preferred Dividend to investors" in order to ensure investors "understand the dividend properly." (*Id.* ¶¶ 55-57). Brda concealed his deceptive use of these consultants by causing Torchlight to keep inadequate books and records and to maintain inadequate accounting controls to hide from the public why Torchlight—a company unable to fund its operations—was paying these consultants $3,000 to $5,000 per month plus stock warrants. (*Id.* ¶ 58).

- Publicly, Defendants never disclosed the short squeeze or their plans to capitalize on a jump in Torchlight's stock price through the ATM Offering, or their belief that a temporary short squeeze was in effect as they sold shares directly to investors through the ATM Offering. (*Id.* ¶¶ 38-50, 97-107).

27

- However, Brda and Palikaras coordinated their messaging to ensure that the short squeeze narrative reached certain investors (e.g., institutional investors) who they hoped would acquire or hold sizeable positions in Torchlight through the Record Date. (*Id.* ¶¶ 59-61). At a March 17, 2021 conference, Brda told at least one investment firm that he expected the Preferred Dividend's impact on short sellers would "driv[e] our stock price…[at] closing." (*Id.* ¶ 60). During the Italian Investor Call, Palikaras privately told investors how the Preferred Dividend could cause "a potential jump towards the close" through a "short squeeze." (*Id.* ¶ 61).

- Brda and Palikaras also coordinated their social media messaging to foment excitement for the short squeeze among their retail-investor followers, without expressly acknowledging the squeeze. (*Id.* ¶¶ 62-66, 89-93). This is exemplified by Palikaras' shorts-in-flames tweet on June 13, 2021, to which his followers responded by cheering "Torch the shorts!" (*Id.* ¶¶ 64-65).

In furtherance of the scheme, Defendants also made material misrepresentations and omissions as discussed above. *See supra* section V.A.[20] These furthered the scheme by misleading "investors to acquire or hold Torchlight common stock through the Record Date to be eligible to receive the Preferred Dividend," thus keeping legacy shareholders from dumping their shares as the stock price increased in June 2021. (*Id.* ¶ 88). Brda also concealed his secret plans to spin off Torchlight's assets—thus misleading investors to believe the assets would be sold—by causing Torchlight, starting in January 2021, to secretly funnel $20,000 per month through an intermediary to the future management team of the Spin-Off Entity. (*Id.* ¶¶ 79-80, 139-40).

Exactly as Defendants planned, Torchlight's stock price artificially surged by over 200% during a ten-day period between June 14-24, 2021. (*Id.* ¶¶ 89-97). On June 16, 2021, Brda tried to leverage a formal agreement from Meta I's Board—who would assume a majority of seats on the Meta II Board—to use 20% of the proceeds from the ATM Offering to fund the drilling expenses of Torchlight's oil and gas assets. (*Id.* ¶¶ 99-100). Palikaras recommended the deal, and although Meta I's Board did not accept the proposal at that time, Meta II did later fund the drilling

---

[20] *See also SEC v. Rio Tinto plc*, 41 F.4th 47, 49 (2d Cir. 2022) ("misstatements and omissions can form *part* of a scheme liability claim") (emphasis in original).

expenses—consistent with Brda's original plan and scheme. (*Id.* ¶¶ 99-102). More importantly, Brda caused Torchlight to go forward with the ATM Offering as Defendants had discussed and planned while they knew Torchlight's stock price was at its artificially-inflated height. (*Id.* ¶¶ 103-04). The strategically timed ATM Offering conducted over a five-day period raised $137.5 million at an average price of $8.50 per share. (*Id.* ¶¶ 103-106). Thereafter, Torchlight's stock price fell dramatically. (*Id.* ¶ 107).

Defendants' conduct had "the purpose and effect of creating a false appearance" concerning Torchlight, the Preferred Dividend, and the ATM Offering, *Verges*, 716 F. Supp. 3d at 466, and was "designed to deceive or defraud investors by controlling or artificially affecting the price of securities." *Set Cap.*, 996 F.3d at 76 (citation omitted). Courts have found similar scheme liability claims actionable. *See, e.g.*, *Verges*, 716 F. Supp. 3d at 470 (Fitzwater, J.) (denying motion to dismiss scheme liability claim where defendants participated in a "pump-and-dump scheme by 'dumping' the artificially inflated penny stock at strategic times over a five-year period"); *Sharette v. Credit Suisse Int'l*, 127 F. Supp. 3d 60, 83 (S.D.N.Y. 2015) (finding plaintiff plausibly alleged scheme liability premised on "a coordinated scheme…to use short selling to manipulate the price of ECD stock, 'creat[ing] a false impression of how market participants value a security'") (quoting *ATSI Commc'ns, Inc. v. Shaar Fund, Ltd.*, 493 F.3d 87, 101 (2d Cir. 2007)).[21]

---

[21] *See also SEC v. Lorin*, 877 F. Supp. 192, 200 (S.D.N.Y. 1995) (defendants manipulated the market in violation of Rule 10b-5 by buying and selling shares of stock pursuant to an agreement to effect a short squeeze); *SEC v. Farmer*, No. 4:14-CV-2345, 2015 WL 5838867, at *15 (S.D. Tex. Oct. 7, 2015) (finding transactions were "deceptive" for scheme liability purposes because "they created an appearance of substance where substance was lacking"); *SEC v. Hopper*, No. 4:04-CV-1054, 2006 WL 778640, at *11 (S.D. Tex. Mar. 24, 2006) (concluding "the SEC has alleged facts from which it could be inferred" that defendant engaged in deceptive transactions that made "the companies appear to the investing public to be robust traders of energy when, in fact, they were not").

**2. Defendants' arguments do not defeat the well-pled allegations that they engaged in deceptive or manipulative acts in furtherance of the fraudulent scheme.**

In general, Defendants' line of attack is flawed in that they seek to break the scheme allegations into component parts and argue that each part, in isolation, was a lawful and legitimate corporate action, and therefore, not actionable. Courts have repeatedly rejected this approach. *See, e.g.*, *Hopper*, 2006 WL 778640, at *10-*11 ("The fact that individual round-trip trades may not have been [illegal]" when viewed in isolation "does not mean that the *series* of huge bogus trades did not violate the securities laws' proscription against schemes to defraud and practices that operate as a fraud or deceit upon any person."); *Verges*, 716 F. Supp. 3d 456, 467-70 (rejecting arguments that defendants merely engaged in lawful "convertible note investing," and concluding that defendants' trades "at strategic times over a five-year period" as part of their co-defendant's "pump-and-dump scheme were deceptive and manipulative").[22] As demonstrated above, the scheme allegations, when viewed holistically and in a light most favorable to the SEC, establish manipulative and deceptive conduct by each Defendant in furtherance of a carefully choreographed scheme to sell millions of Torchlight shares to investors at artificially inflated prices. Nonetheless, the SEC will address Defendants' various attacks on the different categories of deceptive or manipulative acts alleged in the Complaint below.

### i. *Defendants' "open market" and "fully disclosed" arguments fail.*

Defendants argue that any conduct relating to the Preferred Dividend and ATM Offering cannot support scheme liability because both transactions were supposedly visible to the market and fully disclosed. (Brda Mot. at 14-17, 18-20; Palik. Mot. at 27-32). Defendants rely heavily on

---

[22] *See also SEC v. Hui Feng*, 935 F.3d 721, 737 (9th Cir. 2019) ("[D]eceptive conduct that is not inherently unlawful may form the basis of a scheme to defraud." (quotation marks omitted)); *SEC v. Sugarman*, No. 19CV5998, 2020 WL 5819848, at *7 (S.D.N.Y. Sept. 30, 2020) (quoting *SEC v. Wey*, 246 F. Supp. 3d 894, 918 (S.D.N.Y. 2017)) ("[Defendant's] 'course of conduct may not have been inherently unlawful, but it was deceptive.'").

a non-binding case, *In re Overstock Sec. Litig.*, 119 F.4th 787 (10th Cir. 2024). But as shown below, *Overstock* is distinguishable, and Defendants wholly ignore cases, such as *Set Capital LLC v. Credit Suisse Grp. AG*, 996 F.3d 64 (2d Cir. 2021), where this "open market transaction" defense failed under similar circumstances as this case.

The only commonality between this case and *Overstock* is both cases had a dividend that could potentially cause a short squeeze. But unlike this case, the dividend in *Overstock* was not paired with *any* actionable misstatements or omissions[23] or *any* other deceptive or manipulative conduct. *See Overstock*, 119 F.4th at 793 (framing issue as "whether a [single] fully disclosed corporate transaction can be 'manipulative' under the Exchange Act"). By comparison, the Preferred Dividend in this case was closely coordinated with the ATM Offering, Defendants' deceptive marketing campaign, and their misstatements and omissions, which in combination amounted to a "device, scheme, or artifice to defraud" or a "course of business which operates or would operate as a fraud or deceit upon" investors. 15 U.S.C. §§ 77q(a); 17 C.F.R. § 240.10b-5. And unlike *Overstock*—where the dividend was never actually issued[24]—the Preferred Dividend and ATM Offering were successfully deployed to defraud Torchlight investors.

Moreover, in *Overstock*, there was no dispute that "[m]arket analysts…***immediately***" figured out, on their own, that the dividend could cause a short squeeze and reported the same to the market. 119 F.4th at 796 (emphasis added). Based on these "market analysts' descriptions of the dividend's potential impact," the Tenth Circuit concluded that "buyers and sellers possessed sufficient information to form judgments about how Overstock's dividend would impact Overstock's share price," and therefore, "Plaintiff fails to allege that Overstock 'deceiv[ed]

---

[23] *See Overstock*, 119 F.4th at 798-801 (concluding that district court properly dismissed misrepresentation claims, because plaintiffs "failed to plausibly allege reliance"—a necessary element for a *private* securities fraud claim).

[24] *See In re Overstock Sec. Litig.*, No. 2:19-CV-709-DAK-DAO, 2021 WL 4267920, at *4 (D. Utah Sept. 20, 2021) (hereafter "***Overstock II***").

investors as to how other market participants have valued a security.'" *Overstock*, 119 F.4th at 803 (quoting *Wilson v. Merrill Lynch & Co.*, 671 F.3d 120, 130 (2d Cir. 2011)) (bracket in original).

In contrast, the Complaint alleges that "the market did ***not*** appear to ***immediately*** react the way the Defendants intended" when the Preferred Dividend was announced. (Compl. ¶ 55) (emphasis added). Brda himself said as much, writing in September 2020, "I think people don't understand the dividend properly." (*Id.* ¶ 56). As a result, Brda hired consultants to spread the short squeeze narrative to investors, while taking steps to conceal their connection to Torchlight. (*Id.* ¶¶ 5, 55-61). Defendants also privately communicated the squeeze narrative to select investors, and deceptively signaled the squeeze to their followers on social media. (*Id.*) Meanwhile, the rest of the investing public was told by Brda, in Torchlight's public filings in March and May 2021, that "we have no reason to believe our shares would be the target of a short squeeze." (*Id.* ¶¶ 43-44). Thus, (i) some investors had notice of the potential squeeze by virtue of Defendants' deceptive marketing campaign, and (ii) other investors only knew that there was "no reason to believe [Torchlight] shares would be the target of a short squeeze." Both groups were deceived.

Specifically, (i) the former group of investors was misled to believe that the surge in Torchlight's stock price resulted from natural forces arising from the Preferred Dividend, rather than artificial interest driven by a narrative that Defendants deceptively concocted and spread. And (ii) the latter group was misled to believe that natural forces were driving the surge in Torchlight's stock price, rather than an undisclosed scheme to cause a short squeeze or lead some investors to believe a squeeze would occur. Both groups—(i) and (ii)—were further misled because Defendants failed to disclose that they secretly discussed and planned to dump shares into the market via the ATM Offering in coordination with the Preferred Dividend. Accordingly, it is plausible that Defendants "'deceiv[ed] investors as to how other market participants have valued

a security.'" *Overstock*, 119 F.4th at 803 (quoting *Wilson*, 671 F.3d at 130); *see also Sharette*, 127 F. Supp. 3d 60, 83 (S.D.N.Y. 2015) (finding plaintiff plausibly alleged deceptive acts involving "a coordinated scheme…to use short selling to manipulate the price of ECD stock, 'creat[ing] a false impression of how market participants value a security'") (quoting *ATSI*, 493 F.3d at 101).

Ignoring these well-pled allegations, Defendants argue that "the market immediately recognized the effect the Dividend might have on short sellers," as evidenced by social media posts and YouTube videos in March and April 2021. (Palik. Mot. at 27 & 7 n. 11, 12; Brda Mot. at 16). But in addition to being improper to consider at the pleading stage,[25] these posts and videos do not show immediate or widespread market recognition, like the market analyst reports in *Overstock* issued "*[w]ithin hours of [] announcement*" of the dividend. *Overstock II*, 2021 WL 4267920, at *3 (emphasis added). Instead, these posts and videos were published *six or seven months* after the Preferred Dividend was announced in September 2020, and after months of Defendants' coordinated efforts to deceptively spread the short squeeze narrative to certain investors. Also, unlike in *Overstock*, these posts do not reveal all material components of the undisclosed scheme, including Defendants' undisclosed plans to use an ATM Offering to dump shares at inflated prices.

This case is more similar to *Set Capital*, where the Second Circuit held that the complaint alleged "manipulative conduct that is actionable under Section 10(b)" despite defendants' arguments that the conduct involved fully-disclosed transactions. 996 F.3d at 77. There, defendants allegedly "manipulated the market by issuing millions of additional XIV Notes knowing or recklessly disregarding the virtual certainty that their own hedging activity would trigger a liquidity squeeze in VIX futures contracts, destroy the value of XIV Notes, and allow [defendants] to accelerate and redeem the notes at a substantial loss to investors while locking in a profit for

---

[25] *See supra* section IV (Objection to Certain Sources Outside the Complaint).

[their] own account." *Id.* Based on "three prior volatility spikes," defendants knew "the impact of [their] hedging trades" and "used this knowledge as part of an ***undisclosed scheme*** to profit at their investors' expense." *Id.* (emphasis added).[26] "In this context," the court held, "it is no defense that [defendants'] transactions were visible to the market and reflected otherwise legal activity." *Id.*

Like in *Set Capital*, the Complaint plausibly alleges an "***undisclosed scheme***" to sell Torchlight stock at artificially inflated prices. That the Preferred Dividend and ATM Offering were visible to the market does not excuse Defendants' undisclosed scheme.

Defendants also highlight Torchlight's disclosure on May 28, 2021, which they claim disclosed Torchlight "might" conduct the ATM Offering. (Brda Mot. at 19). But that disclosure was merely a generic shelf registration statement that registered "an indeterminate amount of" stock "not to exceed" an aggregate price of $250 million.[27] It did not specifically disclose the ATM Offering or suggest an offering was planned. Torchlight waited to announce the ATM Offering until the shareholder vote occurred, announcing results of the proxy at the same time it announced the sales agreement for the ATM Offering on June 16. *See* (Brda Mot. at 11 n.30).

In addition to being generic and disconnected from the price surge, Torchlight's shelf registration statement was, at best, a misleading half-truth. Defendants knew and discussed—from the outset of merger discussions in September 2020—that "when the shorts get squeezed," they would use "an At-The-Market (ATM) Offering…to raise the capital." (Compl. ¶¶ 7-8, 35-36). Thus, Torchlight's disclosure that it "might" sell shares in the future was materially false and misleading and does not foreclose any claims. *See Set Cap.*, 996 F.3d at 85–86 (defendants' risk disclosures to investors were materially misleading because they merely warned that their

---

[26] *See also Overstock*, 119 F.4th at 803-04 (distinguishing *Set Capital*, because it alleged "an undisclosed scheme" that created an element of "secrecy" that was not alleged in the *Overstock* complaint).
[27] *See* Torchlight Form S-3, filed May 28, 2021, *available* at sec.gov/Archives/edgar/data/1431959/000119983521000349/form-s3.htm.

"hedging activity '*could*' or '*may*' impact prices of XIV Notes [and] affirmed that [they] had 'no reason to believe' that it would," but in fact, defendants "knew with virtual certainty that, upon the next volatility spike, their hedging activity would significantly depress the value of XIV Notes") (emphasis added); *In re Jan. 2021 Short Squeeze Trading Litig.*, 620 F. Supp. 3d 1231, 1265 (S.D. Fla. 2022) (rejecting defendant's argument that its "conduct was openly and accurately disclosed" and concluding that defendant's "selective disclosures allegedly misled investors, the market, and Plaintiffs, and thus, they constitute manipulative conduct under section 10(b) and rule 10b-5").

### ii. *Defendants' promotional efforts were deceptive or manipulative.*

Defendants also argue that their "commentaries," tweets, and private communications with investors relating to the short squeeze were not manipulative, deceptive, or otherwise actionable. (Brda Mot. at 17-18; Palik. Mot. at 13-20, 28-31). These arguments fail for several reasons.

*First*, as discussed above, each Defendant engaged in deceptive or manipulative acts in furtherance of a campaign to market and promote "the Preferred Dividend in hopes of spreading th[e] short squeeze narrative" to certain investors, while concealing that Defendants and Torchlight "were the source of the short squeeze narrative" and without disclosing the overall scheme. (Compl. ¶¶ 5, 35-66, 89-93, 113, 119); *see supra* section V.B.1. Torchlight's stock price surged by over 200% on the heels of Defendants' deceptive promotional campaign. (*Id.* ¶¶ 1, 92-95). Defendants' efforts to market and promote the Preferred Dividend to achieve this artificial surge in Torchlight's stock price were deceptive and manipulative. *See, e.g.*, *SEC v. Farmer*, No. 4:14-CV-2345, 2015 WL 5838867, at *15 (S.D. Tex. Oct. 7, 2015) ("[T]he 'market awareness'

campaign that Defendant coordinated and funded—which disseminated false information about Chimera's business endeavors—constitutes a deceptive practice supporting scheme liability.").[28]

*Second*, Defendants' deceptive marketing campaign also included misstatements and omissions. For example, on March 17, 2021, Brda privately told a group of investors that one thing "driving [Torchlight's] stock price…before closing" would be the Preferred Dividend forcing short sellers to exit their short positions. (Compl. ¶¶ 44, 60). Yet, the very next day, on March 18, 2021, he falsely represented to the investing public in Torchlight's 2020 Form 10-K—which was incorporated into Torchlight's proxy statement seeking shareholder approval of the merger plan— that "we have no reason to believe our shares would be the target of a short squeeze." (*Id.* ¶¶ 43-44). Brda and Palikaras also omitted material information—such as their expressly-stated plans to "use the Preferred Dividend to manipulate the price of Torchlight stock" and to "deploy the ATM Offering" in coordination with the Preferred Dividend—that rendered their respective statements about the Preferred Dividend and its purported purpose misleading. (*Id.* ¶¶ 38-50); *see also supra* section V.A.1 (discussing each Defendant's material misrepresentations and omissions).

*Third*, Palikaras' arguments (Palik. Mot. at 14-17) that he merely repeated information that the market already knew, or that his tweets were not material or misleading, should be rejected for the reasons discussed above. *See supra* section V.A (discussing Palikaras' material omissions); *supra* sections IV and V.B.2.i. (addressing sources purportedly showing what the market knew).

Moreover, before Palikaras sent his shorts-in-flames tweet, the investors on social media who knew about the unverified partial recording of the Italian Investor Call—which had been posted by an anonymous user on social media in early June 2021—could only speculate about the

---

[28] *See also DeFrancesco*, 699 F. Supp. 3d at 242 (finding genuine issue of material fact as to whether defendants engaged in deceptive acts by "assisting with the fraudulent promotional articles that caused [company's] stock price to artificially skyrocket"); *SEC v. Curshen*, 888 F. Supp. 2d 1299, 1308 (S.D. Fla. 2012) (defendant "orchestrated the false media campaign" to "artificially inflate" stock price for scheme liability).

veracity of the recording, the possibility of a short squeeze, and how that speculation squared with Torchlight's conflicting public statement that "we have no reason to believe our shares would be the target of a short squeeze." (Compl. ¶¶ 43-44, 47-50, 63). Aware of this speculation and discourse, Palikaras sent his shorts-in-flames tweet to his social media followers, who perceived the tweet as a rallying cry and confirmation from a corporate insider that a short squeeze was on. (*Id.* ¶¶ 64-66, 86). In reality, Palikaras knew that Torchlight/Brda were planning an ATM Offering if the stock price did jump. (*Id.* ¶¶ 47-50, 63). And once the price began to surge, he knew it would fall soon thereafter. (*Id.* ¶¶ 104 ("We have <u>two days</u> to take advantage…") (emphasis omitted, underline added)). He never disclosed these material facts to investors, and his indirect promotion of the short squeeze avoided revealing Defendants' scheme to the investing public. (*Id.*) Thus, Palikaras' tweets were manipulative, deceptive, and materially misleading. *See, e.g.*, *Bed Bath & Beyond*, 687 F. Supp. 3d at 11-12 ("moon-emoji tweet" misleading when defendant had "soured on Bed Bath"); *SEC v. Stoker*, 865 F. Supp. 457, 468 (S.D.N.Y. 2012) (finding the SEC stated a plausible Section 17(a)(3) claim based on allegations that defendant, among other things, "actively encouraged particular investors to invest in the Fund…, even though he knew that Citigroup had chosen assets for the Fund that it believed were likely to perform poorly").

*Lastly*, as discussed,[29] Defendants' deceptive marketing—in combination with the Preferred Dividend and ATM Offering—also "deceiv[ed] investors as to how other market participants have valued a security."[30] *ATSI*, 493 F.3d at 100. Defendants' arguments to the contrary fail.

---

[29] *See supra* sections V.B.1 and V.B.2.i.

[30] Brda also claims that the allegations concerning "the March 2021 conference" violate Rule 9(b). (Brda Mot. at 18). But in compliance with Rule 9(b), see *Benchmark Elecs.*, 343 F.3d at 724, the Complaint specifies "who" (Brda), "when" (March 17, 2021), "where" (virtual investor conference), and "what"/"how" (Brda told "one investment firm the potential for the Preferred Dividend to cause a short squeeze," which he "intended to drive interest with these investors…, without publicly disclosing their plan or belief that a short squeeze would occur"). (Compl. ¶ 60).

### iii.    Brda's "legitimate purpose" defense and "intent only" arguments fail.

Brda separately argues that the SEC's "intent-only" theory cannot support scheme liability, particularly given his supposed "legitimate purposes" for the transactions. (Brda Mot. at 20-23). But Brda's self-serving "legitimate purpose" defense fails both legally and factually. Legally, there is no "categorical rule that open-market manipulation is actionable only when there is no legitimate economic purpose for the open-market transaction." *CFTC v. Gorman*, 587 F. Supp. 3d 24, 43 (S.D.N.Y. 2022) (citing *Set Cap.*, 996 F.3d at 77; *ATSI*, 493 F.3d at 101). At best, Brda's "legitimate purpose" defense creates a fact issue for a jury. *See Set Cap.*, 996 F.3d at 77-78 ("To the extent [defendant] claims it hedged for a legitimate purpose, its position contradicts the complaint," which plausibly alleged "a manipulative purpose").[31]

Factually, Brda's self-serving representations to investors "that the Preferred Dividend was intended to protect the interests of Torchlight legacy shareholders" are undermined by his undisclosed plans to conduct "the ATM Offering…in coordination with the Preferred Dividend…[, which] would actually dilute those legacy shareholders' interests by injecting new, off-the-shelf shares into the market" mere days before the merger. (Compl. ¶ 42); *see also* (*id.* ¶ 99 (Brda admitting in June 2021 that the ATM Offering "only dilutes our oil and gas assets further")). Moreover, the Complaint plausibly alleges a deceptive or manipulative purpose behind the Preferred Dividend—namely, Brda "believed, and intended to lead investors to believe, that the Preferred Dividend would trigger a short squeeze in Torchlight stock, thus causing an artificial and temporary increase in Torchlight's stock price." (*Id.* ¶ 29).[32] And ultimately, the Preferred

---

[31] *See also SEC v. Gallagher*, No. 21-CV-8739 (PKC), 2023 WL 6276688, at *15-*16 (S.D.N.Y. Sept. 26, 2023) (rejecting argument that trades were done for "a legitimate economic reason" and finding the allegations "sufficient, at this stage, to allege with particularity that [defendant] acted with manipulative intent"); *United States v. Phillips*, No. 22-CR-138 (LJL), 2024 WL 1300269, at *21 (S.D.N.Y. Mar. 27, 2024) (concluding a reasonable jury could find that the defendant placed trades with the intent to manipulate the market, and that jury could reject the defendant's "competing explanation of those trades—namely, that he traded as part of a [legitimate, non-manipulative] strategy").
[32] *See also infra* discussion under section V.C concerning allegations supporting Brda's scienter.

Dividend served no legitimate purpose. No efforts were ever made to sell Torchlight's assets and thereby deliver value to legacy shareholders. Instead, the Preferred Dividend served to hold legacy shareholders—who Defendants misled about the value of the oil and gas assets and the likelihood of a distribution—hostage, as Torchlight's stock price surged leading up to the merger. These legacy shareholders, thus, missed out on what Brda believed was the best window to sell—i.e., the "best way to get maximum money and at the best price." (*Id.* ¶ 99 (quoting Brda's June 16 email)).

Further, the Complaint ***does not*** allege an "intent only" manipulation theory. It alleges a successful scheme to manipulate (i.e., artificially inflate) Torchlight's stock price and sell stock at inflated prices. Indeed, Torchlight's stock price surged by over 200% during a ten-day period that aligned precisely with Brda's plans, and at the height of the manipulation, Brda deployed an ATM Offering, selling millions of shares at inflated prices that raised $137.5 million. (Compl. ¶¶ 1-8).

Moreover, the cases Brda cites are not applicable. For example, the Complaint does not allege that Brda merely failed to disclose his "impure motives for entering the allegedly improper transaction." *Kademian v. Ladish Co.*, 792 F.2d 614, 622 (7th Cir. 1986) (citation omitted); *see also Virginia Bankshares, Inc. v. Sandberg*, 501 U.S. 1083, 1096 (1991) (rejecting Section 14(a) "liability on mere disbelief or undisclosed motive without any demonstration that the proxy statement was false or misleading"). Rather, it plausibly alleges a *scheme* and plans that Brda expressly discussed with Palikaras, but never publicly disclosed. (Compl. ¶¶ 35-46); *see Set Cap.*, 996 F.3d at 77 (finding plaintiff plausibly alleged scheme liability based on "an undisclosed scheme"). It also plausibly alleges deceptive or manipulative acts that "creat[ed] a false impression of how market participants value a security," *ATSI*, 493 F.3d at 101, and misleading half-truths about Brda's plans to conduct an ATM Offering in coordination with the Preferred Dividend. *See supra* sections V.A and V.B.2.i; *Wilson*, 671 F.3d at 130 ("[T]he law is well settled that so-called

39

'halftruths'—literally true statements that create a materially misleading impression—will support claims for securities fraud."). Brda also failed to disclose material information about his plans to use the Preferred Dividend and ATM Offering to defraud investors, which rendered his public statements about the transactions misleading. *See supra* section V.A; *Brown*, 661 F.2d at 66–67 (finding complaint alleged Rule 10b-5 claim based on allegations that defendants misrepresented the "purpose" of an agreement and omitted the reason "they sought the agreement").[33]

### iv. *The Complaint alleges deceptive or manipulative conduct by Palikaras separate and apart from his misstatements and omissions.*

Palikaras argues that the Complaint does not allege actionable conduct by him beyond alleged misrepresentations and omissions. (Palikaras' Mot. at 24-27). In support, he relies on *SEC v. Narayan*, where the court stated that "a scheme liability claim must be based on conduct beyond misrepresentations or omissions." No. 3:16-CV-1417-M, 2017 WL 4652063, at *4 (N.D. Tex. Aug. 28, 2017) (citation omitted). The court dismissed the scheme liability claims against the defendants, finding the complaint failed to allege "actionable activity [by defendants] outside of the context of [their co-defendant's] misrepresentations and omissions." *Id.* *10.

Palikaras fails to mention that *Narayan* was decided before *Lorenzo v. SEC*, where the Supreme Court held that "someone who is not a 'maker' of a misstatement under *Janus* can nevertheless be found to have violated the other subsections of Rule 10b–5 and related provisions of the securities laws, when the only conduct involved concerns a misstatement." 587 U.S. 71, 77 (2019) (concluding that someone who disseminates another's misstatement with intent to defraud can be liable under Rule 10b-5(a) and (c)). Regardless, the Complaint alleges that Palikaras'

---

[33] *See also United States v. Eisenberg*, No. 23-CR-10 (AS), 2023 WL 8720295, at *5 (S.D.N.Y. Dec. 18, 2023) (finding the "terms" of transactions that artificially inflated defendant's stock "were not fully disclosed," because defendant "did not disclose," among other things, "his goal was to inflate the price of [the stock], or [that] he had no intent to repay the cryptocurrency he withdrew while the price of [the stock] was artificially inflated"); *United States v. Regan*, 937 F.2d 823, 829 (2d Cir. 1991) ("Failure to disclose that market prices are being artificially depressed operates as a deceit on the market place and is an omission of a material fact.").

deceptive or manipulative acts were done in furtherance of a scheme to manipulate Torchlight's stock price, which distinguishes this case from *Narayan*. *See* 2017 WL 4652063, at *10 ("There are no allegations that [defendants'] actions were done to affect TTR's stock price, such as scheme to manipulate stock prices….").

Moreover, the Complaint plausibly alleges actionable conduct by Palikaras separate from misstatements or omissions. For example, it alleges that he worked to secure Meta I's approval of the merger structure with the Preferred Dividend, despite knowing that it was part of a scheme designed to manipulate and defraud investors. (Compl. ¶¶ 35-37). He also attempted to secure Meta I's agreement to use part of the proceeds from the ATM Offering to fund the drilling expenses of Torchlight's assets, despite knowing the ATM would be "[d]ilutive to Torchlight" shareholders and that they would be "tak[ing] advantage of" a price that was believed to be inflated by "short covering effect." (*Id.* ¶ 101). Although Meta I allegedly did not accept such agreement before the merger, Palikaras was President, CEO, and a Meta II board member when "Meta II entered into an agreement post-merger to fund the drilling for the oil and gas assets…." (*Id.* ¶¶ 16, 102).

In addition, Palikaras worked closely with Brda to carry out their deceptive marketing campaign. (*Id.* ¶¶ 51-66, 90-93, 104-05). He closely coordinated with Brda where, when, and to whom they talked about the short squeeze. (*Id.*) Together, they attended private investor meetings and selected the investors—particularly those who they believed held or may take a sizeable position in Torchlight—to whom they privately communicated the short squeeze narrative. (*Id.* ¶¶ 59-61). They privately discussed and coordinated when and how to discretely promote the short squeeze to their retail-investor followers on social media. (*Id.* ¶¶ 62-66, 90-93, 104-05). And Palikaras strategically timed and crafted his tweets to deceptively promote the short squeeze and manipulate retail investors following the Torchlight coverage on social media. (*Id.*) Although his

deceptive or manipulative marketing and promotional efforts included misstatements and omissions, his conduct—the planning, timing, and coordination of those efforts—constitute deceptive or manipulative acts separate from his misstatements or omissions. *See, e.g.*, *Bed Bath & Beyond*, 687 F. Supp. 3d at 18 (finding plaintiff alleged "a course of conduct that includes more than just misrepresentations or omissions," including defendant's "delayed filing [of] two SEC forms 'to stimulate demand," and defendant "slow-walked his Form 144 and then filed it in a way 'designed to ensure that its release would be delayed'"); *Verges*, 716 F. Supp. 3d at 470 (finding defendants' actions taken "at strategic times" in order "to propel [their co-defendant's] pump-and-dump scheme" were deceptive/manipulative and distinct from any misstatements or omissions).[34]

## C.    The Complaint Adequately Pleads Each Defendant's Scienter.

Scienter is not required under Sections 17(a)(2) and 17(a)(3), which only require negligence. *SEC v. Moss*, No. 4:20-CV-972-SDJ, 2022 WL 757226, at *5 (E.D. Tex. Mar. 11, 2022) (Jordan, J.). But as to the other claims, "[i]n the Fifth Circuit, scienter is established by showing that a defendant acted intentionally or with severe recklessness." *Silea*, 2022 WL 269105, at *11 (Jordan, J.). This may be established by factual allegations that "either (1) show a defendant's motive to commit securities fraud or (2) identify circumstances that indicate conscious behavior on the part of the defendant." *Verges*, 716 F. Supp. 3d at 471 (citation omitted).

Here, the Complaint more than plausibly alleges circumstances indicating each Defendant's conscious behavior. Brda conceived the scheme in response to Torchlight's deteriorating financial condition, and intentionally sought out a merger partner that fit his scheme. (Compl. ¶¶ 20-27). From the outset of Brda and Palikaras' discussions in September 2020, Brda

---

[34] *See also SEC v. Brown*, 878 F. Supp. 2d 109, 117 (D.D.C. 2012) (steps to conceal individual's status as a *de facto* officer went beyond misrepresentations and omissions); *SEC v. ITT Educ. Servs., Inc.*, 303 F. Supp. 3d 746, 765–66 (S.D. Ind. 2018) (finding evidence of, among other things, defendant "misleading" auditors amounted to conduct "separate and apart from misstatements and omissions in ITT's public filings and analyst calls").

stated his plan to "raise enough money when the shorts get squeezed to eliminate all [Torchlight's] debt," and to use "an At-The-Market (ATM) Offering…to raise the capital." (*Id.* ¶ 36). Several communications detailed in the Complaint show that both Defendants knew and intended that the Preferred Dividend would cause, or lead investors to believe it would cause, a short squeeze and resulting surge in Torchlight's stock price. (*Id.* ¶¶ 32, 33, 36, 43-44, 57, 60, 63, 99, 101, 104, 105). Defendants' communications further show their knowledge and intent to use the ATM Offering to raise funds when Torchlight's stock price was inflated, while also acknowledging that doing so would harm or dilute legacy shareholders' interests. (*Id.* ¶¶ 36, 99, 101, 104-05). Brda knowingly concealed the scheme from the public, misrepresenting in public filings that management did not believe a short squeeze would occur and taking steps to conceal his deceptive use of consultants to spread the short squeeze narrative. (*Id.* ¶¶ 44-45, 55-58). Palikaras also knowingly failed to disclose the scheme, acknowledging internally his concern that the merger would "blow up" if the scheme became public. (*Id.* ¶¶ 47-50); *see also* (*id.* ¶ 63).

For Palikaras, the "proceeds" raised from the scheme/ATM Offering "primarily benefitted" Meta II, "which appointed Palikaras as CEO."[35] (*Id.* ¶¶ 8, 100-01). And Brda was motivated to inflate Torchlight's stock price—which was trading below $1.00—and to raise funds at inflated prices to pay drilling costs and his compensation, neither of which Torchlight could afford. (*Id.* ¶¶ 20-25, 102, 111). Indeed, the funds raised were used, in part, to pay drilling expenses that Torchlight lacked the capital to pay. (*Id.* ¶ 102). Brda received a "$1.5 million bonus [after the merger] as a result of the funds he raised through [his] scheme," which Torchlight "would not have [had] sufficient funds to pay…but for the proceeds" raised through Brda's misconduct. (*Id.* ¶ 111).

---

[35] *See also supra* discussion under section V.A.3.iv (discussing money or property that Palikaras received).

Brda argues that the Complaint's scienter allegations supporting the misrepresentation claims against him do "not make a whole lot of sense," because they supposedly "hing[e] on [the] assertion that Torchlight, through Mr. Brda, never really wanted to sell the O&G Assets." (Brda Mot. at 25). But the theory is not that Brda never *wanted* to sell the assets, but that he knew or was severely reckless in not knowing "that a sale of Torchlight's oil and gas assets within six months of the merger closing was not possible." (Compl. ¶ 76). And in support of this theory, the Complaint alleges that Brda, as CEO of Torchlight, knew: "that Torchlight had unsuccessfully tried to sell its largest oil and gas asset for years," that "only a small number of companies were possible candidates to purchase Torchlight's assets," that the company had no discussions with such candidates in 2020 or 2021, and that "it would take at least a year, if not longer, simply to complete the due diligence that a specialized buyer would undertake before completing a sale of Torchlight's assets." (*Id.* ¶¶ 75-77). Brda also developed plans for "a spin-off of Torchlight's oil and gas assets into a new entity *as early as December 2020*,"[36] "caused Torchlight to begin secretly paying $20,000 a month to individuals who would form the initial management team of the Spin-Off Entity," took steps to conceal his plans, and, mere weeks after the merger closed, "sent the post-merger Meta II Board a fully-formed plan to abandon all of its so-called 'efforts' to sell the assets, and instead, to spin off the assets into the Spin-Off Entity." (*Id.* ¶¶ 78-80). He also tried to leverage a last-minute agreement from Meta I to use proceeds from the ATM Offering to fund drilling expenses for the assets after the merger, which further shows his knowledge that the assets

---

[36] Brda argues that these allegations are "vague" and "fail to satisfy the heightened pleading standard of fraud." (Brda Mot. at 26). However, "[m]alice, intent, knowledge, and other conditions of a person's mind may be alleged generally." FED. R. CIV. P. 9(b). Moreover, the allegations satisfy Rule 9(b), because they detail the "who" (Brda), "what" (created plans to spin off Torchlight's assets), "when" (in December 2020), "where" (in presentations sent to Torchlight's Chairman and other insiders), and "how" (it further shows Brda made his misrepresentations and omissions with scienter). (Compl. ¶ 78); *Benchmark Elecs.*, 343 F.3d at 724 (Rule 9(b) is satisfied by pleading the who, what, when, where, and how of the alleged fraud).

would be spun out and not sold. (*Id.* ¶¶ 99-102). In sum, the Complaint sufficiently alleges each Defendant's scienter in violating Section 17(a)(1), Section 10(b), and Rule 10b-5 thereunder.

**D.    The Complaint Adequately Pleads Brda's Negligence.[37]**

For its Sections 17(a)(2) and 17(a)(3) claims, the SEC "need only prove the defendant acted with negligence." *Sethi*, 910 F.3d at 206 (citation omitted). In this context, "negligence is the degree of care that an ordinarily careful person would use under the same or similar circumstances." *SEC v. Mueller*, No. SA-21-CV-00785-XR, 2024 WL 400897, at *19 (W.D. Tex. Jan. 11, 2024) (citing *SEC v. Shanahan*, 646 F.3d 536, 545 (8th Cir. 2011)). "[I]n securities fraud cases, negligence is typically a jury determination on an objective standard." *Id.* (citing *SEC v. Fitzgerald*, 135 F. Supp. 2d 992, 1020 (N.D. Cal. 2001); *SEC v. Cole*, No. 12–cv–8167 (RJS). 2015 WL 5737275, at *6 (S.D.N.Y. Sept. 19, 2015)).

Brda argues that "the SEC fails to identify any negligence-based theory." (Brda Mot. at 34). But the Complaint need only allege facts from which the Court can reasonably infer that Brda failed to act as a reasonably prudent person would under the same circumstances. *See SEC v. Goldsworthy*, 2008 WL 8901272, at *12 (D. Mass. June 11, 2008) ("[T]he SEC was not required to present evidence of an alternative standard of care [other than a reasonably prudent person] in order to support its claim of negligence"). And the same factual allegations discussed above showing that Brda acted with scienter also plausibly establish that he acted, at minimum, negligently. *See Mueller*, 2024 WL 400897, at *19 (finding genuine disputes of material fact regarding defendant's negligence based on "the same evidence offered in support of [] scienter"). Indeed, it is plausible that Brda—as CEO of Torchlight—acted negligently, because a reasonably

---

[37] This section responds to Brda's arguments challenging negligence as to the Complaint's claims under Sections 17(a)(2) and 17(a)(3). (Brda Mot. at 26-27, 33-34). Because Palikaras does not challenge the element of negligence for these claims, only Brda's negligence is discussed.

prudent person in his position would not sign public filings that contain Brda's misstatements and omissions or engage in deceptive conduct in furtherance of a scheme to defraud investors. *See, e.g.*, *SEC v. Blackburn*, 156 F. Supp. 3d 778, 794 (E.D. La. 2015) (finding the SEC plausibly alleged that a corporate officer "was at least negligent in signing" public filings that contained material omissions, because he "owed a fiduciary duty to the company and the shareholders to ensure that [the company's] SEC filings that he signed were complete and accurate").

**E.    The Complaint Adequately Pleads Proxy Fraud Claims Against Defendants.**

The Complaint's third claim alleges that Defendants violated Section 14(a) of the Exchange Act and Rule 14a-9 thereunder through (1) Brda's misstatements and omissions in Torchlight's proxy statements, and (2) Palikaras' misstatements and omissions during the Italian Investor Call. (Compl. ¶¶ 124-129). Defendants argue that the Complaint fails to allege an "essential link" between their misstatements and a loss-generating corporate action. (Brda's Mot. at 34, 36;[38] Palikaras' Mot. at 37-39).[39]

But neither Section 14(a) nor Rule 14a-9 require an "essential link" to prove a violation thereunder. *See* 15 U.S.C. § 78n(a); 17 CFR § 240.14a-9. Instead, this element derives from *private* securities actions, in which courts require the plaintiff to show a "*causal relationship* between the violation and *the injury for which he seeks redress*" by proving "that the proxy solicitation…was an essential link in the accomplishment of the transaction." *Mills v. Elec. Auto-Lite Co.*, 396 U.S. 375, 385 (1970) (emphasis added).[40] However, "the SEC, unlike private litigants, need not prove

---

[38] Brda also challenges the negligence element for the Section 14(a) claim, (Brda Mot. at 35), which fails for the reasons discussed *supra* under section V.D. His other arguments mirror his arguments attacking the scheme liability and misrepresentation claims (*id.*), which should be rejected for the reasons discussed *supra* under section V.B.2.

[39] Palikaras also restates his "materiality" arguments, which should be rejected for reasons discussed above under section V.A.3. He also appears to assert a "maker" defense under *Janus* (Palik. Mot. at 39), but he cites no law imposing a "maker" requirement under Section 14(a), which—unlike Rule 10b-5(b)—does not reference "maker." *See* 15 U.S.C. § 78n(a). Regardless, this "maker" argument fails for reasons discussed *supra* under section V.A.3.ii.

[40] Courts have explained that *Mills* is now "best understood as defining the test for transaction causation,…often called reliance," in PSLRA cases. *Karp v. First Connecticut Bancorp, Inc.*, 69 F.4th 223, 235 (4th Cir. 2023).

the elements of reliance, proximate causation, or harm" in securities enforcement actions. *Couch*,
2014 WL 7404127, at *7 (discussing claims under Rule 10b-5 and Section 17(a)).[41] That rule is
consistent with the SEC's statutory authority to bring enforcement actions "[w]henever it shall
appear…that any person is engaged or *is about to engage* in acts or practices constituting a
violation of any provision of [the Exchange Act or] the rules or regulations thereunder .…" 15
U.S.C. § 78u(d) (emphasis added). Thus, the SEC need not plead an "essential link" or causation
for its Section 14(a) claim. *See SEC v. Joseph Schlitz Brewing Co.*, 452 F. Supp. 824, 832 (E.D.
Wis. 1978) (rejecting argument that SEC must "allege a causal connection" to state a claim under
Section 14(a), as that "would emasculate the Commission's powers under [15 U.S.C. § 78u(d)] to
enjoin violations before they occur or reoccur"); *SEC v. Das*, No. 8:10CV102, 2010 WL 4615336,
at *9 n.7 (D. Neb. Nov. 4, 2010) (refusing to require the SEC to allege that "the proxy caused an
injury to plaintiffs" to state a claim for violations under Rule 14a-9 and Section 14(a)).[42]

Regardless, the Complaint plausibly alleges an essential link for its proxy fraud claims.
The Complaint plausibly alleges that Brda's misstatements and omissions in Torchlight's proxy
statements were made in furtherance of the scheme that defrauded and harmed investors. (Compl.
¶¶ 34, 39-46, 67-81, 107, 125, 127). Likewise, Palikaras' misstatements during the Italian Investor
Call—the "stated purposes" of which "were to: (a) solicit the Italian shareholders' proxy votes…,
and (b) encourage the investors to hold the common stock of the post-merger company"—
furthered the fraudulent scheme that harmed investors. (*Id.* ¶¶ 82-88, 107, 126-27). Moreover, the

---

[41] *See also Life Partners Holdings*, 854 F.3d at 779; *Blavin*, 760 F.2d at 711; *Geman v. SEC*, 334 F.3d 1183, 1191
(10th Cir. 2003) (an SEC "enforcement action…is much different from a common law action for damages").
[42] *But see SEC v. Mercury Interactive, LLC*, No. C 07-2822 JF (RS), 2009 WL 2984769, at *4 (N.D. Cal. Sept. 15,
2009) (finding SEC did not state a Section 14(a) claim, among other reasons, because it did not adequately plead
"essential link"—but without discussing whether "essential link" is required in SEC enforcement actions).

proxy statements containing Brda's misstatements, and Palikaras' misstatements during the Italian Investor Call, solicited investors' proxy votes in favor of authorizing the merger and Preferred Dividend, which furthered the fraudulent scheme. (*Id.* ¶¶ 34, 38-46, 67-88, 125-27); *see also Mills*, 396 U.S. at 385 (test requires "the proxy solicitation itself, rather than the particular defect in the solicitation materials, was an essential link in the accomplishment of the transaction").

**F.    The Complaint Adequately Pleads Aiding And Abetting Claims Against Brda.**

The Complaint's fourth claim alleges that Brda aided and abetted Meta II's violations of Section 13(a) of the Exchange Act and Rules 12b-20 and 13a-11 thereunder by virtue of his false statements and omissions in Torchlight's periodic public filings (i.e., Torchlight's press releases attached to its Forms 8-K) regarding its "commercially reasonable efforts" to timely sell its oil and gas assets. (Compl. ¶¶ 130-36). Brda argues this claim "fails for the reasons set forth above," (Brda Mot. at 36), which should be rejected for the reasons discussed above under section V.A.2.

The Complaint's fifth claim alleges that Brda aided and abetted Meta II's violations of Sections 13(b)(2)(A) and 13(b)(2)(B) of the Exchange Act by virtue of Brda's efforts to conceal his use of "stock support consultants" and plans to spin off Torchlight's assets in furtherance of the fraudulent scheme. (Compl. ¶¶ 137-43). Brda argues that this claim should be dismissed because the Complaint fails to allege that Torchlight violated the books-and-records or internal controls provisions. (Brda Mot. at 37-39). These arguments should be rejected.

The Complaint plausibly alleges that Torchlight failed to "make and keep books, records, and accounts, which, in reasonable detail, accurately and fairly reflect the transactions and dispositions of [its] assets." 15 U.S.C. § 78m(b)(2)(A). Torchlight failed to make or keep records that accurately or fairly reflected the basis for its payments of $20,000 per month with no invoices or contract to an intermediary who received "consulting fees" for doing no actual work, and that the intermediary funneled those payments to individuals who later formed the management team

of the Spin-Off Entity that Brda secretly planned before the merger. (Compl. ¶¶ 78-80, 138-40). Also, "Brda caused Torchlight to keep no records documenting why Torchlight paid the stock-support consultants $3,000 to $5,000 per month plus stock warrants." (*Id.* ¶ 58). Instead, Brda caused Torchlight to enter into "generic contracts obligating the consultants to 'introduce' the company to potential investors," (*id.*), which did not "accurately" or "fairly" reflect the true nature of these corporate transactions. 15 U.S.C. § 78m(b)(2)(A).

Brda also caused Torchlight to fail to "devise and maintain a system of internal accounting controls sufficient to provide reasonable assurances that" transactions were fairly and accurately recorded in Torchlight's books and records. 15 U.S.C. § 78m(b)(2)(B). Indeed, "[d]uring the SEC's investigation, Meta II [as successor to Torchlight] failed to provide documents or information to the SEC staff describing Torchlight's internal accounting controls related to payments to consultants." (Compl. ¶ 139). Thus, Torchlight either had *no* "such internal accounting controls" or its controls were "insufficiently devised or maintained to account properly for Torchlight's disposition of assets or recognition of expenses." (*Id.*)

These allegations plausibly show that Meta II (as successor to Torchlight) violated its books-and-records and internal-controls obligations. *See, e.g.*, *SEC v. Jackson*, 908 F. Supp. 2d 834, 864 (S.D. Tex. 2012) (finding the SEC plausibly alleged defendants aided and abetted books and records and internal control violations); *SEC v. Medallion Fin. Corp.*, No. 21-CV-11125 (LAK), 2024 WL 4227753, at *20 (S.D.N.Y. Sept. 18, 2024) (finding the SEC "adequately pleads that Medallion Financial's internal controls were deficient" based on allegations of "inadequate controls to ensure the consistency and accuracy of its valuation techniques and disclosures").

**G.**    **Brda's Request To Strike Remedies From The Complaint Is Meritless.**

Brda asks to strike the disgorgement and officer/director bar remedies from the Complaint. (Brda Mot. at 39-40). This request should be rejected as a matter of law. *See, e.g.*, *SEC v. Church-*

*Koegel*, No. CV 20-8480 FMO (JCX), 2021 WL 6104157, at *2 (C.D. Cal. Sept. 29, 2021) ("At the pleading stage, it is premature to determine whether the specific forms of disgorgement sought by the SEC are prohibited as a matter of law.") (citing *SEC v. Levin*, 232 F.R.D. 619, 625 (C.D. Cal. 2005); *SEC v. Caledonian Bank Ltd.*, 145 F.Supp.3d 290, 310 (S.D.N.Y. 2015)).

Moreover, "motions to strike are disfavored and infrequently granted," and Brda has failed to show that the remedies he asks to strike "have no possible relation to the controversy and may cause prejudice" if not struck. *Shintech Inc. v. Olin Corp.*, 723 F. Supp. 3d 546, 558 (S.D. Tex. 2024) (citing *Am. S. Ins. Co. v. Buckley*, 748 F. Supp. 2d 610, 626 (E.D. Tex. 2010)). Both remedies are authorized for the claims alleged. *See* 15 U.S.C. §§ 77t(e), 77u(d)(2), 78u(d)(7). And the SEC has plausibly alleged grounds to (1) disgorge, at minimum, Brda's $1.5 million bonus, and (2) find him unfit to serve as an officer or director of a public company. (Compl. ¶¶ 1-8, 106-111).

### H.    <u>Alternative Request for Leave to Amend the Complaint.</u>

Out of an abundance of caution, should the Court conclude that the SEC has insufficiently pleaded any facts or claim for relief challenged by the Motions, the SEC expressly and respectfully requests leave to amend the Complaint. *See* FED. R. CIV. P. 15; *Foman v. Davis*, 371 U.S. 178, 182 (1962); *Oliver Sch., Inc. v. Foley*, 930 F.2d 248, 253 (2d Cir. 1991).

## VI.    <u>CONCLUSION</u>

For the reasons set forth above, the SEC respectfully requests that the Court deny Defendants' Motions to Dismiss the Complaint in their entirety.

Dated:  February 28, 2025                    Respectfully submitted,

                                             /s/ *Patrick Disbennett*_____
                                             Patrick Disbennett (*pro hac vice*)
                                             Christopher Rogers (*pro hac vice*)
                                             Securities and Exchange Commission
                                             801 Cherry Street, Suite 1900
                                             Fort Worth, Texas 76102
                                             Tel: 817-978-3821
                                             disbennettpa@sec.gov
                                             rogerschri@sec.gov

                                             *ATTORNEYS FOR PLAINTIFF*


**<u>CERTIFICATE OF SERVICE</u>**

I certify that on February 28, 2025, I caused the foregoing document to be electronically filed with the Clerk of the U.S. District Court for the Eastern District of Texas, Sherman Division, by using the CM/ECF system which will send a notice of electronic filing to all CM/ECF participants.


                                             /s/ *Patrick Disbennett*
                                             Patrick Disbennett